IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| IN RE: | HEALTH DIAGNOSTIC LABORATORY, INC., *et al.*, | Case No. 15-32919 |
| | | Chapter 11 |
| | | (Jointly Administered) |
| | Debtors. | |

_____

RICHARD ARROWSMITH, as Liquidating
Trustee of the HDL Liquidating Trust,

        Plaintiff,

v.

                                            AP No. 16-03271

LATONYA S. MALLORY, *et al.*,

        Defendants.

_____

## MEMORANDUM OPINION

Before the Court is the *Motion to Approve Settlement Agreement*, ECF No. 601 (the "Motion") filed on May 10, 2018, by Richard Arrowsmith, in his capacity as the Liquidating Trustee of the HDL Liquidating Trust (the "Liquidating Trustee"), seeking approval of a settlement agreement (the "Settlement Agreement") between the HDL Liquidating Trust and LaTonya S. Mallory ("Mallory")[1] under Federal Rule of Bankruptcy Procedure 9019 (the "Bankruptcy Rules").[2]  Through the Motion, the Liquidating Trustee seeks to resolve claims

_____

[1] The Settlement also includes claims by and against Scott Mallory, the resolution of which are not at issue.

[2] Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in [Bankruptcy] Rule 2002 and to any other entity as the court may direct."  Fed. R. Bankr. P. 9019(a).

asserted on behalf of the HDL Liquidating Trust against Mallory in connection with Mallory's

conduct as a former board member and chief executive officer ("CEO") of Debtor Health

Diagnostic Laboratory, Inc. ("HDL").  On May 21, 2018, the United States filed an *Objection to*

*Motion to Approve Settlement Agreement with LaTonya Mallory*, ECF No. 608.  On May 23,

2018, the United States filed a *Supplement to the United States' Objection to Motion to Approve*

*Settlement Agreement with LaTonya Mallory*, ECF No. 609 (together with the *Objection to*

*Motion to Approve Settlement Agreement with LaTonya Mallory*, the "Objection").[3]    An

evidentiary hearing was conducted on May 24, 2018 (the "Hearing").  At the Hearing, the Court

overruled the Objection.  The Court found the terms of the Settlement Agreement to be fair and

equitable and granted the Motion.  This Memorandum Opinion sets forth the Court's findings of

fact and conclusions of law in support of its decision in accordance with Bankruptcy Rule 7052.[4]

## PROCEDURAL HISTORY

HDL provided lab testing of biomarkers for the indication of risk for cardiovascular

disease, diabetes, and other illnesses.  Mallory was a co-founder of HDL and owned 8.9048% of

HDL's stock as of June 7, 2015 (the "Petition Date").  She served as CEO of HDL from its

formation in 2008 through September 2014 and as chairman of the HDL board of directors

("Board") from 2008 through the end of 2014.  HDL was a privately held health care company

headquartered in Richmond, Virginia, that operated an accredited, full-service clinical

laboratory.  Physicians would send blood samples to HDL, HDL would process the lab tests, and

---

[3] Two other parties-in-interest, G. Russell Warnick and National Union Fire Insurance Company of Pittsburgh, also filed responses to the Motion and Settlement Agreement but did not object to the Settlement Agreement.  *See G. Russell Warnick's Reservation of Rts.*, ECF No. 606; *Nat'l Union Fire Ins. Co. of Pitt., Pa.'s Resp. to Mot. to Approve Settlement Agreement*, ECF No. 607.

[4] This is a contested matter under Bankruptcy Rules 9013 and 9014.  Certain rules under part VII of the Bankruptcy Rules are applicable to contested matters, including Bankruptcy Rule 7052.  *See* Fed. R. Bankr. P. 9014(c). Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

then HDL would bill the patient's private insurance carrier or a federal health care program such as Medicare or Medicaid.  Afterwards, HDL would reimburse the referring physicians for the costs associated with collecting, processing, and handling the blood samples that the physicians had sent to HDL for testing.

In 2013, the United States Department of Justice ("DOJ") and United States Department of Health and Human Services' Office of Inspector General ("HHS OIG") began investigating HDL and their outside sales team, BlueWave Healthcare Consultants, Inc. ("BlueWave"), in connection with HDL's business practices, including its payment of process and handling fees ("P&H Fees") to the referring physicians (the "DOJ Investigation").

In April 2015, HDL signed a settlement agreement with DOJ (the "DOJ Settlement"), as well as a separate corporate integrity agreement with HHS OIG.  In the DOJ Settlement, HDL agreed to pay $47,000,000 to settle all the government's claims against it in connection with the P&H Fees.  During this time, HDL's relationship with its prepetition secured lender, Branch Banking and Trust Company ("BB&T"), was deteriorating.  When HDL defaulted under its loan facilities with BB&T, BB&T discontinued HDL's borrowing ability and cut off HDL's access to its existing accounts.  With no ability to access its cash and with no alternative sources of financing immediately available, HDL resorted to Chapter 11 bankruptcy.

On the Petition Date, Health Diagnostic Laboratory, Inc., Central Medical Laboratory, LLC, and Integrated Health Leaders, LLC (collectively the "Debtors") commenced bankruptcy cases (collectively the "Bankruptcy Case") by each filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court").[5]

---

[5] The Court entered an order on June 9, 2015, authorizing the joint administration of the Debtors' bankruptcy cases. The Debtors were permitted to operate the business of HDL as debtors in possession pursuant to sections 1107 and

On September 17, 2015, the Court entered a sale order (the "Sale Order"), which authorized the sale of substantially all of the Debtors' assets to True Health Diagnostics, LLC ("True Health") under the terms of an Asset Purchase Agreement.[6]  On September 29, 2015, True Health acquired substantially all of the Debtors' operating assets.  On May 12, 2016, the Court entered an order (the "Confirmation Order"),[7] which confirmed the Debtors' Modified Second Amended Plan of Liquidation (the "Plan").[8]  The HDL Liquidating Trust ("Liquidating Trust") was formed pursuant the terms of the Plan on the Effective Date.[9]

On September 16, 2016, the Liquidating Trustee commenced this adversary proceeding ("Adversary Proceeding" or "D&O Action") by filing a complaint (the "D&O Complaint") against over 100 different defendants including HDL's former officers and directors, BlueWave, and BlueWave salespersons (referred to collectively with BlueWave as "BlueWave Defendants").  After this Court denied in part, and granted in part, several motions to dismiss the D&O Complaint, the Liquidating Trustee filed an amended complaint ("Amended D&O Complaint") against dozens of defendants including Mallory.[10]  In the Amended D&O

---

1108 of the Bankruptcy Code.  No trustee was ever appointed under section 1104 of the Bankruptcy Code.  On June 16, 2015, the United States Trustee for the Eastern District of Virginia appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") in accordance with section 1102 of the Bankruptcy Code.

[6] *See* Order (I) Approving Asset Purchase Agreement & Authorizing the Sale of Assets of the Debtors Outside the Ordinary Course of Bus., (II) Authorizing the Sale of Assets Free & Clear of All Liens, Claims, Encumbrances & Interests, (III) Authorizing the Assumption & Sale & Assignment of Certain Executory Cont. & Unexpired Leases & (IV) Granting Related Relief, *In re Health Diagnostic Lab., Inc.*, No. 15-32919 (Bankr. E.D. Va. Sept. 17, 2015), ECF No. 512.

[7] *See* Order Confirming Debtors' Plan of Liquidation Under Chapter 11 of Bankruptcy Code, *In re Health Diagnostic Lab., Inc.*, No. 15-32919 (Bankr. E.D. Va. May 12, 2016), ECF No. 1095.

[8] *See* Modified Second Am. Plan of Liquidation Proposed by the Debtors, *In re Health Diagnostic Lab., Inc.*, No. 15-32919 (Bankr. E.D. Va. Mar. 25, 2016), ECF No. 995.

[9] The Plan became effective on May 12, 2016 (the "Effective Date").  *See* Notice of Confirmation of Chapter 11 Plan at 1, *In re Health Diagnostic Lab., Inc.*, No. 15-32919 (Bankr. E.D. Va. May 14, 2016), ECF No. 1106.

[10] *See* First Am. Compl., ECF No. 375.

Complaint, the Liquidating Trustee seeks, among other things, to recover transfers made by HDL under theories of avoidance, recharacterization, breach of statutory fiduciary duty, unlawful distributions, corporate waste, conspiracy, negligence, gross negligence, assumpsit, unjust enrichment, fraud, tortious interference with contracts, and claim objections.[11]

This Court implemented a streamlined judicial mediation process to facilitate the efficient resolution of the D&O Action. On June 12, 2017, U.S. District Court Judge Henry E. Hudson referred the D&O Action to United States Magistrate Judge David J. Novak for mediation and empowered him with full authority to settle the Adversary Proceeding, subject "only to Rule 9019 of the Federal Rules of Bankruptcy Procedure."[12] To date, the judicial mediation process has been extremely successful due to the apparent willingness of the litigants to engage in meaningful, good faith negotiations before Judge Novak.

On February 2, 2018, the Court entered a separate order (the "Order Directing Judicial Settlement Conference") requiring the Liquidating Trustee, Mallory, and LeClairRyan P.C. ("LeClairRyan") to participate in a renewed settlement conference before Judge Novak in order to revive stalled mediation proceedings involving those parties in the D&O Action.[13] The Order Directing Judicial Settlement Conference aimed at resolving various claims asserted by and against Mallory in multiple courts on a global scale.[14] Mallory and the Liquidating Trustee had

---

[11] *See id.*

[12] *See* Order, ECF No. 315 ("Order Directing Judicial Mediation").

[13] *See* Order Directing Judicial Settlement Conference, ECF No. 522.

[14] In addition to the D&O Action, an interpleader action ("Interpleader Action" or Adversary Proceeding No. 17-03029), a tax action ("Tax Action" or Adversary Proceeding No. 17-04300), and claims objection litigation were pending in this Court. Mallory recently filed a lawsuit against LeClairRyan in state court for alleged malpractice relating to advices she claimed had been given to her by LeClairRyan while she was CEO of HDL (the "LeClairRyan Litigation"). Had the Liquidating Trustee ultimately prevailed in the D&O Action against Mallory, the Liquidating Trustee may have been able to recover any judgment against an award, if any, obtained by Mallory in the LeClairRyan Litigation; however, Mallory's claim in the LeClairRyan Litigation is not an avoidance action under the Bankruptcy Code.

participated in several mediation sessions with Judge Novak during the course of the previous year.  The United States participated in some of those mediations sessions, but declined to take part in the settlement conference conducted by Judge Novak that successfully resulted in the Settlement Agreement now before the Court.

Among other terms, the Settlement Agreement provides that the Liquidating Trustee will release the claims of the Liquidating Trust against Mallory in exchange for Mallory's cooperation in other litigation.  Mallory will become jointly and severally liable to the Liquidating Trustee along with Scott Mallory in the amount of $10,000,000 (the "Settlement Amount"), plus certain additional consideration recited in the Settlement Agreement including a provision allowing for the satisfaction of Mallory's personal liability.[15]

During the Bankruptcy Case, the United States became involved in a False Claims Act ("FCA") case in the United States District Court for the District of South Carolina (the South Carolina District Court").   On August 7, 2015, the United States filed a Complaint in Intervention in a consolidated whistleblower suit against several defendants including HDL, BlueWave, Floyd Calhoun Dent, III, Robert Bradford Johnson, and Mallory (the "Qui Tam Action").[16]  The injunction provision included in the confirmed Plan provided a carve-out ("Carve-Out") for the United States to continue its pursuit of its FCA claims in the Qui Tam Action outside of this Bankruptcy Case.[17]  The jury in the Qui Tam Action found, inter alia,

---

[15] *See* Mot. Ex. 1.

[16] *See* Compl. in Intervention, *United States v. BlueWave Healthcare Consultants, Inc.* (*Qui Tam Action*), No. 14-00230 (D.S.C. Aug. 7, 2015), ECF No. 75.

[17] The Carve-Out set forth in section 7.4(b) of the Plan states:

> *provided, however*, that except as provided in Section 7.5 of the Plan nothing contained herein shall enjoin or release any non-Debtors, including any D&O, from any liability to the United States, including but not limited to, any liabilities arising under the Internal Revenue Code, any environmental laws, subchapter III of chapter 37 of title 31 of the United States Code, or any

HDL guilty of violating the FCA on 35,074 instances.[18]  A day before the Hearing on this Motion in the Bankruptcy Case, the South Carolina District Court entered a final judgment order in favor of the United States against Mallory in the amount of $111,109,655.30 ("Judgment").[19]

Accordingly, on the day of the Hearing, the United States had a final judgment against Mallory from the Qui Tam Action subject only to appeal, and the Liquidating Trustee had a signed Settlement Agreement with Mallory subject only to Court approval pursuant to Bankruptcy Rule 9019.  The United States objected to the Motion and Settlement Agreement in an apparent attempt to forestall the Liquidating Trustee's ability to satisfy the estate's litigation claim against Mallory.  The United States objected to the Motion and Settlement Agreement on two grounds: (1) the terms of the Settlement Agreement were allegedly inequitable and unfair to the United States and not in the best interest of the bankruptcy estate because the payments required by the settlement would violate section 3713 of Title 31 of the United States Code (hereinafter, the "Federal Priority Statute"), and potentially subject the HDL Liquidating Trust and others to liability; and (2) the Liquidating Trustee was not entitled to reserve his rights under Paragraph 7 of the Settlement Agreement to challenge the amount of any distribution due to the United States on its Allowed Class 3 Claim[20] ("United States' Allowed Claim") because the

---

criminal laws, nor shall anything in this Plan or the Confirmation Order enjoin the United States from pursuing or bringing any such claim, suit, action or other proceeding against the non-Debtors, or enjoin any non-Debtors from defending or resolving such claim, suit, action or other proceeding; *provided, further*, that nothing herein shall constitute a waiver of any rights or defenses of such Persons with respect to such actions.

Plan, *supra* note 8, ¶ 7.4(b) (emphasis in original).  The Carve-Out did not grant the United States leave to interfere with the implementation of the Plan.

[18] *See* Verdict Form, *Qui Tam Action* (Jan. 31, 2018), ECF No. 870.

[19] *See* Final Judgment, *Qui Tam Action* (May 23, 2018), ECF No. 910.

[20] By order entered May 9, 2017, the Court approved an agreement between the Liquidating Trustee and the United States to allow proof of claim 1335 filed by the United States in this Bankruptcy Case as a general unsecured claim in the amount of $40,644,852.50.

Liquidating Trustee had released any right to challenge the United States' Allowed Claim.[21]  At the Hearing, the Liquidating Trustee and counsel for Mallory presented arguments in favor of the Motion and Settlement Agreement, and the Liquidating Trustee presented supporting testimonial and documentary evidence.  The United States vehemently opposed the Motion and Settlement Agreement, but did not offer any evidence.

## JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).[22]  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1408.

## DISCUSSION

Compromise and settlements are "'a normal part of the process of reorganization.'"

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,

---

[21] The Court will dispose of the second argument advanced by the Objection, as the Liquidating Trustee is merely reserving whatever rights he may possess.  The Settlement Agreement does not expand the rights of the Liquidating Trustee.  The Court will address the merits of any dispute concerning payment of the United States' Allowed Claim if and when it actually arises.

[22] Additionally, the confirmed Plan in this Bankruptcy Case provides that this Court retains jurisdiction "[t]o protect property of the Estates, including Litigation Claims, from claims against, or interference with, such property . . . ." Plan, *supra* note 8, ¶ 11.1(c).  For the reasons stated *infra*, the Settlement Agreement Assets (defined hereinafter) are property of the Estates.  The Plan also provides for the retention of jurisdiction

> [t]o issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Court in the Case on or before the Effective Date with respect to any Entity.

*Id.* ¶ 11.1(c).  The terms of the confirmed Plan in the Bankruptcy Case and the Order Directing Judicial Mediation in the Adversary Proceeding require Court approval of the Settlement Agreement under Bankruptcy Rule 9019.  The disposition of the Motion will directly affect distribution under, and therefore implementation and execution of, the confirmed Plan.

424 (1968) (quoting *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).  The decision

whether to approve a compromise under Bankruptcy Rule 9019 is committed to the sound

discretion of the Court.  *Shaia v. Three Rivers Wood, Inc.* (*In re Three Rivers Woods, Inc.*), Adv.

Pro. No. 99-03020-DOT, 2001 WL 720620, at *5 (Bankr. E.D. Va. Mar. 20, 2001).

Pursuant to the terms of the Plan confirmed in the Bankruptcy Case and the Order

Directing Judicial Mediation entered in this Adversary Proceeding, the Liquidating Trustee is

empowered to settle the Litigation Claims[23] identified in the Plan with Court approval in

accordance with Bankruptcy Rule 9019.  *See* Fed. R. Bankr. P. 9019; Order Directing Judicial

Mediation, *supra* note 12.  Approval requires the Court to find that the proposed Settlement

Agreement is "fair and equitable."  *See TMT Trailer Ferry*, 390 U.S. at 424.  Settlements are

generally evaluated by comparing "the terms of the compromise with the likely rewards of

litigation."  *Id.* at 424-25.  Courts look to four factors in deciding whether to approve a

settlement or compromise:  "(i) the probability of success in litigation; (ii) the potential

difficulties in any collection; (iii) the complexity of the litigation and the expense,

inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the

creditors."  *See In re Alpha Nat. Res. Inc.*, 544 B.R. 848, 857 (Bankr. E.D. Va. 2016) (citing *In

re Frye*, 216 B.R. 166, 174 (E.D. Va. 1997)).  Although courts will not approve settlement

agreements that are "illegal, a product of collusion, or against the public interest," *United States

v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) (quoting *United States v. Colorado*, 937

F.2d 505, 509 (10th Cir. 1991)), a settlement agreement can be approved so long as it does not

---

[23] The Litigation Claims were clearly identified in Exhibit A to the confirmed Plan and included, among other things, the causes of action alleged in the Amended D&O Complaint against the former officers and directors of HDL and BlueWave Defendants under Chapter 5 of the Code as well as claims against subsequent transferees of avoidable fraudulent transfers under section 550 of the Code (the "Litigation Claims").  *See* Confirmation Order, *supra* note 7, Ex A.

"fall 'below the lowest point in the range of reasonableness,'" *see In re Alpha Nat. Res. Inc.*, 544

B.R. at 857 (quoting *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995)).

The crux of the United States' argument is that the Settlement Agreement is not fair and

equitable because it would require Mallory to violate the Federal Priority Statute. For any one of

three separate reasons, the Court will overrule the Objection advanced by the United States.

First, the terms of the Plan confirmed in this Bankruptcy Case are binding upon the United

States. Second, the text embodied within the Federal Priority Statute renders it inapplicable to

bankruptcy cases. And third, the terms of the Settlement Agreement itself do not serve to disrupt

the priority the statute would otherwise mandate, if it did apply.

The United States was an active participant in this Bankruptcy Case. The Plan confirmed

by the Court specifically binds "all present and former Holders of Claims and Interests, and their

respective successors and assigns, including, but not limited to, the Liquidating Trust and the

Liquidating Trustee."[24] The United States holds an allowed general unsecured "Class 3 Claim"

as defined in the Plan.[25] The Plan confirmed in this Bankruptcy Case was the carefully-crafted

product of intense negotiation that occurred over many months among multiple constituencies.

The Plan enjoyed the overwhelming support of the unsecured creditors. The United States did

not file an objection to the Plan or appeal the Confirmation Order.

As provided by the confirmed Plan, section 1123 of the Bankruptcy Code, and the trust

agreement executed to implement the Plan, the HDL Liquidating Trust is the successor of the

Debtors and the Creditors' Committee.[26] The Litigation Claims, and any proceeds thereof, were

---

[24] Plan, *supra* note 8, ¶ 7.1.

[25] *See id.* ¶ 3.3.

[26] Section 6.5(c)(12) of the Plan grants the Liquidating Trustee the power and charges the Liquidating Trustee with the duty of pursuing claims of the Debtors, the estates, and the Creditors' Committee defined in section 1.76 of the Plan. *See* Confirmation Order, *supra* note 7, at 81–82.

assigned to and remain property of the Liquidating Trust. The confirmed Plan empowers the Liquidating Trustee to "prosecute and/or settle" the Litigation Claims.[27] The actions asserted by the Liquidating Trustee against Mallory in the Amended D&O Complaint are clearly defined as "Litigation Claims."[28] The Litigation Claims, and any proceeds thereof,[29] were "property of the estate" under section 541 of the Bankruptcy Code and they maintain that character as property of the Liquidating Trust under the confirmed Plan. *See Logan v. JKV Real Estate Servs.* (*In re Bogdan*), 414 F.3d 507, 512 (4th Cir. 2005) (quoting *Polis v. Getaways, Inc.* (*In re Polis*) 217 F.3d 899 (7th Cir. 2000)).

The United States negotiated for language to be inserted into the Plan that permitted the United States to continue its pursuit of its FCA claims in the Qui Tam Action outside of this Bankruptcy Case.[30] It did not contest the rights granted to and the duties imposed on the Liquidating Trustee under the Plan to pursue and to distribute the proceeds of the Litigation Claims on behalf of all creditors of the bankruptcy estate.[31] The United States did not assert that the Federal Priority Statute would somehow trump the provisions of the Plan. To the contrary,

---

[27] Plan, *supra* note 8, ¶ 6.5(c)(12).

[28] *See id.* Ex. A.

[29] Section 551 of the Bankruptcy Code provides that "[a]ny transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, or any lien void under section 506(d) of the Bankruptcy Code, is preserved for the benefit of the estate . . . ." 11 U.S.C. § 551. Section 541(a)(4) of the Bankruptcy Code makes clear that "any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551" of the Bankruptcy Code is considered property of the estate. 11 U.S.C. § 541(a)(4).

[30] *See supra* note 17 and accompanying text.

[31] The Plan provided for the transfer of the assets of the bankruptcy estates to the HDL Liquidating Trust. An essential element of the Plan was the preservation and transfer of the "Litigation Claims," which belonged to the bankruptcy estate, to the Liquidating Trust. *See* Plan, *supra* note 8, ¶ 6.11. The primary tenet of the Plan was that the Liquidating Trustee would pursue the Litigation Claims on behalf of all creditors and that the proceeds realized therefrom would be distributed in accordance with the priority scheme set forth in the Plan. The Confirmation Order enjoined all creditors holding allowed claims, including the United States, from interfering with that process. The Carve-Out negotiated by the United States in the Plan pertaining to its right to pursue the Qui Tam Action did not limit the Liquidating Trustee's rights or duties under the Plan.

section 7.8 of the Plan preserved the injunction under section 362 of the Bankruptcy Code for the benefit of the Liquidating Trust.[32]  The Confirmation Order, and Plan incorporated therein, binds the United States as a final, non-appealable order.  *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269 (2010) (holding that a bankruptcy court's confirmation order is considered a final judgment).[33]

By settling the Litigation Claim against Mallory in this Adversary Proceeding, the Liquidating Trustee is fulfilling one of the fundamental duties imposed on him by the Plan.  The United States cannot belatedly invoke the Federal Priority Statute to prohibit the Liquidating Trustee from liquidating the Litigation Claims and otherwise distributing the proceeds as provided by the express terms of the confirmed Plan.  Any such objection should have been advanced at the confirmation hearing.  In the absence of such an objection and particularly in light of its prior active participation as the holder of an allowed Class Three Claim, the United States, as a claimholder, is bound by the terms of the Plan.

Next, the Objection finds no support in the statutory text.  The Federal Priority Statute plainly states that it is inapplicable to the case at bar.  *See* 31 U.S.C. § 3713(a)(2).  Any recovery the Liquidating Trustee might realize under the Settlement Agreement will inure to benefit of all creditors of the bankruptcy estate in accordance with the statutory priority scheme created by Congress in the Bankruptcy Code.  The United States will receive its share of the recovery of the Litigation Claims pursuant to the provisions of the Plan confirmed under section 1129 of the Bankruptcy Code.  While the Objection seeks to disproportionally re-prioritize that distribution

---

[32] *See* Plan, *supra* note 8, ¶ 7.8.  The United States was never granted stay relief under section 362(a) of the Bankruptcy Code permitting it to assert custody or control over property of the bankruptcy estate.  *See* Confirmation Order, *supra* note 7, ¶ 63.  Any interference with the Liquidating Trustee's ability to collect property of the estate (including the Litigation Claims) and distribute the proceeds thereof as provided in the confirmed Plan would constitute a violation of the injunction set forth in section 362 of the Bankruptcy Code.

[33] *See* Confirmation Order, *supra* note 7.

in favor of the United States, Congress has made clear that the Federal Priority Statute cannot be invoked for that purpose.

Subsection (a) of the Federal Priority Statute provides:

> (a)(1) A claim of the United States Government shall be paid first when—
>> (A) a person indebted to the Government is insolvent and—
>>> (i) the debtor without enough property to pay all debts makes a voluntary assignment of property;
>>> (ii) property of the debtor, if absent, is attached; or
>>> (iii) an act of bankruptcy is committed; or
>> (B) the estate of a deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor.
> (2) *This subsection does not apply to a case under title 11.*

31 U.S.C. § 3713 (emphasis added). The exception contained in subsection (a)(2) of the Federal Priority Statute states simply, without any ambiguity that the subsection does not apply to a bankruptcy case. *Id.* § 3713(a)(2). "[W]here, as here, the statute's language is plain, 'the sole function of the court is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). "[U]nless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language . . . ." *Hillman v. IRS*, 263 F.3d 338, 342 (4th Cir. 2001). The plain language of 31 U.S.C. § 3713(a)(2) precludes the government from invoking the Federal Priority Statute in a case under title 11 of the U.S. Code. *See Norwest Bank-Jamestown v. Ostlund Chem. Co.* (*In re Glinz*), 46 B.R. 266, 276 (Bankr. D.N.D. 1984) ("The plain language of section 3713(a)(2) . . . prohibits application of the section in all cases before the bankruptcy court."). This Adversary Proceeding is "a case under title 11." *See* Fed. R. Bankr. P. 7001; *see also Blevins Elec., Inc. v. First Am. Nat'l Bank* (*In re Blevins Elec., Inc.*), 185 B.R. 250, 253-57

(Bankr. E.D. Tenn. 1995).   The Federal Priority Statute does not apply to any settlement agreement that may be approved by the Court in this Adversary Proceeding.[34]

While it is unnecessary to delve into the legislative history behind the Federal Priority Statute because the plain meaning of the statute prevails, the history nevertheless reveals that Congress included the bankruptcy exception in the 1978 amendments to the Federal Priority Statute in order to create a "coherent bankruptcy policy, eliminate[ ] special priorities found in other laws and bring[ ] all priorities into the bankruptcy code itself."  *See* H.R. Rep. No. 95-595, at 252 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6242.   The U.S. Supreme Court succinctly addressed the interplay between bankruptcy law and the Federal Priority Statute in *United States v. Estate of Romani*, 523 U.S. 517, 531 (1998).  Justice Stevens explained:

> The bankruptcy law provides an additional context in which another federal statute was given effect despite the priority statute's literal, unconditional text.   The early federal bankruptcy statutes had accorded to "'all debts due to the United States, and all taxes and assessments under the laws thereof'" a preference that was "coextensive" with that established by the priority statute.   As such, the priority Act and the bankruptcy laws "were to be regarded as *in pari materia*, and both were unqualified; . . . as neither contained any qualification, none could be interpolated."   The Bankruptcy Act of 1898, however, subordinated the priority of the Federal Government's claims (except for taxes due) to certain other kinds of debts.   This Court resolved the tension between the new bankruptcy provisions and the priority statute by applying the former and thus treating the Government like any other general creditor.

---

[34] The case at bar illustrates why Congress created the broad bankruptcy exception to the Federal Priority Statute and did not limit the application of that exception to debtors only, as the Government advocates.  The United States maintains that its priority status applies to Government claims of all types regardless of whether the claims have been liquidated or reduced to judgment.  All that is necessary is for the claim to have been determined by "an appropriate official of the Federal Government to be owed to the United States by a person, organization, or entity other than another Federal agency."  31 U.S.C. § 3701(b)(1).  If the Federal Priority Statute were to apply to this Bankruptcy Case, every Litigation Claim the Liquidating Trustee is pursuing on behalf of the Liquidating Trust could be subordinated to the United States' Allowed Claim.  The payment priorities established in the confirmed Plan would thereby be rendered superfluous.

*Id.* at 531 (quoting *Guar. Title & Tr. Co. v. Title Guar. & Surety Co.*, 224 U.S. 152, 158–60 (1912); *Davis v. Pringle*, 268 U.S. 315, 317–19 (1925)). "Congress amended the priority statute in 1978 to make it expressly inapplicable to Title 11 bankruptcy cases." *Id.* at 531 n.15 (citing Pub. L. 95–598, § 322(b), 92 Stat. 2679 (codified at 31 U.S.C. § 3713(a)(2))). Nothing in the legislative history would permit the Court to stray from the plain language of 31 U.S.C. § 3713(a)(2). *See NLT Comput. Servs. Corp. v. Capital Comput. Sys. Inc.*, 755 F.2d 1253, 1262 (6th Cir. 1985) ("We can only read subsection 3713(a)(2) as evidencing an intent by Congress that whatever rights the United States had under the insolvency statute, those rights were to cease and be replaced by bankruptcy priorities when the bankruptcy intervened. No other construction is satisfactory. The language of subsection 2 is unequivocal."). The Objection must be overruled because the Federal Priority Statute does not apply to the Settlement Agreement filed in this Adversary Proceeding.

Even if the Federal Priority Statute applied to this Bankruptcy Case, it would not prohibit the Court from approving of the Settlement Agreement, as the Settlement Agreement does not violate the statute. None of the assets that fund the Settlement Agreement ("Settlement Agreement Assets") originate from property of Mallory or from property that is otherwise under Mallory's custody or control. The entry of the contemplated consent judgment in the Settlement Agreement does not constitute the transfer of property by Mallory or an "act of bankruptcy" within the meaning of the Federal Priority Statute. The consent judgment only establishes the liability of Mallory to the Liquidating Trustee on certain constructive fraudulent conveyance and breach of fiduciary duty claims asserted in the D&O Action.

The Settlement Agreement identifies five (5) sources of payment to the Liquidating Trustee. First is the assignment of certain demand promissory notes made by CREO Wellness,

LLC ("CREO Wellness") payable to the order of Mallory in the aggregate principal amount of $352,853.98 (the "CREO Notes"). Mallory previously pledged the CREO Notes as collateral for amounts she owed to her counsel. Second is a note to be made by ITS Manufacturing Inc. ("ITS") payable to the Liquidating Trustee in the amount of $500,000 inclusive of interest (the "ITS Note").[35] The ITS Note will be secured by a blanket lien on all property of ITS. Third is the payment of $100,000 in equal installments over a period of twenty months from a third-party source other than Mallory. Fourth is the agreement to turnover any gift, bequeath, or inheritance exceeding $50,000.[36] Finally, the Liquidating Trustee is entitled to receive any net proceeds from any recoveries on account of Mallory's claim against LeClairRyan after full payment of attorneys' fees relating to services of attorneys involved in pursuit of such claim, payment to Mallory's defense counsel in the D&O Litigation and the Qui Tam Action, and all amounts owed to the United States (the "Waterfall Proceeds").

Mallory does not have possession or control over the CREO Notes.[37] The evidence established that Mallory transferred her interest in the CREO Notes to her counsel to secure her obligation to pay attorney's fees pursuant to that certain Second Assignment Agreement dated January 30, 2017. The absolute assignment by Mallory of her interest in the CREO Notes occurred long before Judgment was rendered in the Qui Tam Action.[38] Consequently, the CREO Notes are not the property of Mallory, but of her counsel. The Settlement Agreement requires

---

[35] The ITS Note will have a $250,000 buyout amount that may be exercised by ITS within three years following execution.

[36] Mallory is entitled to retain the first $50,000.

[37] The United States appears to have conflated the CREO Notes with Mallory's interest in CREO Holdings, LLC. While Mallory owns an interest in CREO Holdings, LLC, she does not have any interest in CREO Wellness, which is the maker of the CREO Notes. *See* Hr'g Tr. 82:15–21, May 24, 2018, ECF No. 613.

[38] *Id.* 16:1–4; 83:7–16.

Mallory's counsel to transfer its interest in the CREO Notes to the Liquidating Trustee.[39]  The evidence supports the conclusion that CREO Wellness's payment of the CREO Notes is in exchange for a release from the Liquidating Trustee for subsequent transferee claims that were asserted by the Liquidating Trustee against CREO Wellness under section 550(a) of the Bankruptcy Code.  The United States could not collect its Judgment against Mallory by pursuing assets owned by Mallory's counsel.  *See Metzger v. Culbert* (*In re Metzger*), 709 F.2d 32, 34 (9th Cir. 1983) (holding that a defendant's transfer of property before a final judgment was rendered in a criminal case was not considered a "debt" under the Federal Priority Statute).[40]

Similarly, the evidence established that the ITS Note represents an agreed payment by ITS to the Liquidating Trustee in exchange for a release of the subsequent transferee claims that were asserted against ITS by the Liquidating Trustee under section 550(a) of the Bankruptcy Code.  ITS is a separate legal entity with its own assets and its own lender.[41]  The ITS Note does not constitute a transfer by Mallory of her property.

---

[39] Counsel for Mallory is not a representative of Mallory as contemplated by 31 U.S.C. § 3713(b), and, therefore, is not liable under the statute for transferring the CREO Notes to the Liquidating Trustee or for facilitating the terms of the Settlement Agreement.  Counsel for Mallory does not hold property of Mallory for the purpose of satisfying Mallory's debts.  Rather, the property interests held by counsel for Mallory, as demonstrated by the evidence, are commercial interests obtained for its own purposes.  As such, the transfers by counsel for Mallory under the Settlement Agreement are not transfers of Mallory's property.  Additionally, regardless of whether the transfers were of Mallory's property, because the law firm is acting as Mallory's counsel, and not a representative of Mallory in the capacity of a receiver, executor, trustee, or other such representative as contemplated by the Federal Priority Statute, the statute is inapplicable to counsel for Mallory.

[40] Claims that are wholly contingent upon happenings after the act of bankruptcy do not constitute claims under the priority statute.  *Guillermety v. Sec'y of Educ.*, 241 F. Supp. 2d 727, 733 (E.D. Mich. 2002) (citing *Commonwealth of Mass. v. United States*, 333 U.S. 611 (1948); *United States v. Moore*, 423 U.S. 77 (1975)).  For the same reason, if a defendant has not yet been determined by a court to be liable for an obligation to the government, the debt is not in existence because there was the contingency of the obligation being imposed by the court.  *See In re Metzger*, 709 F.2d at 34.  The United States' claim against Mallory, therefore, did not arise until May 23, 2018, when the United States District Court for the District of South Carolina entered Judgment against Mallory.

[41] Hr'g Tr. 16:5–8.  On August 9, 2017, Mallory executed and delivered to her counsel a Stock Pledge Agreement granting her counsel a security interest in the 510 shares of common stock she owned in ITS.  The Pledge Agreement was perfected long before Judgment was granted in the Qui Tam Action.

The evidence was uncontroverted that Mallory is personally unable to make the Cash Payments set forth in the Settlement Agreement.[42]  An unnamed family member of Mallory has apparently agreed to make the Cash Payments for her.  The Liquidating Trustee has agreed to forbear taking any action to enforce his rights under the Settlement Agreement so long as the payments are kept current.  Although the United States concedes that Mallory does not have sufficient funds to make the Cash Payments, it nonetheless argues that it is somehow inexplicably entitled to the money.  As the payments are being made by an independent third party to the Liquidating Trustee on behalf of Mallory, such payments are not property of Mallory and, thus, would not be a source for recovery by the United States under the Federal Priority Statute.

The obligation to turnover Gift Proceeds does not constitute a transfer of property by Mallory, as there is no existing or anticipated gift, bequeath, or inheritance.  The Gift Proceeds are bare unliquidated windfalls contingent on uncertain future events.  Counsel for Mallory explained that the hypothetical recovery of Gift Proceeds were included in the Settlement Agreement to account for the rare possibility that Mallory is gifted or bequeathed an amount over $50,000.[43]  The United States would not be able to collect on its Judgment against Mallory by pursuing unknown and uncertain windfalls.

Lastly, the United States already enjoys priority status as to the LeClairRyan Waterfall Proceeds.  Under the Settlement Agreement, the Liquidating Trustee is entitled to monies recovered from the pursuit of the LeClairRyan Litigation only after the waterfall of payouts have

---

[42]  Hr'g Tr. 86:5–12.

[43]  *See id.* 85:21–86:4.

been made to Mallory's attorneys and to the United States.[44]  The United States must be paid in full before Mallory can pay the Liquidating Trustee any of the LeClairRyan Waterfall Proceeds. The Settlement Agreement's treatment of the LeClairRyan Waterfall Proceeds preserves the priority to which the United States would be entitled if the Federal Priority Statute was applicable to this proceeding.  The United States cannot be heard to complain that this provision of the Settlement Agreement impacts it adversely in any manner.[45]

For each of these three different reasons, the Court finds that the Settlement Agreement does not violate the Federal Priority Statute.  The Court reviews the Liquidating Trustee's decision to settle the Litigation Claim against Mallory "utilizing a business judgment standard." *SunTrust Bank v. Matson* (*In re CHN Constr., LLC*), 531 B.R. 126, 133 (Bankr. E.D. Va. 2015); *see also In re Goss*, 568 B.R. 525, 530 (Bankr. D.S.C. 2017).  The Court finds that the Settlement Agreement was not illegal, a product of collusion, or against the public interest.  The evidence presented at the Hearing reflected that the Settlement Agreement was the result of extensive, arms-length, negotiation conducted in good faith by the litigants pursuant to a Court-approved mediation process under the skillful direction of Judge Novak.  The United States was an invited and welcomed participant that declined, for whatever reason, to become involved.

While the Liquidating Trustee believed he would ultimately prevail on his Litigation Claim against Mallory, he nevertheless concluded that pursuing the complex litigation would be expensive, protracted, and require the outlay of significant resources.  Given that the Settlement Agreement avoids the inherent risk and uncertainty attendant to litigation, produces an

---

[44] Mot. Ex. 1.

[45] On August 9, 2017, Mallory executed and delivered a Security Agreement, which was duly perfected, providing a security interest to her counsel in the proceeds of the LeClairRyan Litigation to secure outstanding and future legal fees.

immediate and material benefit to the Litigation Trust by increasing the funds available for distribution to creditors, and eliminates the uncertainty of recovery from the limited financial resources that Mallory has available to satisfy any judgment against her, the Court finds that Settlement Agreement is in the best interest of the estate and all of its creditors, including the United States.  The Court concludes that the Settlement Agreement is both "fair and equitable." *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (citations omitted).   It falls far above "the lowest point in the range of reasonableness."  *In re Alpha Nat. Res. Inc.*, 544 B.R. 848, 857 (Bankr. E.D. Va. 2016); *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995).  The Court agrees with the business judgment of the Liquidating Trustee that the Settlement Agreement presents the most efficient resolution of the Litigation Claims against Mallory.

## CONCLUSION

The settlement of time-consuming, burdensome, and uncertain litigation – especially in the bankruptcy context – is encouraged.  *See, e.g.*, *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979); *Tindall v. Mavrode* (*In re Mavrode*), 205 B.R. 716, 719 (Bankr. D.N.J. 1997).   It is incumbent upon the Liquidating Trustee to use his best efforts to achieve a commercially reasonable and economically sound resolution of the Litigation Claims in this Bankruptcy Case.  By actively participating in the Plan confirmation process, the United States clearly acquiesced to the Liquidating Trustee's authority to prosecute and settle Litigation Claims on behalf of the estate.  As a participant in the confirmed Plan's distribution scheme and as the holder of the United States' Allowed Claim, the United States cannot interfere with the implementation of the confirmed Plan and frustrate the Liquidating Trustee's efforts to execute his duties thereunder.  The Federal Priority Statute is simply inapplicable to this bankruptcy case.

Even if it were applicable, the Federal Priority Statute would be of no moment, as none of the Settlement Agreement Assets are recoverable by the United States in any event.

As the Settlement Agreement is fair and equitable and is in the best interests of all creditors, including the United States, the Court will approve the Settlement Agreement under Bankruptcy Rule 9019.  Going forward, the United States is encouraged to participate in the judicial mediation process that the Court has implemented to resolve the Litigation Claims that remain.

ENTERED:  Jun 12 2018

_____/s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE

ENTERED ON DOCKET: Jun 12 2018