## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## (RICHMOND DIVISION)

| | |
|---|---|
| In re: | Chapter 11 |
| HEALTH DIAGNOSTIC LABORATORY, INC., *et al.*,[1] | Case No. 15-32919 (KRH) |
| Debtors. | (Jointly Administered) |
| RICHARD ARROWSMITH, LIQUIDATING TRUSTEE OF THE HDL LIQUIDATING TRUST, | Adv. Proc. No. 16-03271 |
| Plaintiff, | |
| vs. | |
| G. RUSSELL WARNICK, *et al*. | |
| Defendants. | |

## LIQUIDATING TRUSTEE'S MEMORANDUM OF LAW IN
## SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Richard Arrowsmith, in his capacity as Liquidating Trustee of the HDL

Liquidating Trust (the "**Liquidating Trustee**" or the "**Plaintiff**") by his undersigned counsel,

pursuant to Federal Rule of Civil Procedure 56, as made applicable herein by Rule 7056 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Bankruptcy Rule

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728), and Integrated Health Leaders, LLC (2434) (referred to herein collectively as "**HDL**").

Richard S. Kanowitz (admitted pro hac vice)
Evan M. Lazerowitz (admitted pro hac vice)
**COOLEY LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: rkanowitz@cooley.com
Email: elazerowitz@cooley.com

Cullen D. Speckhart (VSB No. 79096)
Eric Kuwana (admitted pro hac vice)
**COOLEY LLP**
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 842-7800
Direct: (202) 776-2052
Email: cspeckhart@cooley.com
Email: ekuwana@cooley.com

*Counsel to Plaintiff Richard Arrowsmith,*
*Liquidating Trustee of the HDL Liquidating Trust*

7056-1, hereby files this memorandum of law (the "**Memorandum**") in support of his motion (the

"**MSJ**") for entry of partial summary judgment against the Golias Defendants,[2] the BlueWave

Defendants,[3] the Carnaggio Defendants,[4] and the AMS Defendants[5] (collectively, the

"**Defendants**").  In support of this Memorandum, the Liquidating Trustee respectfully states as

follows:[6]

---

[2] The Golias Defendants are Tipton Golias, Joseph Golias, Donald Golias, Karla Falgout, Tipton Golias in his capacity as Trustee of The Wyndell L. Golias Voting Trust, Eric Petersen, David Mayes, John Tessler, Pamela Oates, and Helena Laboratories Corp. ("**Helena**").  The "**Golias Shareholder Defendants**" are all of the Golias Defendants besides Helena.

[3] The BlueWave Defendants are BlueWave Healthcare Consultants, Inc. ("**BlueWave**"), HisWay of South Carolina, Inc., Floyd Calhoun Dent III ("**Dent**"), Cobalt Healthcare Consultants Inc., AROC Enterprises LLC, Riverland Pines LLC, Crosspoint Properties LLC, Helm-Station Investments LLP, Lakelin Pines LLC, Trini D Island LLC, and CAE Properties LLC.  The BlueWave Defendants do not include Robert Bradford Johnson, Blue Eagle Farming LLC, Blue Smash Investments, LLC, Eagle Ray Investments LLC, Forse Investments, LLC, H J Farming, LLC, Armor Light, LLC, and War-Horse Properties, LLLP, each of whom filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of Alabama, or certain of their affiliates and subsidiaries.

[4] The Carnaggio Defendants are Thomas Carnaggio, Kevin Carrier, Jerry Carroll, John Coffman, Jason Dupin, Julie Harding, Robert Lively, Heather Lockhardt, Charles Maimone, Kyle Martel, and Michael Samadani.

[5] The AMS Defendants are Advanced Medical Sales, LLC, Christo Consulting, Corp, Disease Testing & Mangement LLC, DX Sales LLC, El Medical Consulting, Inc., Infinity Medical Consulting LLC, JBH Marketing, Inc., Meade Medical Group, LLC, Med-Con-EC LLC, MRT Health Consultants, Inc., Nibar Health Consultants, Inc., Quasi Maturi LLC, RBLIV Consulting, Inc., and WCBLUE Lab LLC. Southeast Healthcare Consultants, LLC is not subject to this MSJ.

[6] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the accompanying statement of undisputed material facts ("**SMF**"), which is incorporated by reference herein.

# Table of Contents

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

LEGAL STANDARD............................................................................................... 4

ARGUMENT............................................................................................................ 5

I.     This Court Should Enter a Summary Declaratory Judgment That the
Percentage-Based Commission Structure in The BlueWave Agreement
Violated Applicable Law and Grant the Liquidating Trustee's Objection to
BlueWave's POC  (Counts 74 and 75 of the Amended D&O Complaint)............ 5

     A.     The Percentage-Based Commission Structure in the BlueWave
Agreement Violated Applicable Law ........................................................ 5

          1.     Legal Standard .............................................................................. 5

          2.     Applicable Law ............................................................................. 6

               a.     The Anti-Kickback Statute ................................................ 6

               b.     The False Claims Act......................................................... 7

          3.     The BlueWave Agreement Violated the AKS and FCA By
Providing for Illegal Percentage-Based Compensation ................. 8

          4.     The Liquidating Trustee is Entitled to a Summary
Declaratory Judgment that the BlueWave Agreement
Violated Applicable Law ............................................................. 13

     B.     The BlueWave POC Should Be Disallowed Based Upon the
Illegality of the BlueWave Agreement .................................................... 14

II.     The BHL Settlement Note and Golias Double Payment Should be
Recharacterized as Equity Contributions (Count 29 of the Amended D&O
Complaint) ........................................................................................................ 16

III.     BlueWave's and the Golias Defendants' POCs Should Be Equitably
Subordinated Under Section 510(c) of the Bankruptcy Code (Count 76 of
the Amended D&O Complaint) ......................................................................... 19

     A.     BlueWave's and the Golias Defendants' POCs Should be
Equitably Subordinated............................................................................ 20

     B.     The Conduct of the BlueWave Defendants' and Golias
Defendants' Agents Should Be Imputed To Them For Purposes of
Equitable Subordination and their Alleged Good Faith Transferee
Defense .................................................................................................... 21

IV.     The Court Should Grant Partial Summary Judgment on the Liquidating
Trustee's Constructive Fraudulent Transfer Claims  (Counts 2, 4, 6, 8, 10,
12, 30-33, 38, 40, 42, 44, 46, 48, 50, 51, and 52 of the Amended D&O
Complaint) ........................................................................................................ 24

214874179

# Table of Contents
(continued)

**Page**

A.     Applicable Law ................................................................................. 24

    1.     Section 548 of the Bankruptcy Code ........................................... 27

    2.     UFTA, as applicable law under section 544(b) of the Bankruptcy Code .............................................................................. 28

    3.     FDCPA, as applicable law under section 544(b) of the Bankruptcy Code .............................................................................. 29

    4.     Maryland Uniform Fraudulent Conveyance Act, as applicable law under section 544(b) of the Bankruptcy Code ................................................................................................. 30

    5.     Virginia Code § 55-81, as applicable law under section 544(b) of the Bankruptcy Code .................................................... 31

    6.     Section 547 of the Bankruptcy Code ........................................... 31

    7.     Section 550 of the Bankruptcy Code ........................................... 31

B.     The Transfers Were of HDL's Interests in Property and Made Within The Applicable Time Limits. ................................................ 32

C.     HDL Was Insolvent and Inadequately Capitalized at all Times. ............. 33

D.     HDL Did Not Receive Reasonably Equivalent Value for the Discretionary Shareholder Distributions .................................................. 37

E.     HDL Did Not Receive Reasonably Equivalent Value for the Shareholder Tax Distributions ................................................................. 38

F.     There is No Reasonably Equivalent Value for the BlueWave Transfers. ................................................................................................. 39

G.     There is no Reasonably Equivalent Value for the Golias Double Payment ................................................................................................... 40

H.     The Liquidating Trustee Meets All of the Requirements for a Preference Claim Under Section 547 of the Bankruptcy Code ............... 40

I.     The Liquidating Trustee May Recover from Subsequent Transferees. ............................................................................................. 41

V.     The Liquidating Trustee is Entitled to Summary Judgment on His Tortious Interference Claims as to the Assigning Creditors Aetna, Cigna and UHC (Counts 69-71 of the Amended D&O Complaint) ................................................ 42

    A.     Choice of Law and Elements of the Tortious Interference Claim ........... 43

    B.     There is No Dispute of Fact that Cigna, Aetna and UHC Each Had Contractual and/or Business Relationships or Expectancy with HCPs and Their Patients ......................................................................... 44

214874179

# Table of Contents
### (continued)

|  |  | Page |
|---|---|---|

C.    There is No Genuine Factual Dispute that the Tortious Interference Defendants Knew of the Contractual and/or Business Relationship or Expectancy Among the Insurers and HCPs and the Insurers and Patients ................................................................................................ 47

D.    It is Undisputed that the Tortious Interference Defendants Acted Intentionally and Without Justification to Interfere with the Contractual and/or Business Relationship or Expectancy Among the Insurers and HCPs and the Insurers and Patients ............................... 49

E.    The Tortious Interference Defendants Induced or Caused a Breach or Termination of the Contractual and/or Business Relationship or Expectancy Among the Insurers and HCPs and the Insurers and Patients ................................................................................................ 53

VI.    The Liquidating Trustee is Entitled to Summary Judgment on the Defendants' Affirmative Defense of Statute of Repose (Golias Defendants' A.D. 1; BlueWave Defendants' A.D. 1; Carnaggio Defendants' A.D. 1) ............................................................................ 54

A.    The Statute of Repose Defenses Should Be Dismissed Because, In Each Count, The Liquidating Trustee Is Only Seeking To Recover Transfers Within The Applicable Limitations Period ............................ 55

B.    The Liquidating Trustee is Entitled to Summary Judgment That The Actual Fraud Claims Are Timely ................................................... 56

VII.    The Liquidating Trustee is Entitled to Summary Judgment on the Golias Defendants' and BlueWave Defendants' Good Faith Transferee for Value Affirmative Defenses under 11 U.S.C. § 548(c), 550(b), and Applicable Law (Golias Defendants' A.D. 4-6; BlueWave Defendants' A.D. 5-7) ............. 59

A.    Good Faith Transferee Defense ............................................................ 59

1.    Sections 548(c) and 550(b) of the Bankruptcy Code ................... 59

2.    UFTA Section 8(a) ....................................................................... 60

3.    MUFCA ........................................................................................ 60

B.    The Golias Defendants Are Not Good Faith Transferees for Value ........ 61

1.    The Golias Defendants Provided No Value to HDL .................... 61

2.    The Golias Defendants Did Not Receive the Payments in Good Faith ................................................................................. 62

C.    The BlueWave Defendants are Not Good Faith Transferees For Value ................................................................................................ 65

1.    The BlueWave Defendants Provided No Value ........................... 65

214874179

## Table of Contents
(continued)

Page

2.    The BlueWave Defendants Did Not Receive The Transfers in Good Faith ............................................................................. 65

D.    The Good Faith Transferee Defense Does Not Apply to Va. Code § 55-81 .......................................................................................... 66

VIII.    The Liquidating Trustee is Entitled to Summary Judgment on the Golias Defendants' Advice of Counsel Defense in the Tax Action (Golias Defendants' Tax Answer, A.D. 2) ...................................................... 66

A.    The Golias Defendants Cannot Assert the Advice of Counsel Defense Because They Asserted Privilege Over Their Attorneys' Documents ............................................................................. 66

B.    The Golias Defendants Cannot Rely Upon the Advice of HDL's Attorneys As A Defense ........................................................ 67

IX.    The Liquidating Trustee is Entitled to Summary Judgment on the BlueWave Defendants' Purported Voluntary Payment Affirmative Defense .......................................................................................... 68

X.    The Liquidating Trustee is Entitled to Summary Judgment on the Carnaggio Defendants' Affirmative Defenses That The Claims Against Them Are Barred by the APA Release (Carnaggio Defendants' A.D. 2) ........... 70

CONCLUSION ...................................................................................................... 71

214874179

# Table of Authorities

**Page(s)**

## Cases

*A.F.L. Falck, S.p.A. v. E.A. Karay Co., Inc.*,
  722 F. Supp. 12 (S.D.N.Y. 1989) ........................................................................61

*Abboud v. Abboud*,
  232 B.R. 793 (Bankr. N.D. Okla. 1999), *aff'd*, 237 B.R. 777 (10th Cir. B.A.P.
  1999) ................................................................................................................14

*In re Abell*,
  549 B.R. 631 (Bankr. D. Md. 2016) ....................................................................5

*Abramson v. Boedeker*,
  379 F.2d 741 (5th Cir. 1967) ..............................................................................56

*Acequia v. Clinton (In re Acequia)*,
  34 F.3d 800 (9th Cir. 1994) ................................................................................56

*In re Agricultural Research & Tech. Grp.*,
  916 F.2d 528 (9th Cir. 1990) ..............................................................................61

*Alevromagiros v. Hechinger Co.*,
  993 F.2d 417 (4th Cir. 1993) ..............................................................................36

*In re Am. Apparel, Inc. Shareholder Litig.*,
  2013 WL 10914316 (C.D. Cal. Aug. 8, 2013)....................................................23

*Am. Diamond Exch. v. Alpert*,
  28 A.3d 976 (Conn. 2011) ..................................................................................43

*In re Anderson*,
  330 B.R. 180 (Bankr. S.D. Tex. 2005) ................................................................22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................4

*Armstrong v. Collins*,
  No. 01CIV.2437(PAC), 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010)............39, 65

*In re ASI Reactivation, Inc.*,
  934 F.2d 1315 (4th Cir. 1991) ............................................................................20

*Askanase v. Fatjo*,
  130 F.3d 657 (5th Cir. 1997) ..............................................................................23

214874179

## Table of Authorities

### (continued)

Page(s)

*In re Bayou Grp., LLC,*
396 B.R. 810 (Bankr. S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 439 B.R.
284 (S.D.N.Y. 2010) ...............................................................................................64

*In re Blixseth,*
514 B.R. 817 (Bankr. D. Mont. 2014) ....................................................25, 26, 27

*In re BMT-NW Acquisition, LLC,*
582 B.R. 846 (Bankr. D. Del. 2018) .......................................................................41

*Bouchat v. Bal. Ravens Football Club, Inc.,*
346 F.3d 514 (4th Cir. 2003) ..................................................................................4

*Boyer v. Crown Stock Distribution, Inc.,*
587 F.3d 787 (7th Cir. 2009) .................................................................................61

*Brandon v. Newman,*
243 Ga. App. 183, 532 S.E.2d 743 (2000).............................................................14

*Brinkley v. Harbour Recreation Club,*
180 F.3d 598 (4th Cir. 1999) .................................................................................69

*In re Broadband Wireless Intern. Corp.,*
295 B.R. 140 (10th Cir. B.A.P. 2003)....................................................................14

*Broughton v. Johnson,*
247 Ga. App. 819–820(1)(a), 545 S.E.2d 370 (2001)............................................15

*Carroll v. Robert F. Craig P.C. (In re Innovative Commun. Corp.),*
507 B.R. 841 (Bankr. D.V.I. 2014) (Walrath, J.)............................................56, 58

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................................................4

*Chapman v. Parsons,*
Civil Action No. 4:18-cv-00360-O, 2019 U.S. Dist. LEXIS 118310 (N.D. Tex.
Apr. 2, 2019) .........................................................................................................22

*Chen v. New Trend Apparel, Inc.,*
8 F. Supp. 3d 406 (S.D.N.Y. 2014) .......................................................................61

*In re Cold Harbor Assocs., L.P.,*
204 B.R. 904 (Bankr. E.D. Va. 1997)....................................................................17

214874179

## Table of Authorities
(continued)

Page(s)

*Collelo v. Geographic Servs. Inc.*,
  283 Va. 56, 727 S.E.2d 55 (Va. 2012) ...................................................................43

*In re Commonwealth Biotechnologies, Inc.*,
  No. 11-30381-KRH, 2012 WL 5385632 (Bankr. E.D. Va. Nov. 1, 2012) .......................16, 17

*In re Conex Holdings, LLC*,
  518 B.R. 269 (Bankr. D. Del. 2014) ...................................................................41

*Cont'l Cas. Co. v. Fuscardo*,
  35 F.3d 963 (4th Cir. 1994) ...................................................................5

*Cullifer v. Comm'r*,
  108 T.C.M. (CCH) 408 (T.C. 2014, *aff'd*, 651 F. App'x 847 (11th Cir. 2016).....................37

*D'Iorio v. Winebow, Inc.*,
  68 F. Supp. 3d 334 (E.D.N.Y. 2014) ...................................................................4

*D.R. Horton, Inc. v. Bd. Of Sup'rs for Cty. Of Warren*,
  737 S.E.2d 886 (Va. 2013)...................................................................68, 69

*Dougherty, McKinnon & Luby, P.C. v. Greenwald*,
  225 Ga. App. 762, 484 S.E.2d 722 (1997)...................................................................14

*Eichholz Law Firm, P.C. v. Jeff Martin & Assocs., P.C.*,
  No. CV414-172, 2016 WL 4492855 (S.D. Ga. Aug. 24, 2016) ...................................15

*Empire Trucking v. Reading Anthracite Coal*,
  71 A.3d 923 (Penn. 2013)...................................................................43

*In re Epic Capital Corp.*,
  290 B.R. 514 (Bankr. D. Del. 2003) ...................................................................20

*In re F.H.L., Inc.*,
  91 B.R. 288 (Bankr. D.N.J. 1988) ...................................................................40

*Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*,
  926 F.2d 1458 (5th Cir. 1991) ...................................................................20

*Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*,
  453 F.3d 225 (4th Cir. 2006) ...................................................................16

*Faulkner v. Millar*,
  319 S.C. 216, 460 S.E.2d 378 (1995) ...................................................................24

vii

# Table of Authorities
### (continued)

Page(s)

*Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus.)*,
  Nos. 12-12057, 14-50377 (MFW), 2015 Bankr. LEXIS 2029 (Bankr. D. Del.
  June 18, 2015) ..............................................................................................................58

*Furlev Sales & Assoc., Inc. v. N. Am. Auto. Warehouse, Inc.*,
  325 N.W.2d 20 (Minn. 1982) ...............................................................................43, 44

*Gen. Assur. of America, Inc. v. Overby-Seawell Co.*,
  533 Fed. App'x 200 (4th Cir. 2013) .....................................................................43

*Gold v. Sovereign Bank (In re Taneja)*,
  453 B.R. 618 (Bankr. E.D. Va. 2011) ...................................................................55

*In re Grove-Merritt*,
  406 B.R. 778 (Bankr. S.D. Ohio 2009) ..................................................................64

*Hays v. Adam*,
  512 F. Supp. 2d 1330 (N.D. Ga. 2007) ...................................................................6

*Hoff v. Comput. Assocs. Int'l, Inc.*,
  CA 3-96-CV-2679-R, 1997 U.S. Dist. LEXIS 23465 (N.D. Tex. Aug. 18,
  1997) ..........................................................................................................................22

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
  712 F.3d 185 (5th Cir. 2013) ...........................................................................56, 58

*In re Jeffrey Bigelow Design Grp., Inc.*,
  956 F.2d 479 (4th Cir. 1992) ..................................................................................28

*Joint Tech., Inc. v. Weaver*,
  567 F. App'x 585 (10th Cir. 2014) ........................................................................10

*Jones v. Revels (In re Revels)*,
  No. 05-13351-3P7, 2007 Bankr. LEXIS 4687 (Bankr. M.D. Fla. Jan. 31,
  2007) ..........................................................................................................................63

*Jordan v. Osmun*,
  Civil Action No. 1:16-cv-501, 2016 U.S. Dist. LEXIS 135314 (E.D. Va. Sep.
  29, 2016) ....................................................................................................................21

*In re Joshua Slocum, Ltd.*,
  103 B.R. 610 (Bankr. E.D. Pa.), *aff'd sub nom. In re Joshua Slocum Ltd.*, 121
  B.R. 442 (E.D. Pa. 1989) .........................................................................................37

## Table of Authorities
(continued)

Page(s)

*Kallok v. Medtronic, Inc.*,
573 N.W.2d 356 (Minn. 1998).................................................................................44

*In re Kane & Kane*,
479 B.R. 617 (Bankr. S.D. Fla. 2012).......................................................................27

*In re Kenrob*,
474 B.R. 799 (E.D. Va. 2012)...................................................................................39

*Kipperman v. Onex Corp.*,
411 B.R. 805 (N.D. Ga. 2009) ..................................................................................27

*In re Laines*,
352 B.R. 397 (Bankr. E.D. Va. 2005)........................................................................25

*In re Lancelot Inv. Fund, L.P.*,
467 B.R. 643 (Bankr. N.D. Ill. 2012) ........................................................................71

*LifeNet, Inc. v. Musculoskeletal Transplant Found., Inc.*,
490 F. Supp. 2d 681 (E.D. Va. 2007) ........................................................................66

*Lippe v. Bairnco Corp.*,
249 F.Supp.2d 357 (S.D.N.Y.2003)...........................................................................61

*Livernois v. Med. Disposables, Inc.*,
837 F.2d 1018 (11th Cir. 1988) ................................................................................16

*In re Lull*,
386 B.R. 261 (Bankr. D. Haw. 2008) ........................................................................60

*United States ex rel. Lutz v. Berkeley Heartlab, Inc.*,
No. 9:11-CV-1593-RMG, 2017 WL 1282012 (D.S.C. Apr. 5, 2017) ...............................66, 67

*In re LXEng LLC*,
607 B.R. 67, 97 (Bankr. D. Conn. 2019) ....................................................................26

*Magill v. Gulf & Western Indus., Inc.*,
736 F.2d 976 (4th Cir. 1984) .....................................................................................4

*Marquez v. Wilshire Credit Corp.*,
No. CV C-07-245, 2008 WL 11464717 (S.D. Tex. Apr. 4, 2008) ...........................................69

*Mauldin Furniture Galleries, Inc. v. Branch Banking & Tr. Co.*,
No. 6:10-240-TMC, 2012 U.S. Dist. LEXIS 121140 (D.S.C. Aug. 27, 2012)......................23

214874179

# Table of Authorities
(continued)

Page(s)

*U.S. ex rel. Mayes v. Berkley HeartLab, Inc.*,
  853 F.3d 131 (4th Cir. 2017) ................................................................13

*Med. Dev. Network, Inc. v. Prof'l Respiratory Care*,
  673 So. 2d 565 (Fla. Dist. Ct. App. 1996) ...........................................11

*In re Merry-Go-Round Enterprises, Inc.*,
  229 B.R. 337 (Bankr. D. Md. 1999) .............................................25, 35

*In re Meyer*,
  244 F.3d 352 (4th Cir. 2001) ...............................................................31

*Minn. Lawyers Mut. Ins. Co. v. Batzli*,
  No. 3:09CV432, 2009 WL 5172860 (E.D. Va. 2009) ...........................5

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*,
  782 F. Supp. 2d 1047 (C.D. Cal. 2011) .................................................4

*NextWave Pers. Communs., Inc. v. FCC (In re NextWave Pers. Communs., Inc.)*,
  235 B.R. 277 (Bankr. S.D.N.Y. 1999) ................................................32

*In re Nieves*,
  648 F.3d 232 (4th Cir. 2011) ...............................................................59

*In re Northlake Foods, Inc.*,
  715 F.3d 1251 (11th Cir. 2013) (per curiam) ......................................39

*Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*,
  926 F. Supp. 835 (E.D. Ark. 1996) ................................................11, 13

*In re O'Day Corp.*,
  126 B.R. 370 (Bankr. D. Mass. 1992) .................................................26

*Obester v. Lucas Assocs.*,
  No. 1:08-CV-03491-MHS-AJB, 2010 WL 8292401 (N.D. Ga. Aug. 2, 2010) ......................14

*Official Comm. of Unsecured Creditors of Exeter Holding, Ltd. v. Haltman*,
  No. 13-CV-5475 (JS)(AKT), 2018 WL 1582293 (E.D.N.Y. Mar. 30, 2018) ........................25

*Ostashko v. Ostashko*,
  No. 00-cv-7162, 2002 WL 32068357 (E.D.N.Y.2002) .........................61

*In re Osteen*,
  Case No. 3:12-cv-00023, 2012 WL 5194251 (W.D. Va. Oct. 19, 2012) ...............................31

**Table of Authorities**
(continued)

**Page(s)**

*P. Stolz Family P'ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004)...........................................................................54

*Peterson v. Tyson Foods, Inc.*,
983 F.2d 1057 (4th Cir. 1993) .........................................................................4

*Phillips v. Blankenship*,
251 Ga. App. 235, 554 S.E.2d 231 (2001)......................................................15

*Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC)*,
445 B.R. 206 (Bankr. S.D.N.Y. 2011) ............................................................58

*In re Pioneer Home Builders, Inc.*,
147 B.R. 889 (Bankr. W.D. Tex. 1992)...........................................................26

*Pool v. Johnson*,
Civil Action No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613 (N.D. Tex.
Apr. 15, 2002) ..................................................................................................22

*Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*,
625 S.W.2d 295 (Tex. 1981).............................................................................22

*In re Province Grande Olde Liberty*,
LLC, 655 Fed. App'x 971 (4th Cir. 2016)........................................................18

*Quillen v. Int'l Playtex, Inc.*,
789 F.2d 1041 (4th Cir. 1986) .........................................................................43

*In re Racing Servs., Inc.*,
482 B.R. 276 (Bankr. D.N.D. 2012), *rev'd and remanded on other grounds*,
504 B.R. 549 (D.N.D. 2014), *aff'd*, 779 F.3d 498 (8th Cir. 2015) .........................69

*Rahbar v. Law Office of Arquilla & Poe*,
PLC, No. 1:18-cv-1475, 2019 U.S. Dist. LEXIS 63133 (E.D. Va. Apr. 11,
2019) ..................................................................................................................22

*Reneker v. Offill*,
Civil Action No. 3:08-CV-1394-D, 2012 U.S. Dist. LEXIS 83017 (N.D. Tex.
June 14, 2012)....................................................................................................23

*In re Rexford Properties, LLC*,
557 B.R. 788 (Bankr. C.D. Cal. 2016)..............................................................40

*In re Roco Corp.*,
701 F.2d 978 (1st Cir. 1983)............................................................................37

xi

**Table of Authorities**
(continued)

Page(s)

*Ross v. City of Memphis*,
    423 F.3d 596 (6th Cir. 2005) ....................................................................68

*In re Ryan*,
    472 B.R. 714 (Bankr. E.D. Va. 2012).....................................................28

*In re S. Textile Knitters*,
    65 Fed. App'x 426 (4th Cir. 2003) .........................................................19

*Salsgiver Communs., Inc. v Consol. Communs. Holdings*,
    150 A.3d 957 (Pa. Super. Ct. 2016).......................................................44

*Samples v. Monroe*,
    183 Ga. App. 187, 358 S.E.2d 273 (1987)..............................................15

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) (Posner, J.) ................................................26

*In re Schwinn Bicycle Co.*,
    192 B.R. 477 (Bankr. N.D. Ill. 1996) ....................................................26

*SEC v. Universal Express, Inc.*,
    2008 WL 1944803 (S.D.N.Y.2008)..................................................60, 61

*Sedillos v. Board of Educ.*,
    313 F. Supp. 2d 1091 (D. Colo. 2004)...................................................67

*In re SGK Ventures, LLC*,
    521 B.R. 842 (N.D. Ill. 2014) ................................................................38

*Smith v. Am. Founders Fin., Corp.*,
    365 B.R. 647 (S.D. Tex. 2007) ..............................................................56

*Southern Indus., Inc. v. Jeremias*,
    66 A.D.2d 178, 411 N.Y.S.2d 945 (2d Dep't 1978)..............................61

*In re Starlight Grp., LLC*,
    531 B.R. 611 (Bankr. E.D. Va. 2015) ....................................................20

*Starr v. Robinson*,
    181 Ga. App. 9, 351 S.E.2d 238 (1986).................................................14

*Steelcase, Inc. v. M.B. Haynes Corp.*,
    No. 1:09CV443, 2011 WL 3439241 (W.D.N.C. Aug. 5, 2011) ...............4

# Table of Authorities

(continued)

Page(s)

*In re SunSport, Inc.*,
  260 B.R. 88 (Bankr. E.D. Va. 2000) ...............................................................................25, 65

*Tabas v. Lehman (In re Capitol Invs., Inc.)*,
  473 B.R. 838 (Bankr. S.D. Fla. 2012) ......................................................................................65

*In re Taneja*,
  743 F.3d 423 (4th Cir. 2014) ...................................................................................................59

*In re TC Liquidations LLC*,
  463 B.R. 257 (Bankr. E.D.N.Y. 2011) ....................................................................................38

*Terry v. June*,
  420 F. Supp. 2d 493 (W.D. Va. 2006) .....................................................................................28

*Terry v. June*,
  432 F. Supp. 2d 635 (W.D. Va. 2006) .....................................................................................60

*In re Tire Kings of America, Inc.*,
  164 B.R. 40 (Bankr. M.D. Pa. 1993) .......................................................................................41

*In re Trace Int'l Holdings, Inc.*,
  289 B.R. 548 (Bankr. S.D.N.Y. 2003) .....................................................................................37

*In re Tri-Union Dev. Corp.*,
  479 B.R. 425 (Bankr. S.D. Tex. Sept. 3, 2012) ......................................................................71

*In re Turner & Cook, Inc.*,
  507 B.R. 101 (Bankr. D. Vt. 2014) .....................................................................................25, 35

*Twichell v. Glenwood-Inglewood Co.*,
  131 Minn. 375 (1915) ...............................................................................................................44

*Tyger Const. Co. Inc. v. Pensacola Const. Co.*,
  29 F.3d 137 (4th Cir. 1994) ......................................................................................................36

*United States v. Greber*,
  760 F.2d 68 (3d. Cir. 1985)........................................................................................................7

*United States v. Ringley*,
  985 F.2d 185 (4th Cir. 1993) ......................................................................................................4

*United States v. United Techs. Corp.*,
  2008 U.S. Dist. Lexis 61199 (W.D. Ohio Aug. 1, 2008), *aff'd on liability,
  rev'd on damages calculation*, 626 F.3d 313 (6th Cir. 2010)...................................................13

**Table of Authorities**
(continued)

Page(s)

*United States v. Wells Fargo Bank, N.A.*,
132 F. Supp. 3d 558 (S.D.N.Y. 2015)................................................................68

*Ussery v. Goodrich Restoration, Inc.*,
341 Ga. App. 390, 800 S.E.2d 606 (2017)........................................................15

*U.S. ex rel v. Osheroff v. Tenet Healthcare Corp.*,
No. 09-22253-CIV, 2013 WL 1289269 (S.D. Fla. Mar. 27, 2013) ...................13

*Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*,
386 F.3d 581 (4th Cir. 2004) .............................................................................5

*In re Whitley*,
463 B.R. 775 (Bankr. M.D.N.C. 2012)..............................................................28

*In re Whitley*,
No. 10-10426C, 2014 WL 1871823 (Bankr. M.D.N.C. May 7, 2014)...............60

*Willoughby v. Metro. Lloyds Ins. Co.*,
No. 3:12-CV-861-P, 2013 U.S. Dist. LEXIS 193551 (N.D. Tex. Mar. 8, 2013) ...................23

*Wood v. Milyard*,
566 U.S. 463 (2012)..........................................................................................69

*Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys.)*,
482 F.3d 1118 (9th Cir. 2007) ..........................................................................36

*In re WRT Energy Corp.*,
282 B.R. 343 (Bankr. W.D. La. 2001)..........................................................26, 27

*XYZ Corp. v. United States*,
348 F.3d 16 (1st Cir. 2003)................................................................................66

*Yamada v. McLeod*,
243 Va. 426, 416 S.E.2d 222 (1992).................................................................23

*Zimmer, Inc. v. NuTech Med., Inc.*,
54 F. Supp. 2d 850 (N.D. Ind. 1999) .........................................................6, 8, 11

214874179

**Table of Authorities**
(continued)

**Page(s)**

**Statutes**

11 U.S.C.
  §101(31)(B) ................................................................................................40
  §544(b) .......................................................................................................30
  §548(a)(1)(B) .............................................................................................25
  § 101(5) ......................................................................................................25
  § 101(12) ....................................................................................................25
  § 101(31)(E) ..............................................................................................40
  § 547(b) ............................................................................................31, 40, 41
  § 547(b)(4) .................................................................................................54
  § 547(f) ......................................................................................................40
  § 548 ...................................................................................................*passim*
  § 548(b) ......................................................................................................54
  § 548(c) ......................................................................................................59
  § 548(d)(2)(A) ...........................................................................................59
  § 550(a) ............................................................................................27, 32, 42
  § 550(b) ......................................................................................................59

26 U.S.C.
  § 3121(d)(2) ...............................................................................................12

28 U.S.C.
  § 2201 ..........................................................................................................5
  § 3001 ........................................................................................................29
  § 3304(a) ....................................................................................................30
  § 3304(b) ....................................................................................................30
  § 3306(b)(1) ...............................................................................................55
  § 3306(b)(2) ........................................................................................33, 55
  § 3307(a) ....................................................................................................60

31 U.S.C.
  § 3729(a)(1) .......................................................................................1, 7, 8
  § 3729(a)(1)(A) ...........................................................................................7
  § 3729(a)(1)(B) ...........................................................................................7
  § 3729(a)(1)(C) ...........................................................................................7
  § 3729(a)(2) .................................................................................................7
  § 3729(a)(3) .................................................................................................7
  § 3729(b) .....................................................................................................7
  § 3729(b)(1) .................................................................................................7

**Table of Authorities**
(continued)

Page(s)

42 U.S.C.

    § 1320a–7b(b)(3)(B) ........................................................................12

    §1320a-7b ........................................................................................10

    § 1320a-7b(b) ...............................................................................1, 6

    § 1320a-7b(g) ...............................................................................8, 13

AKS........................................................................................... *passim*

Ala. Code

    § 8-9A-1 ..........................................................................................28

    § 8-9A-8(a) ......................................................................................60

    § 8-9A-9(2) ......................................................................................55

    § 8-9A-9(4) ......................................................................................54

Bankruptcy Code

    Chapter 7 ....................................................................................31, 41

    Section 101 ......................................................................................25

    Section 510(c) ..................................................................................19

    Section 544(b) ............................................................................ *passim*

    Section 547 ..............................................................................31, 40, 54

    Section 548(c) ..............................................................................59, 60

    Section 550 ......................................................................................31

    Section 550(b) ..........................................................................59, 61, 62

Cal. Civ. Code

    § 3439.01 ........................................................................................28

    §3439.08(d)(3) ................................................................................60

    § 3439.09(a) ....................................................................................55

    § 3439.09(b) ....................................................................................54

2015 Cal. Legis. Serv. Ch. 44 (effective January 1, 2016) ........................................28

False Claims Act ............................................................................... *passim*

Federal Debt Collection Procedures Act, 28 U.S.C. § 3301-3308 ........................ *passim*

Georgia Code Ann.

    § 13-8-1 ...............................................................................6, 13, 14, 15

    § 23-1-10 ........................................................................................15

Ill. Comp. Stat.

    § 160/1 ..........................................................................................28

    § 160/9(a) ........................................................................................60

    § 160/10(a) ..................................................................................54, 55

**Table of Authorities**
(continued)

Page(s)

Mass. Gen. Laws
    ch. 109A ...........................................................................................................28
    ch. 109A, § 9(a) ...............................................................................................60
    ch. 109A, § 10(a) .............................................................................................55
    ch. 109A, § 10(b) .............................................................................................54

Md. Code Ann., Com. Law
    § 15-201 ...........................................................................................................28
    § 15-204 .....................................................................................................30, 55
    § 15-205 .....................................................................................................30, 55

Md. Code Ann., Cts. & Jud. Proc. § 5-101 .............................................................55

N.C. Gen. Stat.
    §§ 39-23.1 *et seq.* (2014) ...............................................................................28
    § 39-23.8(a) (2014) .........................................................................................60
    § 39-23.9(1) (2014) .........................................................................................55
    § 39-23.9(2) (2014) .........................................................................................54

2015 N.C. Sess. Laws 23, § 5 ..................................................................................28

Tenn. Code Ann.
    §§ 66-3-301 *et seq.* ........................................................................................28
    § 66-3-309(a) ...................................................................................................60
    § 66-3-310(1) ...................................................................................................55
    § 66-3-310(2) ...................................................................................................54

Tex. Bus. & Com. Code
    § 24.001 ...........................................................................................................28
    § 24.009(a) .......................................................................................................60
    § 24.010(a)(1) ..................................................................................................55
    § 24.010(a)(2) ..................................................................................................54

Uniform Fraudulent Conveyance Act ...........................................................25, 32, 61

Uniform Fraudulent Transfer Act
    § 1(2) .......................................................................................................*passim*
    § 4(a)(2) ...........................................................................................................29
    §4(a)-(b) ...........................................................................................................55
    § 5 ....................................................................................................................29
    § 8(a) ...............................................................................................................60
    § 9 ..............................................................................................................62, 66

Uniform Voidable Transactions Act .........................................................................28

## Table of Authorities
(continued)

Page(s)

Va. Code
§ 55-81 .................................................................................................................25
§ 8.01-253 ...........................................................................................................55
§ 13.1-653 ...........................................................................................................38
§ 55-80 .................................................................................................................55
§ 55-81 ....................................................................................................31, 55, 66

Wis. Stat.
§§ 242.01 *et seq.* ...............................................................................................28
§ 242.09(1) ...........................................................................................................60
§ 893.425(1) .........................................................................................................55
§ 893.425(2) .........................................................................................................54

## Other Authorities

28 C.F.R. § 85.3(a)(9) ...............................................................................................8

42 C.F.R.
§ 1001.952 .............................................................................................................6
§ 1001.952(i) .......................................................................................................12
§ 1001.952(d) ...........................................................................................6, 7, 12

155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010) ................................................8

Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2736 (4th ed.) .........................44

3 Am. Jur. 2d Agency § 256 ...................................................................................21

3 Am. Jur. 2d Agency § 259 ...................................................................................22

5 *Collier on Bankruptcy* ¶ 548.05[1][a] ...............................................................25

*Estimating Contingent Liabilities*, 1989 BYU L. Rev. ........................................26

Fed. R. Bankr. P. 3001(f) ........................................................................................14

Fed. R. Civ. Proc.
56 ....................................................................................................................4, 44
Rule 8(c)(1) .........................................................................................................69

## Table of Authorities
(continued)

**Page(s)**

OIG, Advisory Opinion

No. 11-15 (Oct. 3, 2011)...........................................................................................9
No. 11-17 (Nov. 16, 2011)....................................................................................9, 10
No. 98-1 (Mar. 25, 1998).........................................................................................9
No. 98-4 (Apr. 15, 1998)..........................................................................................9
No. 99-3 (Mar. 16, 1999).........................................................................................9

*OIG Compliance Program for Individual and Small Group Physician Practices*,
65 Fed. Reg. 59, 434, 440 n.28 (Oct. 5, 2000).........................................................7

*OIG Supp. Compliance Guidance for Hospitals*, 70 Fed. Reg. 4858, 4866 (Jan.
31, 2005) ................................................................................................................6

Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124
Stat. 119 (Mar. 23, 2010)........................................................................................8

*Restatement (Second) of Torts § 767* ...........................................................................44

214874179

## PRELIMINARY STATEMENT

Discovery in this case has confirmed the allegations of the Amended D&O Complaint, leaving no genuine dispute as to any material fact supporting the inescapable conclusion that HDL was a fraudulent scheme from its inception.  HDL's management and insiders knew at all relevant times that their conduct was, at best, highly risky and at worst, in violation of applicable law and contracts with the Insurers.  The evidence of such knowledge is overwhelming and includes advice from counsel as well as "red flag" warnings from healthcare providers, outside attorneys, other laboratories, and the Insurers. In addition, the uncontroverted evidence demonstrates that HDL's outside sales force was the "tip of the spear" that implemented the fraudulent scheme by, among other things, intentionally and unjustifiably interfering with the Insurers' contractual and business relationships with HCPs and patients. Based upon the uncontroverted factual record, the Liquidating Trustee seeks partial summary judgment on several of his claims and the Defendants' affirmative defenses in order to streamline the issues for trial.

First, the Liquidating Trustee is entitled to summary judgment on his cause of action for a declaratory judgment that the compensation provisions of the BlueWave Agreement violated applicable law and therefore BlueWave's POC requesting payment thereunder should be disallowed.  The BlueWave Agreement contained a compensation structure based upon a percentage of HDL's sales revenues that OIG guidance has indicated, and courts have held, violates the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "**AKS**") and the False Claims Act, 31 U.S.C. §§ 3729 - 3733 ("**FCA**").  There is no genuine dispute of material fact as to this aspect of the case, because the terms of the BlueWave compensation structure and the intent of the parties to knowingly induce the referral of federal healthcare business is apparent from the face of the agreement.

1

Second, the Liquidating Trustee is entitled to summary judgment on his claim seeking to recharacterize T. Golias' BHL Settlement Note as a capital contribution. The BHL Settlement Note was executed on March 1, 2010, because HDL required additional capital to fund the BHL Settlement but was unable to obtain financing from a third-party lender and was undercapitalized. The BHL Settlement Note was executed in favor of an insider who was HDL's largest shareholder, lacked a fixed maturity date, had no fixed rate of interest, did not require interest payments, the source of repayment was based on the success of HDL's business, and no sinking fund was established for its repayment. Thus, given the instrument's characteristics and the economic reality of the circumstances surrounding HDL's entry into the BHL Settlement Note, it should be recharacterized as a capital contribution and all payments thereunder should be recharacterized as equity distributions.

Third, the Golias Defendants' and BlueWave's proofs of claim seeking payments allegedly due in the one year preceding the Petition Date should be equitably subordinated based upon their knowledge of HDL's insolvency, scheme, and other misconduct.

Fourth, the Liquidating Trustee is entitled to summary judgment on his constructive fraudulent transfer and preference claims because he has presented unrebutted evidence and the expert report of Christopher J. Kearns that HDL was insolvent based on the balance sheet test, the adequate capital test, and the cash flow test. In contrast, the Defendants rely upon the expert report of Marc Brown, who testified that he was instructed by counsel to assume HDL had no liabilities to the government or private payors, only tested HDL's solvency on December 7, 2012 and January 11, 2013, and did not consider evidence that preceded or post-dated those testing dates. However, Mr. Brown's testimony is not based on the actual facts of the case. Contrary to the "no liabilities" assumption from counsel upon which Mr. Brown relied, the undisputed factual record and

214874179

applicable caselaw makes clear that HDL had liabilities to the government and payors, as further set forth in the Kearns Report. Thus, the Liquidating Trustee has presented unrebutted testimony that HDL was insolvent and has met all other applicable elements of his constructive fraudulent transfer and preference claims.

Fifth, the Liquidating Trustee is entitled to summary judgment on his tortious interference claims asserted on behalf of the Assigning Creditors Aetna, Cigna and UHC because there is no genuine dispute of material fact that the Insurers had contractual and/or business relationships or expectancy with HCPs and patients, that the defendants knew of these relationships, and that the Tortious Interference Defendants intentionally and unjustifiably interfered with the same by inducing and enticing HCPs and patients to use HDL for laboratory testing even though HDL was an out-of-network laboratory. By using HDL's tests, HCPs and patients breached provisions of their agreements with the Insurers and diverted business from in-network laboratories to HDL. HDL submitted claims to the Insurers that included phantom, exorbitant and unjustified rates, which did not represent the rates HDL intended to collect from the patients. As a result, the Insurers paid more for services than they would be obligated to pay otherwise and suffered damages in amounts of their filed proofs of claim, which the Liquidating Trustee will prove at trial.

Sixth, the Liquidating Trustee is entitled to summary judgment on several affirmative defenses asserted by the Defendants, including the statute of repose, the advice of counsel defense, and other defenses to the Liquidating Trustee's fraudulent transfer and preference claims. All of these defenses are unavailing as a matter of law, or based upon the uncontroverted factual record that has been established in this case. Accordingly, the Liquidating Trustee is entitled to summary judgment on those affirmative defenses.

214874179

## **LEGAL STANDARD**

Summary judgment is proper where "there is no genuine dispute as to any material fact" and a party is "entitled to judgment as a matter of law." *See* Fed. R. Civ. Proc. 56(a); *United States v. Ringley*, 985 F.2d 185, 186 (4th Cir. 1993).[1] A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "As the Supreme Court has observed, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact.*" *Bouchat v. Bal. Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (citing *Anderson*, 477 U.S. at 247-48). Inferences from the facts are to be drawn in the light most favorable to the nonmoving party. *Magill v. Gulf & Western Indus., Inc.*, 736 F.2d 976, 979 (4th Cir. 1984).

Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Peterson v. Tyson Foods, Inc.*, 983 F.2d 1057 (4th Cir. 1993); *Steelcase, Inc. v. M.B. Haynes Corp.*, No. 1:09CV443, 2011 WL 3439241, at *2 (W.D.N.C. Aug. 5, 2011).[2]

---

[1] Federal Rule of Civil Procedure 56 was amended in 2010 to change the standard from "no genuine **issue** of material fact" to "no genuine **dispute** of material fact." *See* Committee Notes on Rules – 2010 Amendment, Fed. R. Civ. Proc. 56 (emphasis added). The committee noted that the word "'dispute'" better reflects the focus of a summary-judgment determination. *Id.*

[2] To the extent the Court determines that summary judgment is not warranted for an entire claim or defense, the Liquidating Trustee respectfully submits that this Court enter an order on any issues that it finds are undisputed pursuant to Federal Rule of Civil Procedure 56(g), which authorizes the Court to "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. Proc. 56(g); *D'Iorio v. Winebow, Inc.*, 68 F. Supp. 3d 334, 356 (E.D.N.Y. 2014); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011).

214874179

## ARGUMENT

I.    **This Court Should Enter a Summary Declaratory Judgment That the Percentage-Based Commission Structure in The BlueWave Agreement Violated Applicable Law and Grant the Liquidating Trustee's Objection to BlueWave's POC  (Counts 74 and 75 of the Amended D&O Complaint)**

At the heart of HDL's Illicit Scheme was the BlueWave Agreement, which provided for the payment of significant commissions to BlueWave based on a percentage of sales revenues generated from the sale of HDL's tests.  It is well-settled that such a payment arrangement violates the AKS and FCA.  This is a pure question of law that the Court can decide, and there are no genuine disputes of material fact as to the illegality of BlueWave's percentage-based commission structure.   The Court should enter a declaratory judgment recognizing the illegality of the BlueWave Agreement and granting the Liquidating Trustee's objection to the BlueWave POC that seeks to recover illegal payments under that agreement.

A.    **The Percentage-Based Commission Structure in the BlueWave Agreement Violated Applicable Law**

1.    *Legal Standard*

A court may award declaratory relief under 28 U.S.C. § 2201 when there is an "actual controversy," *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592–93 (4th Cir. 2004), and the Court finds that "(i) it will serve a useful purpose in clarifying and settling the legal relations in issue, and (ii) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994) (internal quotation and citation omitted). "In a bankruptcy context, the court has authority to issue declaratory judgments on matters concerning the administration of the estate." *In re Abell*, 549 B.R. 631, 649 (Bankr. D. Md. 2016). The Court can determine whether a contract is illegal as a matter of law.  *Minn. Lawyers Mut. Ins. Co. v. Batzli*, No. 3:09CV432, 2009 WL 5172860, *1 (E.D. Va. 2009) ("When a claim for declaratory judgment, standing alone, seeks only

214874179

an interpretation or construction of the law, there is obviously no entitlement to a jury trial."); *Zimmer, Inc. v. NuTech Med., Inc.*, 54 F. Supp. 2d 850, 862 (N.D. Ind. 1999) (determining that sales agreement violated the AKS on summary judgment and declaring that the agreement was void and unenforceable).

The BlueWave Agreement states that it was governed by Georgia law. *See* SMF ¶ 29; Kanowitz Decl., Ex. 130, § 17. Georgia Code § 13-8-1 states that a "contract to do an immoral or illegal thing is void." *See Hays v. Adam*, 512 F. Supp. 2d 1330, 1342 (N.D. Ga. 2007) (holding contracts between billboard advertising company and its sales agents to be illegal because they contemplated the marketing of unregistered securities in contravention of federal securities laws). The commission structure in the BlueWave Agreement violated the AKS and FCA and therefore is unenforceable under Georgia law.

2.       *Applicable Law*

a.       *The Anti-Kickback Statute*

The AKS prohibits knowingly and willfully offering, paying, soliciting or receiving any remuneration to induce the referral of items for services that may be reimbursed in whole or part by a federal health care program. 42 U.S.C. §1320a-7b(b). The remuneration can be in any form (e.g., in cash or in kind) and can be provided directly or indirectly, overtly or covertly. *Id.* Additionally, remuneration should be at fair market value ("**FMV**") for actual and necessary items furnished or services rendered based upon an arm's-length transaction and should not take into account the value or volume of any past or future referrals or other business generated between the parties. *See AKS Personal Services and Managements Contracts Safe Harbor, 42 C.F.R § 1001.952(d);*[3] *OIG Supp. Compliance Guidance for Hospitals*, 70 Fed. Reg. 4858, 4866 (Jan. 31,

---

[3] The OIG has provided statutory exceptions and regulatory safe harbors to protect certain arrangements from AKS prosecution because such practices are unlikely to result in fraud or abuse. 42 C.F.R. § 1001.952. For example, the

214874179

2005). In its guidance regarding compliance for physician practices, the OIG directs that FMV

"excludes any value attributable to referrals of Federal program business or the ability to influence

the flow of such business." *OIG Compliance Program for Individual and Small Group Physician*

*Practices*, 65 Fed. Reg. 59, 434, 440 n.28 (Oct. 5, 2000) (citation omitted). The AKS is implicated

if any "one purpose" of an arrangement is to induce or reward referrals.[4]

b.    *The False Claims Act*

The FCA provides, in pertinent part, that any person who: "(A) knowingly presents, or

causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes,

uses, or causes to be made or used, a false record or statement material to a false or fraudulent;

[or] (C) conspires to commit a violation of subparagraph (A) [or] (B) …. is liable to the United

States Government [for statutory damages and such penalties as are allowed by law]." 31 U.S.C.

§§ 3729(a)(1)-(3) (2006), as amended by 31 U.S.C. §§ 3729(a)(1)(A)-(C) (2010). Under the FCA,

"knowing" and "knowingly" "(A) means that a person, with respect to information i. has actual

knowledge of the information; ii. acts in deliberate ignorance of the truth or falsity of the

information; or iii. acts in reckless disregard of the truth or falsity of the information; and (B)

requires no proof of specific intent to defraud." 31 U.S.C. § 3729(b) (2006), *as amended by* 31

U.S.C. § 3729(b)(1) (2010).

---

Personal Services and Managements Contracts safe harbor may offer protection to an arrangement between an entity and an independent contractor, such as a HCP, if the arrangement (1) is in writing and signed by the parties; (2) covers all services provided by the independent contractor, and specifies the services to be provided; (3) for part-time work, sets forth the schedule, length, and exact charge for the intervals of work; (4) spans at least one year; (5) sets in advance the aggregate compensation to be paid, which must be fair market value and not be determined in a manner that takes into account the volume or value of any referrals or business generated between the parties; (6) does not involve services that involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law; and (7) covers aggregate services that do not exceed those reasonably necessary to accomplish the commercially reasonable purpose of the services. 42 C.F.R. § 1001.952(d). There must be strict compliance with all seven elements for safe harbor protection to apply.

[4] *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985).

7

The FCA further provides that any person who violates the FCA is liable to the U.S. Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty. *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

In March 2010, as part of the Patient Protection and Affordable Care Act of 2010 ("**ACA**"), Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010), the AKS was amended to provide expressly that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g) (as amended by § 6402 of the ACA). According to the legislative history of the ACA, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for purposes of civil action under the False Claims Act . . . ." 155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010).

> 3.     *The BlueWave Agreement Violated the AKS and FCA By Providing for Illegal Percentage-Based Compensation*

The percentage-based commission structure in section 4 of the BlueWave Agreement was a contractual mechanism to provide BlueWave with kickbacks in violation of the AKS.  In addition to payment of monthly fees, the BlueWave Agreement provided for BlueWave to receive a commission that was equal to 13.8% of the revenue collected by HDL from sales in the Territory from April 1, 2010 through September 30, 2011, and thereafter, 16.8% of the revenue collected by HDL from sales in the Territory.  Kanowitz Decl., Ex. 130, § 4.  "Sale" was defined as an "order for services and accepted by [HDL] obliging [HDL] to deliver its services." *Id.*  This is exactly the type of arrangement that the OIG[5] explicitly identified as abusive of federal healthcare programs. Examples of such OIG advisory opinions include, but are not limited to, the following:

---

[5] The OIG's guidance is "entitled to deference." *NuTech Medical*, 54 F. Supp. 2d at 856.

214874179

- OIG, Advisory Opinion No. 99-3 (Mar. 16, 1999), which provides that the OIG identified "several characteristics of arrangements among [s]ellers, sales agents, and purchasers that appear to be associated with an increased potential for program abuse, particularly overutilization and excessive program costs …" such as "compensation based on percentage of sales; … direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program; … use of sales agents who are healthcare professionals or persons in a similar position to exert undue influence on purchasers or patients; and marketing of items or services that are separately reimbursable by a Federal health care program … whether on the basis of charges or costs." *See* SMF ¶ 36.

- OIG, Advisory Opinion No. 98-1 (Mar. 25, 1998), which determined that a percentage-based compensation arrangement between an orthopedic manufacturer and a third-party independent contractor was problematic because (1) it included significant financial incentives that increased the risk of abusive marketing and billing practices; (2) the third-party independent contractor had opportunities to unduly influence referral sources and patients through active marketing and direct contacts with physicians who order and dispense the manufacturer's products; and (3) the proposed arrangement contained no safeguards against fraud and abuse. *See id.*

- OIG, Advisory Opinion No. 98-4 (Apr. 15, 1998), in which the OIG determined that an arrangement between a sleep testing provider and a hospital, through which the sleep testing provider was compensated for its marketing services based on each successful order for items or services was "inherently subject to abuse because [it is] linked to business generated by the marketer." *See id.*

- OIG, Advisory Opinion No. 11-15 (Oct. 3, 2011), in which OIG determined that the proposed management contract between a clinical pathology laboratory and a third-party marketing and selling company, which provided for a fee to the third-party company calculated based on a percentage of a laboratory's income would "pose more than a minimal risk of fraud and abuse" for several reasons, including that the usage fees "take into account the volume or value of business" generated for the laboratory, "posing considerable risks of overutilization of laboratory services, distorted medical decision-making, and increased costs to federal healthcare programs." *See id.*

- OIG, Advisory Opinion No. 11-17 (Nov. 16, 2011), in which the OIG determined that the proposed percentage-based compensation

9

arrangement between a laboratory and a HCP was not sufficiently low risk to deserve protection, stating that "[p]ercentage compensation arrangements are inherently problematic under the anti-kickback statute, because they relate to the volume and value of business generated between the parties, rather than the fair market value of the services provided" and create a risk of overutilization. *See id.*

By its plain terms, the percentage-based compensation structure in the BlueWave Agreement violated the AKS. **First**, it is clear that HDL and BlueWave intended for BlueWave to receive remuneration from HDL in exchange for arranging for or recommending purchasing or ordering HDL's products, which products might be paid in full or in part by federal healthcare programs. 42 U.S.C. §1320a-7b. The BlueWave Agreement states that BlueWave would "perform certain sales services" for HDL, including "the sale of various laboratory tests and services of HDL." Kanowitz Decl., Ex. 130, § 1. The BlueWave Agreement also clearly contemplates the sale of products that could have been paid for by governmental sources given that it (i) required BlueWave to allow the United States Department of Health and Human Services and the General Accounting Office to review its books and records (*id.*, § 4.c); (ii) stated that the BlueWave Agreement was to be "construed in accordance with any and all federal and state laws, including laws relating to Medicare, Medicaid, and other third-party payors" (*id.* § 18); and (iii) required "zero balance billing" for "Medicare . . . and Medicaid" (*id.* § 3(e)). There is no genuine dispute of material fact that the parties intended for BlueWave to sell and/or market HDL's tests to patients covered by federal healthcare programs.

**Second**, the intention of the parties to the BlueWave Agreement to knowingly and willfully induce the referral of federal healthcare business is apparent from the face of the agreement. Courts interpreting the above-cited OIG guidance have concluded on summary judgment that substantially similar sales agreements violated the AKS. *See, e.g.*, *Joint Tech., Inc. v. Weaver*, 567 F. App'x 585 (10th Cir. 2014) (affirming the decision of the district court on summary judgment,

which held that a contract between a durable medical equipment company distributor and its independent sales agent contractor violated the AKS, as the contract was based on a commission-based compensation structure); *NuTech Med., Inc.*, 54 F. Supp. 2d at 862 (granting plaintiff manufacturer's motion for summary judgment against defendant that marketed and distributed products in exchange for a percentage of "receivables" after finding that the compensation arrangement violated the AKS and was, therefore, illegal and unenforceable).[6]

The AKS "requires that the prohibited acts (soliciting, receiving, offering, or paying) be done 'knowingly and willfully,' not that the actor 'knowingly and willfully' intend to violate the statute." *NuTech Med., Inc.*, 54 F. Supp. 2d at 862. The inclusion of a percentage-based compensation scheme in the BlueWave Agreement is "sufficient to justify the conclusion that the parties' actions under the Agreement could be motivated by their desire to increase sales of . . . products that might be paid for by federal or state health care programs." *Id.* In other words, the BlueWave Agreement clearly motivated BlueWave to sell more of HDL's tests because BlueWave's compensation was directly correlated to the number of tests performed. Performance under such a compensation structure is exactly the "type of conduct that the anti-kickback statute was enacted to prevent." *NuTech Med, Inc.*, 54 F. Supp. 2d at 836. There is no genuine dispute of material fact that the BlueWave Agreement was unenforceable as a matter of law because it violated the AKS.[7]

---

[6] *See also Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F. Supp. 835, 837-44 (E.D. Ark. 1996) (granting defendant medical supplier's motion for summary judgment against plaintiff marketing company after finding that the commission-based sales arrangement was prohibited by the AKS and was not "saved by the 'safe harbor' regulations"); *Med. Dev. Network, Inc. v. Prof'l Respiratory Care*, 673 So. 2d 565 (Fla. Dist. Ct. App. 1996) (holding that commission-based sales agreement between durable medical equipment supplier and marketing company was "void and unenforceable as a matter of law," citing the AKS).

[7] The undisputed evidence also supports this fact. The commission-based compensation structure of the BlueWave Agreement was not reviewed by any healthcare attorneys when the agreement was executed. SMF ¶ 35. And the BlueWave Agreement in fact was implemented in a manner that demonstrates why such percentage-based commission

Moreover, because the BlueWave Defendants and Carnaggio Defendants were not employed by HDL, there is no genuine dispute of material fact regarding the inapplicability of the employee safe harbor provisions of the AKS. 42 U.S.C. § 1320a–7b(b)(3)(B). Subsection (b)(3)(B) of the AKS provides that "illegal remuneration" "shall not apply to . . . any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." *Id.* An "employee" is "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2); *see* 42 C.F.R. § 1001.952(i) ("employee . . . has the same meaning" as the Internal Revenue Code's definition of "employee"). The BlueWave Agreement explicitly states that the nature of the relationship between the sales force and HDL is not that of employer-employee, but rather of an independent contractor. Kanowitz Decl., Ex. 130, § 10 ("[BlueWave] shall act as and be deemed to be an independent contractor for all purposes of this Agreement.").

Likewise, there is no genuine dispute of material fact that the BlueWave Agreement fails the test set forth in 42 C.F.R. § 1001.952(d). That regulation provides that "remuneration," as used in the AKS, does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as the aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arm's-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare. *See* 42 C.F.R. § 1001.952(d). The BlueWave Agreement plainly fails this

---

arrangements are illegal, including the sales force's training to target "money hungry physicians" to induce referrals and increase payment of commissions. SMF ¶ 87.

test, as the compensation was directly tied to the number of sales generated on behalf of HDL. Accordingly, the BlueWave Agreement violated the AKS and was not subject to any safe harbor protection or defenses. Thus, the Liquidating Trustee is entitled to a summary declaratory judgment that the BlueWave Agreement violated the AKS.

In addition, the BlueWave Agreement, and BlueWave's performance thereunder, violated the FCA as under 42 U.S.C. §1320a-7b(g), any claim tainted by the AKS that HDL presented or that BlueWave caused to be presented to the government constituted a FCA violation. *See U.S. ex rel. Mayes v. Berkley HeartLab, Inc.*, 853 F.3d 131, 135 (4th Cir. 2017) (citing 42 U.S.C. § 1320a-7b(g)); *see also U.S. ex rel v. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2013 WL 1289269, at *4 (S.D. Fla. Mar. 27, 2013) ("[I]f a healthcare provider requests payment from Medicare notwithstanding the fact that the transactions underlying the claims were in violation of the Anti-Kickback Statute and Stark, the healthcare provider has committed a fraud against the government . . . ."); *see also United States v. United Techs. Corp.*, 2008 U.S. Dist. Lexis 61199, at *33 (W.D. Ohio Aug. 1, 2008) (awarding penalty for each invoice submitted), *aff'd on liability, rev'd on damages calculation*, 626 F.3d 313 (6th Cir. 2010).

### 4.   The Liquidating Trustee is Entitled to a Summary Declaratory Judgment that the BlueWave Agreement Violated Applicable Law

This Court should enter a summary declaratory judgment that the BlueWave Agreement violated applicable law and is void and unenforceable under Georgia Code § 13-8-1.  As set forth *supra*, because there is no genuine dispute of material fact that the BlueWave Agreement violated the law and policy underlying the AKS and FCA, it is illegal in all states. *Cf. Nursing Home Consultants, Inc.,* 926 F. Supp. at 842 ("If the Marketing Agreement violates the law and/or policy underlying the federal Medicare system, as expressed in the Medicare statutes and regulations, it is illegal in any state in the Union."). Under Georgia Code § 13-8-1, courts "will not enforce illegal

or immoral contracts because so doing would implicate the judiciary by facilitating the illegality

or immorality." *Brandon v. Newman*, 243 Ga. App. 183, 187, 532 S.E.2d 743 (2000).  Thus, this

Court should declare that the BlueWave Agreement is void and unenforceable.[8]

### B.      The BlueWave POC Should Be Disallowed Based Upon the Illegality of the BlueWave Agreement

Section 501(a) of title 11 of the United States Code (the "**Bankruptcy Code**") provides

that a creditor may file a proof of claim. 11 U.S.C. § 501(a).  In the event a proof of claim is filed

in accordance with the Bankruptcy Rules, it "shall constitute prima facie evidence of the validity

and amount of the claim." Fed. R. Bankr. P. 3001(f).  If a party in interest objects to a claim that

was filed in accordance with the Bankruptcy Rules, then the objection must contain some

substantial factual basis to support its allegation of impropriety in order to overcome the creditor's

prima facie case.  The objecting party has the burden of going forward with evidence supporting

the objection.  Such evidence must be of probative force equal to that of the allegations contained

in the proof of claim.  *In re Broadband Wireless Intern. Corp.*, 295 B.R. 140, 145 (10th Cir. B.A.P.

2003) (citing *Abboud v. Abboud*, 232 B.R. 793, 796 (Bankr. N.D. Okla. 1999), *aff'd*, 237 B.R. 777

(10th Cir. B.A.P. 1999)).  Should the objecting party satisfy this burden, "the burden then shifts

back to the creditor to prove the validity of the claim by a preponderance of the evidence." 4 Collier

on Bankruptcy ¶ 502.02[3][f] (15th ed. rev. 2007)).

---

[8] Although Georgia Code § 13-8-1 provides that the "[if] the contract is severable . . . the part of the contract which is legal will not be invalidated by the part of the contract which is illegal," the material provisions of the BlueWave Agreement cannot be severed. The promise to pay BlueWave percentage-based commission was central to the parties' performance under the BlueWave Agreement.  *Dougherty, McKinnon & Luby, P.C. v. Greenwald*, 225 Ga. App. 762, 763–64, 484 S.E.2d 722, 723 (1997). Thus both the services to be performed under the BlueWave Agreement and the consideration to be provided were illegal, rendering the agreement non-severable.  *Starr v. Robinson*, 181 Ga. App. 9, 10, 351 S.E.2d 238, 240 (1986) (holding that brokerage agreement was illegal and non-severable where both the consideration and services to be performed under the agreement were illegal). Nor can the BlueWave Agreement be rewritten in a way that makes it legal.  *Obester v. Lucas Assocs.*, No. 1:08-CV-03491-MHS-AJB, 2010 WL 8292401, at *46 (N.D. Ga. Aug. 2, 2010).

The BlueWave POC alleges claims against HDL for breach of the BlueWave Agreement, as well as a number of quasi-contractual claims for work and labor performed. SMF ¶ 256. All of those claims are unenforceable because the BlueWave Agreement violated applicable law, as did any payments made under the agreement. *Samples v. Monroe*, 183 Ga. App. 187, 358 S.E.2d 273 (1987) (holding that breach of contract and unjust enrichment claims were barred by Ga. Code § 13–8–1); *Broughton v. Johnson*, 247 Ga. App. 819–820(1)(a), 545 S.E.2d 370 (2001); *Phillips v. Blankenship*, 251 Ga. App. 235, 236, 554 S.E.2d 231, 233 (2001) ("If the consideration for [a] claim for unjust enrichment were based on [illegal activity], her claim would fail.").

The quasi-contractual claims are additionally unenforceable because BlueWave cannot recover on its quasi-contract claims when a contract (even one later found to be partially illegal) exists. *Ussery v. Goodrich Restoration, Inc.*, 341 Ga. App. 390, 393, 800 S.E.2d 606, 610 (2017). Additionally, the doctrine of unclean hands bars BlueWave from recovering on payments that violated applicable law. *See* Ga. Code. Ann. § 23-1-10 ("[H]e who would have equity must do equity and must give effect to all equitable rights of the other party respecting the subject matter of the action."); *Eichholz Law Firm, P.C. v. Jeff Martin & Assocs., P.C.*, No. CV414-172, 2016 WL 4492855 (S.D. Ga. Aug. 24, 2016).

Moreover, BlueWave's damages claims are limited because the BlueWave Agreement was terminable upon 30 days' written notice by HDL to BlueWave. *See* Kanowitz Decl., Ex. 130, § 7.b ("Either party may terminate this agreement upon the material or continuing breach of the other by giving the other thirty (30) days prior written notice of termination, specifying the breach and injury with reasonable particularity. Termination shall become effective at the end of such notice period unless the cited breach is cured to the satisfaction of the party giving notice."). The BlueWave Agreement was terminated by notice dated January 9, 2015. SMF ¶ 229. Thus,

pursuant to section 7(b) of the BlueWave Agreement, BlueWave cannot recover any payments that

would have been due to BlueWave starting 30 days after the notice of termination was served, *i.e.*,

February 8, 2015. *See Livernois v. Med. Disposables, Inc.*, 837 F.2d 1018, 1023 (11th Cir. 1988).

## II.    The BHL Settlement Note and Golias Double Payment Should be Recharacterized as Equity Contributions (Count 29 of the Amended D&O Complaint)

This Court has the authority to recharacterize a debt financing as an equity contribution.

*Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N.*

*Am.), Inc.)*, 453 F.3d 225, 233 (4th Cir. 2006).  The factors the court may consider in determining

whether it should recharacterize a claim include:

> (1) the names given to the instruments, if any, evidencing the
> indebtedness; (2) the presence or absence of a fixed maturity date
> and schedule of payments; (3) the presence or absence of a fixed rate
> of interest and interest payments; (4) the source of repayments; (5)
> the adequacy or inadequacy of capitalization; (6) the identity of
> interest between the creditor and the stockholder; (7) the security, if
> any, for the advances; (8) the corporation's ability to obtain
> financing from outside lending institutions; (9) the extent to which
> the advances were subordinated to the claims of outside creditors;
> (10) the extent to which the advances were used to acquire capital
> assets; and (11) the presence or absence of a sinking fund to provide
> repayments.

*Id.*    However, no single factor is dispositive in determining whether recharacterization is

appropriate under the circumstances. *In re Commonwealth Biotechnologies, Inc.*, No. 11-30381-

KRH, 2012 WL 5385632, at *7 (Bankr. E.D. Va. Nov. 1, 2012).  Applying these factors, and

considering the circumstances at HDL at the time of the transaction, there is no genuine dispute of

material fact that the March, 1 2010 "Note" provided by Tipton Golias should be recharacterized

as equity.

The undisputed facts demonstrate that the investment instrument was a "Promissory Note"

in name only. *See* SMF ¶ 58; Kanowitz Decl. Ex. 70.  There is no genuine dispute of material fact

that at the time the "Note" was executed in March 2010, HDL was significantly undercapitalized

and had to settle a lawsuit with BHL in order to continue operating. *See* SMF ¶ 62; *see also In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 916 (Bankr. E.D. Va. 1997) ("[i]f investing in the corporation appears to have been especially risky (e.g. it was thinly capitalized), or the source of funds to repay the loan is not made clear, then the transaction has more of the earmarks of an equity contribution.")  Indeed, Mallory explained that "we had to get the loan in order to fund [the BHL Settlement"] at execution of the settlement agreement." *See* Kanowitz Decl. Ex. 17, at 46:10-22.

Since they had been heavily involved in the settlement discussions, it is clear that the Golias Defendants knew at the time that HDL's situation was dire. As J. Golias explained: ". . . the financing that we provided was critical." *See* Kanowitz Decl. Ex. 9, at 157:18-25.  And, on March 19, 2010, Mallory told both J. Golias and Bartlett that she was "really worried about payroll next week."  Kanowitz Decl. Ex. 68. Seizing on this destitute financial situation, T. Golias provided the "Note," the terms of which Mallory described as simply "crazy."  Kanowitz Decl., Ex. 17, at 46:23-47:4.

As the instrument itself details, T. Golias was all but guaranteed significant investment returns typically only achievable through stock, stock options or preferred stock – up to and including a potential *six* times return on the loan principal.  *See* Kanowitz Decl. Ex. 70, at HDL_DO_03375203.   Further, the repayment terms were commercially adhesive as well, providing for repayment of his $3,650.000 advance in full by April 26, 2010.  *Id.* at HDL_DO_03375202.  But, as Mallory explained, HDL "had no choice . . . [w]e . . . had signed the document with Berkeley Settlement Agreement because Golias said that they would fund . . . so once it was signed, we were stuck having to fund it." *See* Kanowitz Decl. Ex. 17, at 47:15-19; *see also* SMF ¶ 63. HDL's undercapitalized position left it without any other options. *Id.  See Commonwealth Biotechnologies, Inc.,* 2012 WL 5385632, at *7 (holding recharacterization would

have been appropriate where "[p]laintiff was undercapitalized at the time the Purported Note was issued.").

Further, and unlike two previous promissory notes provided by T. Golias, which were actually interest-bearing loans, the BHL Settlement Note lacked a fixed rate of interest, did not require interest payments, and excluded a fixed maturity date. *See* Kanowitz Decl. Ex. 70. The lack of such formalities is atypical for a conventional debt financing. *See In re Province Grande Olde Liberty,* LLC, 655 Fed. App'x 971, 975 (4th Cir. 2016) (affirming bankruptcy court's decision to recharacterize debt as equity where, *inter alia*, there was a failure "to observe any formalities such as . . . actual interest payments . . . ."); *see also* Kanowitz Decl. Ex. 112 (payoff statement).  And as further evidence that this was not a typical debt financing, the source of repayment was based on the success of HDL's business – no sinking fund was established for its repayment.  In an apparent acknowledgment of its inherent potential equity returns, the instrument did not provide, as had the Initial Golias Notes, that the amounts advanced could be converted into HDL stock.  SMF ¶ 11.  There is no genuine dispute of material fact as to the atypical nature of the purported debt financing provided by T. Golias.

The circumstances surrounding the March 24, 2010 installment payment were also atypical of a debt financing.  The March 24, 2010 payment was made pursuant to a separate promissory note dated March 23, 2010, and not under the terms and conditions of the BHL Settlement Note or the Second Shareholders' Agreement.  SMF ¶ 65.  Subsequently, the Second Shareholders' Amendment stated that the March 23 promissory note was cancelled as of its issuance date and "replaced by the $600,000 advance set forth in section 7(f) below."  SMF ¶ 66.  Thus, the terms of the financing provided by T. Golias were modified by an amendment to the Shareholders' Agreement that was signed by all of HDL's shareholders.  The fact that T. Golias entered into such

18

a modification through a document that governed the relationship between HDL and its equityholders demonstrates the lack of any genuine disputes of material fact as to whether the BHL Settlement Note was intended to be an equity contribution rather than a debt financing.

The BHL Settlement Note also required HDL to pay T. Golias based on a formula keyed off the date of the payment. *See* Kanowitz Decl. Ex. 70. The minimum was *double* the amount advanced, increasing to six times the amount advanced if paid between January 1, 2018 and December 31, 2018, an outrageous multiple for a true loan. On December 29, 2011, just days before the double payment formula would have increased to a "2.5 times" figure, HDL paid T. Golias in the amount of $7,300,000. *See* Kanowitz Decl. Ex. 1, at 160:15-21. HDL's payment was double the amount of Tipton Golias's $3,650,000 advance and represented an effective interest rate of 50.27% per annum. Viewed under the totality of the circumstances surrounding entry into the BHL Settlement Note, the undisputed facts clearly display that the "Note" was clearly not a debt instrument, and as such, the Liquidating Trustee is entitled to summary judgment on his recharacterization claim.[9]

## III. BlueWave's and the Golias Defendants' POCs Should Be Equitably Subordinated Under Section 510(c) of the Bankruptcy Code (Count 76 of the Amended D&O Complaint)

In order to succeed on a claim for equitable subordination under section 510(c) of the Bankruptcy Code, the movant must establish that (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to the creditors of the bankrupt and conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *In re S. Textile Knitters*, 65 Fed.

---

[9] The Liquidating Trustee also relies upon the unrebutted expert testimony of Kearns, who opined that "any transfers made on account of those 'loans' made by Golias are economically equivalent to 'equity' contributions and distributions." SMF ¶¶ 262, 264; Kanowitz Decl., Exs. 31 at 61; and 15 at 250:20 to 254:12.

App'x 426, 439 (4th Cir. 2003); *In re ASI Reactivation, Inc.*, 934 F.2d 1315, 1321 (4th Cir. 1991);

*In re Starlight Grp., LLC*, 531 B.R. 611, 636 (Bankr. E.D. Va. 2015). Inequitable conduct typically

takes the form of: (1) fraud, illegality, breach of fiduciary duties, (2) undercapitalization, or (3)

claimant's use of the debtors as a mere instrumentality or alter ego. *See In re Epic Capital Corp.*,

290 B.R. 514, 524 (Bankr. D. Del. 2003). Insider conduct is scrutinized under a more exacting

standard and a plaintiff need only present evidence of unfair conduct and the insider must then

prove the underlying fairness of the transaction. *Fabricators, Inc. v. Technical Fabricators, Inc.*

*(In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991).

A.    **BlueWave's and the Golias Defendants' POCs Should be Equitably
        Subordinated**

There is no genuine dispute of material fact as to whether the Court should equitably

subordinate the claims of BlueWave and the Golias Defendants, all of which seek payments

allegedly due either within the 1 year prior to the Petition Date or post-petition. It is inequitable

to allow BlueWave to recover payments under the illegal and void BlueWave Agreement, which

contains a percentage-based commission structure that violates the AKS and FCA, rendering it

unenforceable by this Court. *See supra* section I. There is also no genuine dispute of material fact

that the BlueWave Defendants participated in the Illicit Scheme that gives rise to the Liquidating

Trustee's claims, SMF ¶¶ 69-147, and repeatedly ignored red flags and advice that such conduct

was high risk, SMF ¶¶ 148-149, 179, 184, 186. It would be inequitable to allow parties that engage

in such harmful misconduct to recover ahead of the creditors that they harmed.

Similarly, the claims of the Golias Defendants, who now seek to recover unpaid

Shareholder Tax Distributions or payments to Helena, should be subordinated given that there is

no genuine dispute of material fact that the payments were due at a time when they knew or should

have known HDL was insolvent and after HDL revoked its S Corp. status. *See infra*, section

20

VII.B.2.  The Golias Defendants also knew or should have known that HDL's business was high risk and suspect at all times relevant to the Golias Defendants' POCs. *See id.* It is therefore appropriate for the Court to subordinate the Golias Defendants' claims in light of their knowledge of HDL's fraud and insolvency and status as insiders.

> **B.      The Conduct of the BlueWave Defendants' and Golias Defendants' Agents Should Be Imputed To Them For Purposes of Equitable Subordination and their Alleged Good Faith Transferee Defense**

For the purposes of equitable subordination and the good faith transferee defense discussed herein, the conduct and knowledge of certain individual defendants should be imputed to their principals, corporations, and family members under the imputation doctrine. It is black-letter law that under the imputation doctrine, a principal is constructively chargeable with, and bound by, the knowledge received by its agent. 3 Am. Jur. 2d Agency § 256.  "The rule of imputed knowledge is a rule of public policy based upon the necessities of general commercial relationships, and where a principal acts through an agent, a third person dealing with the agent is entitled to rely upon the agent's knowledge and notice, and it binds the principal, who should incur the risks of the agent's infidelity or lack of diligence rather than innocent third parties." *Id.*

There are two groups of defendants who are subject to the imputation doctrine.  The Golias Shareholder Defendants executed irrevocable powers of attorney that made T. Golias their agent for all HDL-related matters and authorized him to vote their shares as HDL shareholders.  SMF ¶ 51. Such an instrument creates an express agency relationship as a matter of law. *Jordan v. Osmun*, Civil Action No. 1:16-cv-501, 2016 U.S. Dist. LEXIS 135314, at *9 (E.D. Va. Sep. 29, 2016);

*Pool v. Johnson*, Civil Action No. 3:01-CV-1168-L, 2002 U.S. Dist. LEXIS 6613, at *15 (N.D. Tex. Apr. 15, 2002).[10]

Moreover, all of the Golias Shareholder Defendants are related to T. Golias as his relative, co-worker, close family friend, or trusts established for the benefit of his relatives.  SMF ¶ 52. And the undisputed material facts demonstrate that the other Golias Shareholder Defendants received regular updates regarding HDL from T. Golias and/or J. Golias. SMF ¶¶ 54, 165. Thus, T. Golias was also the apparent or implied agent of the other Golias Shareholder Defendants.  *Hoff v. Comput. Assocs. Int'l, Inc.*, CA 3-96-CV-2679-R, 1997 U.S. Dist. LEXIS 23465, at *19 (N.D. Tex. Aug. 18, 1997); *see also Rahbar v. Law Office of Arquilla & Poe*, PLC, No. 1:18-cv-1475 (LMB/MSN), 2019 U.S. Dist. LEXIS 63133, at *25 (E.D. Va. Apr. 11, 2019).

Accordingly, there is no genuine dispute of material fact that T. Golias acted as the agent for the other Golias Shareholder Defendants.  Because T. Golias was the agent for the other Golias Shareholder Defendants, they are constructively charged with any knowledge that he knew or should have known regarding HDL.  *In re Anderson*, 330 B.R. 180 (Bankr. S.D. Tex. 2005) ("[N]otice to an agent is constructive notice to the principal."); *see also Chapman v. Parsons*, Civil Action No. 4:18-cv-00360-O, 2019 U.S. Dist. LEXIS 118310, at *14 (N.D. Tex. Apr. 2, 2019) ("[I]t has long been the rule in Texas that 'if an agent's acts are within the scope of his authority, then notice to the agent of matters over which the agent has authority is deemed notice to the principal.'" (quoting *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295, 300 (Tex. 1981)); 3 Am. Jur. 2d Agency § 259 ("[F]or purposes of determining a principal's legal

---

[10] The result is the same under Virginia law (where HDL is based) or Texas law (where the Golias Shareholder Defendants and Helena reside or are incorporated).

relations with a third party, notice of a fact that an agent knows or has reason to know is imputed

to the principal if knowledge of the fact is material to the agent's duties to the principal.").

Such knowledge also includes any knowledge gained by T. Golias' attorneys, Galen and

Bartlett as the Golias Shareholder Defendants' board designees, and J. Golias as Tipton's delegate

for HDL-related matters.  SMF ¶ 53, 201-202.  *See Willoughby v. Metro. Lloyds Ins. Co.*, No. 3:12-

CV-861-P, 2013 U.S. Dist. LEXIS 193551, at *10 (N.D. Tex. Mar. 8, 2013) (holding that

knowledge acquired by attorney is imputed to the client); *Yamada v. McLeod*, 243 Va. 426, 433,

416 S.E.2d 222, 226 (1992) (same).[11] And for similar reasons, T. Golias' and J. Golias' knowledge

is imputed to Helena because they are officers of Helena. SMF ¶ 231; *see Askanase v. Fatjo*, 130

F.3d 657, 666 (5th Cir. 1997); *Reneker v. Offill*, Civil Action No. 3:08-CV-1394-D, 2012 U.S.

Dist. LEXIS 83017, at *34 (N.D. Tex. June 14, 2012).

The conduct of Dent should also be imputed to BlueWave and the other BlueWave

Defendants.  Dent was either the primary owner or officer of each of the BlueWave Defendants,

or the BlueWave Defendant is owned by his wife.  *See* SMF ¶¶ 37-46. All of the BlueWave

Defendants also share the same accountant. *Id.* at ¶ 47.  Under those circumstances, Dent's

individual acts and knowledge should be imputed to each of the BlueWave Defendants because

Dent was their express, apparent or implied agent. *See Mauldin Furniture Galleries, Inc. v. Branch

Banking & Tr. Co*., No. 6:10-240-TMC, 2012 U.S. Dist. LEXIS 121140, at *21 (D.S.C. Aug. 27,

2012) ("[N]otice of facts by an officer or agent of a corporation is normally imputed to the

---

[11] *See also In re Am. Apparel, Inc. Shareholder Litig.*, 2013 WL 10914316, at *37 & n. 262 (C.D. Cal. Aug. 8, 2013) ("The reason Lion Capital was given two seats on [the] board was to ensure that it would be able to influence the company's business decisions and safeguard its investment. Any conclusion that Lion Capital did not control the decisions of the board members it designated would ignore the reason it negotiated for seats on the board in the first place.").

214874179

corporation.").[12] Such knowledge includes knowledge of Dent's and BlueWave's attorneys and

other representatives such as Johnson. *See Faulkner v. Millar*, 319 S.C. 216, 460 S.E.2d 378 (1995)

(notice to an attorney is notice to the client).

## IV.  The Court Should Grant Partial Summary Judgment on the Liquidating Trustee's Constructive Fraudulent Transfer Claims  (Counts 2, 4, 6, 8, 10, 12, 30-33, 38, 40, 42, 44, 46, 48, 50, 51, and 52 of the Amended D&O Complaint)

The Liquidating Trustee may avoid pre-petition transactions that transferred HDL's assets

and that were constructively fraudulent or preferential under applicable law.  HDL made several

Transfers that should be avoided, including the Shareholder Distributions, the Bluewave Transfers;

and the Golias Double Payment (collectively, the "**Constructive Fraudulent Conveyances**"), the

Preference Transfers, and the Subsequent Transfers to Dent, the BlueWave Defendants, and the

AMS Defendants.  There are no disputed issues of material fact for the Constructive Fraudulent

Transfers, the Preference Transfers, or the Subsequent Transfers.

### A.    Applicable Law

The Liquidating Trustee's constructive fraudulent transfer claims arise under several

federal and state laws.[13]  Each of these laws, discussed below, allows the Liquidating Trustee to

avoid transfers and return those assets to HDL's estate.  They all apply to transactions where HDL

(1) transferred property in which it had an interest or assumed an obligation; (2) did not receive a

fair return for the asset transferred or obligation assumed; and (3) were made when HDL was

already insolvent or would leave HDL insolvent, undercapitalized, or unable to pay its debts as

---

[12] The result is the same under Virginia law (where HDL is based) or South Carolina law (where the BlueWave Defendants reside or are incorporated).

[13] Section 544(b) provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." The term "applicable law" includes both state law (which is most commonly the UFTA), as well as nonbankruptcy federal law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301-3308 ("**FDCPA**"). The specific relevant laws are discussed herein.

they matured.[14]  *See* 11 U.S.C. 548(a)(1)(B).  Each of the other applicable laws follow a

substantially similar analysis.  *See* Adv. 16-03271 Dkt. No. 363 (the "**MTD Mem. Op.**"), at 38

(UFTA), 41-42 (FDCPA); *Official Comm. of Unsecured Creditors of Exeter Holding, Ltd. v.

Haltman*, No. 13-CV-5475 (JS)(AKT), 2018 WL 1582293, at *10 (E.D.N.Y. Mar. 30, 2018) ("The

elements of a constructive fraudulent conveyance claim under [the Uniform Fraudulent

Conveyance Act] are similar [to 11 U.S.C. § 548]."); *In re Laines*, 352 B.R. 397, 402 n.6 (Bankr.

E.D. Va. 2005) (using same insolvency analysis for both Va. Code 55-81 and 11 U.S.C.

548(a)(1)(B)).

   The Liquidating Trustee may satisfy the insolvency element by satisfying any one of three

tests: (a) the balance sheet test, (b) the adequate capital test, or (c) the cash flow test.  *In re Blixseth*,

514 B.R. 817, 880-884 (Bankr. D. Mont. 2014).  Using the balance sheet test, the Liquidating

Trustee may establish insolvency by showing "the sum of the debts is greater than the sum of the

assets, at a fair valuation, exclusive of property transferred with actual fraudulent intent, and

property that may be exempted from the bankruptcy estate."  *In re SunSport, Inc.*, 260 B.R. 88,

116 (Bankr. E.D. Va. 2000) (citing 5 *Collier on Bankruptcy* ¶ 548.05[1][a].).  This analysis should

include all debts and liabilities, including those that are contingent[15] or the result of fraud, even if

they do not appear on the company's contemporaneous financial statements.  *See In re Merry-Go-

Round Enterprises, Inc.*, 229 B.R. 337, 343 (Bankr. D. Md. 1999) (rejecting balance sheet analysis

that did not include contingent liabilities); *In re Turner & Cook, Inc.*, 507 B.R. 101, 109 (Bankr.

D. Vt. 2014) ("[I]t is reversible error to exclude a potential liability from the insolvency calculation

---

[14] Collectively, the third element is referred to as insolvency.

[15] As that term is defined under section 101 of the Bankruptcy Code.  A "debt" is defined as a "liability on a claim" and a "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §§ 101(5) and (12).

214874179

merely because the liability is contingent or because the debtor disputes the claim. . . . When a liability was contingent at the time of the challenged transfers but is reduced to judgment before the court's insolvency determination, however, a court may permissibly use the judgment amount in valuing the contingent liability at the time of the transfers."); *In re LXEng LLC*, 607 B.R. 67, 97–98 (Bankr. D. Conn. 2019) ("Where 'a contingent liability is both probable and capable of reasonable estimation, it must be accrued.'" (quoting *Estimating Contingent Liabilities*, 1989 BYU L. Rev. at 1329)). If the debtor is in "precarious financial condition," its assets are discounted to their liquidation value. *In re Schwinn Bicycle Co.*, 192 B.R. 477, 486 (Bankr. N.D. Ill. 1996).

The Liquidating Trustee may also show insolvency using the adequate capital test. *In re Blixeth*, 514 B.R. at 883. This test looks at whether the debtor generated enough cash from operations or sales of assets to pay its debts and remain financially stable. *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992); *see also In re O'Day Corp.*, 126 B.R. 370, 406-07 (Bankr. D. Mass. 1992) (finding company did not maintain sufficient capital where it relied on unreasonable financial projections). The adequate capital test "encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually." *In re O'Day Corp.*, 126 B.R. at 407. And companies or enterprises that operate entirely on fraud are "insolvent from the outset and could have been petitioned into bankruptcy." *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (Posner, J.)

The Liquidating Trustee may also rely on the cash flow test to establish insolvency. *In re Blixseth*, 514 B.R. at 884. "[T]his test examines whether an entity has the ability to pay going forward." *Id.*; *In re WRT Energy Corp.*, 282 B.R. 343, 415 (Bankr. W.D. La. 2001) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely

26

214874179

would not be paid as their claims matured."). "[T]he intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." *In re WRT Energy Corp.*, 282 B.R. at 415 (citing 5 Collier on Bankruptcy ¶ 548.05[3][c]). This inference may be made based on objective standards of what was known (or should have been known) at the time. *Id.*; *In re Blixesth*, 514 B.R. at 884.

Insolvency, under any of the tests, is typically proven using expert testimony. *In re Kane & Kane*, 479 B.R. 617, 630 (Bankr. S.D. Fla. 2012). Although determining whether a transaction is a constructively fraudulent conveyance is typically a question of fact, summary judgment is appropriate "when a party opposing summary judgment fails to present evidence sufficient to make an issue of an expert's conclusions." *Id.*; *Kipperman v. Onex Corp.*, 411 B.R. 805, 835 (N.D. Ga. 2009) (granting summary judgment after expert report was excluded). Based on the undisputed facts in this case, and the Defendants' failure to present evidence sufficient to make an issue of the Plaintiff's expert's conclusions, all the Transfers should be avoided as a matter of law. Any subsequent transfers of avoidable payments identified in Exhibit 3 to the Arrowsmith Decl. should be avoided as well. *See* 11 U.S.C. § 550(a).

### 1.   *Section 548 of the Bankruptcy Code*

The Liquidating Trustee may avoid any transfer or obligation of HDL if: (1) it resulted in a transfer of HDL's property or imposed an obligation on HDL; (2) it was made or incurred within 2 years of the filing of the Petition Date; (3) HDL received less than reasonably equivalent value; and (4) either (a) HDL was insolvent or made insolvent by the transfer, (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with HDL was an unreasonably small capital, or (c) intended to incur, or believed that

HDL would incur, debts that would be beyond HDL's ability to pay as such debts matured.  11

U.SC. 548(a)(1)(B).

"Reasonably equivalent value" means the value on the date of the transfer in light of all of

the circumstances.  *See In re Jeffrey Bigelow Design Grp., Inc.*, 956 F.2d 479, 484 (4th Cir. 1992)

("Reasonably equivalent value is not susceptible to simple formulation. . . . The focus is on the

consideration received by the debtor, not on the value given by the transferee." (ellipsis in

original)); *In re Whitley*, 463 B.R. 775, 785 (Bankr. M.D.N.C. 2012).  "Value" can mean property

or satisfaction or security of a present or antecedent debt by the debtor.  *In re Ryan*, 472 B.R. 714,

727 (Bankr. E.D. Va. 2012).  To determine if the value is "reasonably equivalent," the court looks

to the consideration actually received by the debtor, not to the value given by the transferee." *Id.*

### 2.      *UFTA, as applicable law under section 544(b) of the Bankruptcy Code*

Bankruptcy Code section 544(b) allows the Liquidating Trustee to bring actions under non-

bankruptcy law in a bankruptcy action.  Therefore, he may bring claims under the laws of states

where any wire transfers were sent to:[16] Alabama, California, Illinois, Massachusetts, North

Carolina, Tennessee, Texas, and Wisconsin. Each of these states followed the Uniform Fraudulent

Transfer Act ("**UFTA**")[17] at the time of the Transfers.[18]

---

[16] Under Virginia law, a fraudulent conveyance is "completed by acceptance by the beneficiary's bank of a payment
order for the benefit of the beneficiary of the originator's payment order," which means that a fraudulent-conveyance
claim should be governed by the substantive law of the state where (a) the recipient's bank is located if a wire transfer
is used to pay the recipient; or (b) the transferor's (HDL) bank account is located if a check is used. *Terry v. June*, 420
F. Supp. 2d 493, 504 (W.D. Va. 2006).  The list of Transfers identifies the relevant mode of payment, state where the
recipient's bank account is located, and the applicable state fraudulent transfer law. SMF ¶ 275; Arrowsmith Decl.,
Ex. 1.

[17] *See* Ala. Code §§ 8-9A-1 *et seq.*; Cal. Civ. Code §§ 3439.01 *et seq.* (2014); 740 Ill. Comp. Stat. §§ 160/1 *et seq.*;
Md. Code Ann., Com. Law §§ 15-201 *et seq.*; Mass. Gen. Laws ch. 109A;  N.C. Gen. Stat. §§ 39-23.1 *et seq.* (2014);
Tenn. Code Ann. §§ 66-3-301 *et seq.*; Tex. Bus. & Com. §§ 24.001 *et seq.*; Wis. Stat. §§ 242.01 *et seq.*

[18] While California and North Carolina enacted the Uniform Voidable Transactions Act, the effective date of those
laws post-dates all of the Transfers at issue herein.  *See* 2015 Cal. Legis. Serv. Ch. 44 (effective January 1, 2016);
2015 N.C. Sess. Laws 23, § 5 (law effective for transfers made after October 1, 2015).

214874179

The UFTA empowers the Liquidating Trustee to avoid a transfer of the debtor's assets[19] or obligation incurred by a debtor as fraudulent if: (1) it does not receive a reasonably equivalent value in exchange for the transfer or obligation; and (2) the debtor either (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.  UFTA § 4(a)(2).

Alternatively, the Liquidating Trustee may avoid a transfer made or obligation incurred by a debtor as fraudulent if: (1) a creditor's claim arose before the transfer was made or the obligation was incurred;[20] (2) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and (3) the debtor was insolvent at that time, or the debtor became insolvent as a result of the transfer or obligation.  UFTA § 5.

### 3.    FDCPA, as applicable law under section 544(b) of the Bankruptcy Code

Bankruptcy Code section 544(b) permits the Liquidating Trustee to bring claims under the FDCPA, which "provides the exclusive civil procedures for the United States — (1) to recover a judgment on a debt; or (2) to obtain, before judgment on a claim for a debt, a remedy in connection with such claim." 28 U.S.C. § 3001. The Liquidating Trustee may avoid a transaction under the FDCPA if: (1) "the debtor makes the transfer or incurs the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation"; and (2) either "(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of

---

[19] "Asset" means property of a debtor. UFTA § 1(2).

[20] The Liquidating Trustee has identified several Assigning Creditors whose claims arose prior to the Transfers, including the DOJ and the Insurers. *See* SMF ¶ 246-249, 251.

the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." *See* 28 U.S.C. § 3304(b).

Alternatively, the Liquidating Trustee may avoid a transaction under the FDCPA if (1) the United States' claim arose before the transfer was made or the obligation was incurred; (2) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and (3) the debtor was insolvent at that time, or the debtor became insolvent as a result of the transfer or obligation. 28 U.S.C. § 3304(a).   The provisions of the FDCPA are substantially similar to section 548 of the Bankruptcy Code.  MTD Mem. Op., at 41-42.

> 4.    *Maryland Uniform Fraudulent Conveyance Act, as applicable law under section 544(b) of the Bankruptcy Code*

Pursuant to 11 U.S.C. 544(b), the Liquidating Trustee may also bring claims under the Maryland Uniform Fraudulent Conveyance Act ("**MUFCA**"), Md. Code, Com. Law, § 15-204 & 15-205, for any transfers that were wired to bank accounts located in Maryland.   Under that law, the Liquidating Trustee may avoid a conveyance if: (1) it was made by the debtor; (2) without fair consideration; and (3) (a) the debtor is insolvent or will be rendered insolvent by the transaction, (b) the debtor is engaged in or is about to engage in a transaction for which it is undercapitalized, or (c) the debtor believes that it will incur debts beyond its ability to pay.  *Id.*

Fair consideration is given for property or an obligation if "(1) In exchange for the property or obligation, as a fair equivalent for it and in good faith, property is conveyed or an antecedent debt is satisfied; or (2) The property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained."  *Id.* § 15-203.

214874179

5.      *Virginia Code § 55-81, as applicable law under section 544(b) of the Bankruptcy Code*

The Liquidating Trustee may avoid constructive fraudulent conveyances under Virginia law, pursuant to section 544(b) of the Bankruptcy Code, for any payments that were made by check from HDL's bank accounts.  A transfer is constructively fraudulent under Virginia's fraudulent transfer law when: (1) the debtor transfers property; (2) while it is insolvent or is thereby rendered insolvent; and (3) the transfer was not made upon consideration deemed valuable in law.  Va. Code § 55-81.  Courts interpreting this provision have concluded that "consideration deemed valuable in law" is "any valuable consideration received by the transferor," so long as something is gained. *In re Meyer*, 244 F.3d 352, 355 (4th Cir. 2001).  It does not necessarily require "reasonably equivalent value."  *In re Osteen*, Case No. 3:12-cv-00023, 2012 WL 5194251, at *6 (W.D. Va. Oct. 19, 2012).

6.      *Section 547 of the Bankruptcy Code*

Section 547 of the Bankruptcy Code allows the Liquidating Trustee to avoid any transfer of interest of HDL in property (i) to or for the benefit of a creditor; (ii) for or on account of an antecedent debt owed by the debtor before such transfer was made; (iii) made while the debtor was insolvent; (iv) made on or within 90 days before the date of the filing of the petition, or on or within 1 year of the filing of the petition for an insider; (v) that enables such creditor to receive more than such creditor would receive if (a) the case were a case under chapter 7 of the Bankruptcy Code; (b) the transfer had not been made; and (c) such creditor received payment of such debt to the extent provided by the provisions of this title.  11 U.S.C. § 547(b).

7.      *Section 550 of the Bankruptcy Code*

Section 550 of the Bankruptcy Code allows the Liquidating Trustee to recover a transfer of property (or the value thereof) that has been avoided under sections 544, 547, or 548 of the

Bankruptcy Code from either: "(1) the initial transferee of such transfer or the entity from whose

benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transfer."

11 U.S.C. § 550(a).

### B.     The Transfers Were of HDL's Interests in Property and Made Within The Applicable Time Limits

The constructive fraudulent conveyance laws permit a trustee to avoid transfers,

transactions, or obligations for which a debtor did not receive fair value and made either while it

was undercapitalized, insolvent, or unable to pay its debts. Several of the specific state laws have

additional elements that vary slightly.  *See supra*, section V.A.  For example, Virginia does not

refer to the "reasonably equivalent value" element contained in the UFTA, FDCPA, and section

548, and instead requires that there be no "consideration deemed valuable in law." Maryland

follows the earlier Uniform Fraudulent Conveyance Act ("**UFCA**") that refers to "fair

consideration."  These minor variations do not create any conflicts given that HDL was insolvent

at all relevant times and received **no** value – be it reasonably equivalent, deemed valuable in law,

or fair consideration – in exchange for the Transfers.  Moreover, all of the fraudulent transfer laws

are designed to accomplish the paramount goal of recovering fraudulently conveyed funds for the

benefit of creditors.  *Cf. NextWave Pers. Communs., Inc. v. FCC (In re NextWave Pers. Communs.,*

*Inc.)*, 235 B.R. 277, 289 (Bankr. S.D.N.Y. 1999) (recognizing similarities between the UFTA,

UFCA, and section 548 and explaining that "Section 544 promotes the central bankruptcy policy

of equitable distribution amongst all creditors").

All of the statutes expressly require that the debtor transferred its own interests or property.

As evidenced by HDL's books and records, the transfers the Liquidating Trustee seeks to avoid

were payments that HDL made to the transferees or to taxing authorities on their behalf, and thus

constitute HDL property or an interest HDL held.  *See* Arrowsmith Decl., Exs. 1-2.  There is no

genuine dispute of material fact on this element.  And all of the Constructive Fraudulent Transfer

Claims are timely under applicable law as set forth *infra* in section VI.A, and given that the FDCPA

has a six year statute of limitations for constructive fraud claims.  *See* 28 U.S.C. § 3306(b)(2).

### C.    HDL Was Insolvent and Inadequately Capitalized at all Times

The insolvency element of the Liquidating Trustee's constructive fraudulent conveyance

claims is met because the Liquidating Trustee has presented unrebutted evidence that HDL was

insolvent based on the balance sheet test, the adequate capital test, and the cash flow test.  The

Liquidating Trustee has demonstrated, through the undisputed factual record and the Kearns

Report and testimony, that HDL was insolvent at all relevant times because the Illicit Scheme

tainted virtually all of HDL's revenue.  *See* SMF ¶ 262, Kanowitz Decl., Ex. 31 at 22.  Ropes &

Gray quantified those liabilities at the March 25, 2013, Board presentation using preliminary 2012

figures that estimated potential fines **in excess of $13 billion**, without even accounting for

liabilities owed to private payors.  SMF ¶ 178.

HDL was explicitly on notice of those liabilities at all relevant times, and received warnings

from HCPs and their attorneys, as well as threatening letters from insurance companies.  SMF ¶¶

148-49.[21]  And OIG guidance also made clear that HDL's practices exposed it to high risk.  SMF

¶ 36.  HDL's inside and outside counsel subsequently arrived at similar conclusions.  On August

30, 2012, Derek Kung issued the Kung Memo, which made clear to HDL's Board that P&H should

be terminated because it was a "red flag" for the OIG and posed "a high level of risk under the

AKS and Stark Law." SMF ¶ 148.k.  The Kung Memo also informed the Board that HDL's Patient

Payment Waiver could violate the AKS.  SMF ¶ 149.h.  Two months later on October 24, 2012,

---

[21] HDL also recognized in February 2011 that it could not sign a certification requested by Cigna regarding the waiver of patient payments, which represents an acknowledgment that HDL was incurring obligations to the Insurers. SMF ¶ 149.d.

Patton Boggs sent HDL a memorandum that outlined various state regulations prohibiting Patient

Payment Waiver. SMF ¶ 149.i-j.  And at the March 25, 2013, Board presentation, Ropes & Gray

advised HDL to terminate Patient Payment Waiver and P&H. SMF ¶ 174-75.  Thus, the undisputed

evidentiary record leaves no doubt that HDL was explicitly on notice of liabilities that it knew, or

should have known, it owed to the government and private payors.

Kearns' testimony and report also support the undisputed factual record that HDL was

insolvent under all of the insolvency tests.  Kearns explained that *every dollar* HDL brought in

through the Bluewave Agreement was not only illegitimate, but actually created greater liabilities

than what was recorded on HDL's incorrectly-stated financial statements.  SMF ¶ 262, Kanowitz

Decl., Ex. 31, at 51-57.  Because most of HDL's revenue was both tainted and improperly

recorded, HDL's liabilities exceeded its assets at all relevant times.  *Id.* The magnitude of HDL's

reliance on the Illicit Scheme was illustrated by the cratering of its revenue after it ceased the

unlawful practices.  *Id.* at 54-57.

Kearns further explains that HDL was insolvent under the balance sheet test because

HDL's reported financial statements were not reliable indicators of its economic condition and

expected future profitability.  They omitted substantial liabilities related to the Illicit Scheme and

recorded revenue that was obtained by the practices that made up the Illicit Scheme.  *Id.* at 57-58.

In reality, because virtually all of HDL's revenue was obtained through the Bluewave Agreement,

its liabilities exponentially exceeded its revenue as quickly as its sales numbers grew.  *Id.*

Kearns further explains that because HDL lacked the financial resources to sustain a rapid

deterioration in operational and financial performance and simultaneously deal with substantial

accrued liabilities, HDL was inadequately capitalized at all times.  *Id.* at 59.  And without the

34

revenues of the Illicit Scheme, HDL could never meet its liabilities or pay its debts as they came due. *Id.*

Despite the existence of those known or knowable liabilities, HDL failed to account for them in its financial statements. But that is of no moment given that the Bankruptcy Code explicitly requires such liabilities to be included in a solvency analysis. *Accord In re Merry-Go-Round Enterprises, Inc.*, 229 B.R. at 343; *In re Turner & Cook, Inc.*, 507 B.R. at 109. Both Ropes & Gray and Kearns were able to value HDL's liabilities to the government and private payors. This Court should similarly do so based upon the uncontroverted factual record and as explained in the Kearns Report and related testimony.

In contrast, the report and related testimony of the Defendants' insolvency expert, Marc Brown, does not create a genuine dispute of material fact as to HDL's solvency. Brown's opinion is flawed in that it is predicated upon the erroneous instruction of his counsel to assume that HDL had no liabilities owed to the government and private payors. SMF ¶ 266; Kanowitz Decl., Ex. 29, at 40-41, ¶¶ 133-34 ("I have been instructed by Counsel to assume that the proper contingent liability to apply at both December 7, 2012, and January 11, 2013 is zero for any DOJ-related contingent liability. . . . I have also been instructed to assume that the proper contingent liability to apply as [sic] both December 7, 2012 and January 11, 2013 is zero for any private insurer potential contingent liability."); SMF ¶ 276; Kanowitz Decl., Ex. 3, at 7:16-19 (stating that Brown was "instructed [by counsel] to value contingent liabilities at zero.").

However, as set forth herein and in the Kearns Report, there is no genuine dispute of material fact that HDL had known or knowable liabilities owed to those parties at all relevant times. Brown's report and testimony do not alter those facts. **First**, the instruction of Brown's counsel to assume that no liabilities existed is not evidence and is therefore not a proper basis for

this Court to hold that a genuine dispute of material fact exists.  *See Wood v. Stratos Prod. Dev.,*

*LLC (In re Ahaza Sys.)*, 482 F.3d 1118, 1122 n.1 (9th Cir. 2007) ("[A]rguments and statements of

counsel are not evidence.").

**Second**, Brown's conclusion that HDL was solvent on his two testing dates is predicated

entirely upon the instruction of counsel. Thus, Brown admitted that if the Court determines that

HDL had liabilities that exceeded the equity value of HDL's business, it would "trip the binary

switch from solvent to insolvent."  Kanowitz Decl., Ex. 3, at 89:13 to 90:4. As set forth herein,

this Court should conclude that HDL faced massive liabilities owed to the government and private

payors from day one and therefore HDL's liabilities exceeded its assets at all relevant times.  *See*

Kanowitz Decl., Ex. 31, at 51-57.  Accordingly, the "binary switch" in Brown's report should

switch from solvent to insolvent.

Brown's opinion and report therefore do not create a genuine dispute of material fact as to

HDL's solvency because they are at odds with the uncontroverted evidentiary record and his

opinions should not be considered on summary judgment as they are speculative and lack

credibility.  *See, e.g.*, *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir.

1994) ("An expert's opinion should be excluded when it is based on assumptions which are

speculative and are not supported by the record."); *Alevromagiros v. Hechinger Co.*, 993 F.2d 417,

421 (4th Cir. 1993) ("The credibility of competing experts is a question for the jury only if the

party with the burden of proof has offered enough evidence to sustain a verdict in its favor.").  This

Court should enter summary judgment in favor of the Liquidating Trustee on his constructive

fraudulent transfer counts.[22]

---

[22] In addition, Brown only considered HDL's solvency on two specific dates:  December 7, 2012 and January 11,
2013.  SMF ¶ 266; Kanowitz Decl., Ex. 29, at ¶¶ 44, 48-49. Brown admitted that he did not consider HDL's solvency
after January 11, 2013 and his report does not include evidence outside of those two dates. SMF ¶ 267; Kanowitz
Decl., Ex. 3, at 7:5-15; 227:10-11 ("I wasn't asked to look at business post my test date. Last test date was January

36

### D. HDL Did Not Receive Reasonably Equivalent Value for the Discretionary Shareholder Distributions

HDL did not receive reasonably equivalent value, consideration deemed valuable in law, or fair consideration in exchange for the Discretionary Shareholder Distributions because HDL did not receive *any* consideration in exchange for paying its shareholders millions of dollars in discretionary distributions. Distributions made to shareholders reduce a company's equity and capitalization. *See In re Roco Corp.*, 701 F.2d 978, 982 (1st Cir. 1983) ("Under generally accepted accounting principles this treasury stock would be reported on the balance sheet of [debtor] as a reduction of stockholders' equity, not as an asset. As the appellate panel noted, treasury stock is a form of shareholder distribution from which the corporation receives no assets. When a corporation purchases treasury stock it reduces its capitalization."). Distributions that reduce a company's equity or capitalization also provide no value to the company. *E.g.*, *Cullifer v. Comm'r*, 108 T.C.M. (CCH) 408 (T.C. 2014) ("Finally, [the company] distributed a number of assets, which it had valued at $3,727,121.21, in satisfaction of a special dividend to petitioner. [The company] did not receive any value, much less "reasonably equivalent" value, in exchange for these transfers. . . . Accordingly, we conclude that [the company's] pre-stock-sale distributions made after June 1, 2004, including the special dividend, are fraudulent under [the UFTA]."), *aff'd,* 651 F. App'x 847 (11th Cir. 2016); *In re Trace Int'l Holdings, Inc.*, 289 B.R. 548, 560 (Bankr. S.D.N.Y. 2003) ("A corporation holds its assets in trust for the benefit of the corporation's creditors, and cannot lawfully distribute its assets to shareholders to the prejudice of those creditors. Consequently, an insolvent Delaware corporation cannot pay a dividend."); *In re Joshua Slocum, Ltd.*, 103 B.R. 610, 618 (Bankr. E.D. Pa.) ("The courts have uniformly concluded that a stock redemption by an

---

11, 2013."). To the extent the Court determines that a genuine dispute of material fact exists on insolvency, such a determination should be limited to transfers that took place on December 7, 2012, and January 11, 2013.

214874179

insolvent company fails to supply reasonably equivalent value to the company."), *aff'd sub nom. In re Joshua Slocum Ltd.*, 121 B.R. 442 (E.D. Pa. 1989).

In addition, the Discretionary Shareholder Distributions did not provide any consideration to HDL because they violated the Shareholders' Agreement and applicable law. Section 12(b) of the Shareholders' Agreement contains a relevant exception that: "Notwithstanding the foregoing, the Company shall not be required to make any distributions hereunder if such distributions would be in violation of applicable law." Kanowitz Decl., Ex. 107, at § 12(b).  Applicable law prohibits a corporation from making shareholder distributions if, after giving it effect, the corporation's total assets would be less than the sum of its liabilities. Va. Code § 13.1-653. As discussed above, HDL was insolvent due to the liabilities generated by the Illicit Scheme.  The Discretionary Shareholder Distributions therefore were made in violation of applicable law and the section 12(b) exception was triggered, absolving HDL of any obligation to make distributions under the Shareholders' Agreement.

E.    **HDL Did Not Receive Reasonably Equivalent Value for the Shareholder Tax Distributions**

The Shareholder Tax Distributions should also be avoided because they failed to provide reasonably equivalent value, consideration deemed valuable in law, or fair consideration to HDL. Because an S-Corp. has no tax liability of its own, a payment to its shareholders to reimburse them for their personal tax liability amounts to a corporate dividend.  *In re SGK Ventures, LLC*, 521 B.R. 842, 859 (N.D. Ill. 2014).  Dividends and similar payments to shareholders do not provide reasonably equivalent value.  *Id.*; *In re TC Liquidations LLC*, 463 B.R. 257, 271 (Bankr. E.D.N.Y. 2011) ("It was improper for the Debtors to issue the Tax Dividends and essentially pay Defendants' personal tax obligations. There is no shown consideration provided to the Debtors for these payments. Thus, the Court finds that the Debtors did not receive fair consideration for the Tax

214874179

Dividends . . . ."). The same holds true here. The Shareholder Tax Distributions were gratuitous payments to shareholders to reduce their individual tax liability.

Some courts have ruled that tax distributions can provide reasonably equivalent value under certain circumstances. *See, e.g.*, *In re Northlake Foods, Inc.*, 715 F.3d 1251 (11th Cir. 2013) (per curiam); *In re Kenrob*, 474 B.R. 799 (E.D. Va. 2012). None constitute binding authority, and none are applicable or persuasive. These cases are also distinguishable because they rely on shareholder agreements that require tax distributions but do not mention any level of discretion or exceptions in the contract or the law. *Id.*

Here, by contrast, HDL was insolvent due to the liabilities generated by the Illicit Scheme and the Shareholder Tax Distributions therefore were made in violation of applicable law and the section 12(b) exception was triggered. The transfer of the fraudulent distributions was therefore legally gratuitous and conferred no benefit on HDL in return.

F.     **There is No Reasonably Equivalent Value for the BlueWave Transfers**

The Bluewave Transfers did not provide HDL with reasonably equivalent value, consideration deemed valuable in law, or fair consideration because they were made for illegal consideration and Bluewave's services increased HDL's liability more than the value of the revenue they brought in. As set forth *supra* in section I, the percentage-based commission structure in the BlueWave Agreement was illegal and unenforceable under applicable law. Accordingly, the Liquidating Trustee is entitled to summary judgment that the BlueWave Transfers did not provide reasonably equivalent value. *See Armstrong v. Collins*, No. 01CIV.2437(PAC), 2010 WL 1141158, at *30 (S.D.N.Y. Mar. 24, 2010) ("Illegal consideration does not constitute reasonably

equivalent value."); *In re F.H.L., Inc.*, 91 B.R. 288, 301 (Bankr. D.N.J. 1988) (avoiding transaction where "the promissory note would create a further increase in [debtor's] liabilities").[23]

### G.    There is no Reasonably Equivalent Value for the Golias Double Payment

As discussed *supra*, the BHL Settlement Note, which the Golias Double Payment purportedly paid against, constituted a form of equity granted to T. Golias.  Therefore, the Golias Double Payment was a redemption of stock, which as set forth *supra*,  provided no value to HDL. Therefore, the Liquidating Trustee may avoid the Golias Double Payment, and the Court should grant summary judgment on the related claims.

### H.    The Liquidating Trustee Meets All of the Requirements for a Preference Claim Under Section 547 of the Bankruptcy Code

The Liquidating Trustee also meets all of the elements of section 547(b) to avoid the Preference Transfers.  As set forth above, all of the Preference Transfers were of an interest of HDL in property, made to or for the benefit of the Golias Defendants, BlueWave, and Dent while HDL was insolvent,[24] and made within one year[25] and/or 90 days of the Petition Date.

The Preference Transfers were all made for or on the account of an antecedent debt allegedly owed by HDL before the transfers were made because they fall into one of the following

---

[23] The Liquidating Trustee also relies upon the unrebutted expert testimony of Kearns, who concluded that the payments under the BlueWave Agreement did not provide reasonably equivalent value.  SMF ¶ 262; Kanowitz Decl., Ex. 31, at 60.

[24] HDL is presumed to have been insolvent on and during the 90 days immediately preceding the Petition Date. *See* 11 U.S.C. § 547(f).

[25] The Golias Defendants and BlueWave Defendants satisfy the statutory definitions of insider given that Dent and the Golias Shareholder Defendants were all shareholders or persons in control of HDL.  *See* 11 U.S.C. 101(31)(B) (the term insider includes . . . (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor."). The corporate entities included within the BlueWave Defendants and Helena also satisfy the definition of statutory insider because each of the corporate defendants is controlled by a statutory insider or his/her relative.  *See* 11 U.S.C. § 101(31)(E) (including within definition of insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor").  Those defendants also satisfy the definition of a non-statutory insider. *See, e.g.*, *In re Rexford Properties, LLC*, 557 B.R. 788, 795 (Bankr. C.D. Cal. 2016) (holding that trust was an insider where its co-trustee and income beneficiary were insiders of the debtor).

categories, as applicable: (i) the payments to Helena were made under the Invention Agreement or invoices issued by Helena for work performed prior to the date of payment, SMF ¶¶ 235-238; (ii) the payments to the Golias Shareholder Defendants and Dent were made for tax payments allegedly due under the Shareholders' Agreement, SMF ¶ 254; and (iii) the payments to BlueWave were made pursuant to the BlueWave Agreement for work performed prior to the date of payment, SMF ¶ 256. *See In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 860 (Bankr. D. Del. 2018) ("An 'antecedent debt refers to a debt that was incurred before the debtor made the alleged preferential transfer. A debt is "incurred" on the date which a debtor first becomes legally bound to pay." (internal quotation marks and footnotes omitted)).

The Liquidating Trustee satisfies the final element of section 547(b) – whether the creditors would have recovered more in a chapter 7 case – because it is uncontroverted that no unsecured creditor would have received a 100% payout in a chapter 7 case. *See In re Conex Holdings, LLC*, 518 B.R. 269, 278 (Bankr. D. Del. 2014) ("The relevant inquiry for the Court is whether [the creditor] would have received a 100 percent payout in a Chapter 7 liquidation. If so, no preference can be recovered; if not, the requirements of Section 547(b)(5) are met. As a matter of general arithmetic, any transfer to a general unsecured creditor ordinarily satisfies this test unless the debtor's estate turns out to be solvent in Chapter 7." (footnotes omitted)); *In re Tire Kings of America, Inc.*, 164 B.R. 40 (Bankr. M.D. Pa. 1993) (concluding that the chapter 7 liquidating element was met where testimony showed that the debtor's liabilities outweighed its assets on the petition date).

## I.    The Liquidating Trustee May Recover from Subsequent Transferees

Some of the Bluewave Transfers were subsequently transferred from BlueWave to other persons or entities.  As set forth in Exhibit 3 to the Arrowsmith Decl., BlueWave's books and records reflect that Dent, the BlueWave Defendants, and the AMS Defendants received the

214874179

Subsequent Transfers from funds that were initially transferred by HDL to BlueWave, and subsequently transferred to those defendants. SMF ¶ 278.  Accordingly, because the Bluewave Payments should be avoided, the Liquidating Trustee may recover the value of the Bluewave Payments from these initial, immediate, or mediate transferees of the Bluewave Payments under 11 U.S.C. § 550(a).

**V.    The Liquidating Trustee is Entitled to Summary Judgment on His Tortious Interference Claims as to the Assigning Creditors Aetna, Cigna and UHC (Counts 69-71 of the Amended D&O Complaint)**

In Counts 69-70 of his Amended Complaint, the Liquidating Trustee brings claims for tortious interference with contracts, contract expectancy, prospective business relationship and economic advantage of the Assigning Creditors against the Tortious Interference Defendants.[26] *See* Am. Compl., ¶¶ 1028-1042. In Count 71 of the Amended Complaint, the Liquidating Trustee incorporates the claim of tortious interference with business and contractual relations from the Aetna Complaint and brings it on behalf of the Assigning Creditor Aetna against Dent and BlueWave. *See* Am. Compl., ¶¶ 1043-1053; SMF ¶¶ 215, 248.[27]

Through this MSJ, the Liquidating Trustee seeks summary judgment on the aforementioned claims specifically as to the Assigning Creditors Aetna, Cigna, and UHC, which assigned their respective rights to pursue these claims to the HDL Liquidating Trust. SMF ¶¶ 244-249.[28]

---

[26] The "**Tortious Interference Defendants**" are BlueWave, Dent, HisWay of South Carolina, Inc., RBLIV Consulting, Inc., and the Carnaggio Defendants.

[27] The Aetna Complaint was transferred to this Court and is pending under docket number 16-03349.

[28] The Liquidating Trustee expressly reserves the right to assert claims on behalf of additional Assigning Creditors in addition to Aetna, Cigna, and UHC.

214874179

## A.      Choice of Law and Elements of the Tortious Interference Claim

Pursuant to the Virginia's choice of law doctrine, which applies the rule of *lex loci delecti* or the "place of the wrong," the law of the place where "the last event necessary to make an actor liable for an alleged tort takes place" governs. *Gen. Assur. of America, Inc. v. Overby-Seawell Co.*, 533 Fed. App'x 200, 206 (4th Cir. 2013) (quoting *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986)). For tortious interference claims, the last event consummating the tort is the event causing injury. *See Collelo v. Geographic Servs. Inc.*, 283 Va. 56, 727 S.E.2d 55 (Va. 2012). Accordingly, tortious interference claims are governed by the law of the jurisdiction where each of the Assigning Creditors is based because the injury to these creditors is the last act necessary to cause the wrong. Specifically, the law of Connecticut applies to the claims assigned to the HDL Liquidating Trust by Cigna, the law of Pennsylvania to the claims assigned by Aetna, and the law of Minnesota to the claims assigned by UHC. SMF ¶¶ 89-91.

Common to each of these states' laws are the following elements that the Liquidating Trustee must prove to prevail on his tortious interference claims: (1) the existence of a contractual or business relationship or expectancy of the same between the plaintiff and a third party; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) the resulting damage to the party whose relationship or expectancy has been disrupted. *See, e.g.*, *Am. Diamond Exch. v. Alpert*, 28 A.3d 976 (Conn. 2011) (Connecticut law); *Empire Trucking v. Reading Anthracite Coal*, 71 A.3d 923 (Penn. 2013) (Pennsylvania law); *Furlev Sales & Assoc., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982) (Minnesota law).

Additionally, Pennsylvania and Minnesota require that there be an "absence of the privilege or justification on the part of the defendant" to interfere. *See Furley Sales & Assoc., Inc.*, 325 N.W.2d at 27; *Empire Trucking v. Reading Anthracite Coal*, 71 A.3d at 933. "Whether interference

is justified is ordinarily a factual determination of what is reasonable conduct under the circumstances. The burden of proving justification is on the defendant." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 363 (Minn. 1998). Tortious interference is unjustified "when it is done for the indirect purpose of injuring the plaintiff or benefiting the defendant." *Furley Sales & Assocs., Inc.*, 325 N.W.2d at 27; *see also Twichell v. Glenwood-Inglewood Co.*, 131 Minn. 375, 381 (1915) (holding that the law will impute bad faith when the wrongdoer has knowledge that the contract existed).[29]

As discussed in greater detail below, the uncontroverted evidence reflects that there is no genuine dispute of material fact as to any of the required elements. The Liquidating Trustee, therefore, seeks summary judgment on his claims for tortious interference on behalf of the Insurers other than the quantum of damages, which the Liquidating Trustee reserves for trial.[30]

### B. There is No Dispute of Fact that Cigna, Aetna and UHC Each Had Contractual and/or Business Relationships or Expectancy with HCPs and Their Patients

During the relevant time fame, each of the Insurers had agreements with individual HCPs or with networks of HCPs (collectively, the "**Provider Agreements**"). SMF ¶ 92. While each of the Provider Agreements may have contained provisions that were unique to a HCP or a particular network, generally, all Provider Agreements contained provisions that required that HCPs accept fixed rates for services in consideration of certain benefits, including access to plan members, and

---

[29] Under Pennsylvania law, courts also give consideration to the following factors to determine whether the interference was privileged or justified: nature of the actor's conduct, the actor's motive, the interests of the other with which the actor's conduct interferes, the interests sought to be advanced by the actor, the social interests in protecting the freedom of action of the actor and the contractual interests of the other, the proximity or remoteness of the actor's conduct to the interference, and the relations between the parties. *Salsgiver Communs., Inc. v Consol. Communs. Holdings*, 150 A.3d 957, 964 (Pa. Super. Ct. 2016) (citing *Restatement (Second) of Torts § 767*).

[30] *See* Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2736 (4th ed.) (explaining that Fed. R. Civ. Proc. 56(a) and 56(g) "authorize a summary judgment on liability when otherwise appropriate").

214874179

refer such plan members to other in-network providers for non-emergency services (such as those provided by HDL) (the "**In-Network Referral Requirement**"). SMF ¶ 93; *see e.g.*, Kanowitz Decl., Ex. 198, at HDL_DO_03382289 ("Laboratory test procedures not performed in a laboratory owned and operated by you must be referred to our Participating Laboratory Provider(s)."). The Provider Agreements also included provisions regarding compliance with applicable state and federal laws ("**Legal Compliance Requirement**") and provisions prohibiting physicians from charging for medically unnecessary services ("**Medically Unnecessary Services Exclusion**"). *See* SMF ¶ 94.

The UHC and Aetna Provider Agreements included provisions requiring HCPs to collect any co-payments, deductibles or coinsurance from patients ("**Patient Responsibility Collection Requirement**"). SMF ¶ 95. Additionally, Cigna's physician reference guides from 2011 through 2015, which Cigna supplied to its contracted or in-network providers to provide guidance regarding the terms of the Cigna Provider Agreements contained a paragraph titled "Fee Forgiving/Waiver of Copayment/Coinsurance or Deductible." SMF ¶ 96. This paragraph expressly stated that "[m]ost benefit plans insured or administered by Cigna exclude from the participant's coverage those charges for which the participant is not obligated to pay. Therefore, if a plan participant is not obligated to pay a charge, any claim for reimbursement for any part of that charge under such a contract or benefit plan is generally not covered. It is Cigna's view that 'fee-forgiving' on any particular claim, or any portion thereof, could constitute fraud and may subject a heath care professional to civil and criminal liability." SMF ¶ 97. The 2014 Cigna reference guide additionally explicitly prohibited reductions of plan participants' cost-sharing obligations as a "participant incentive" and stated that non-compliance with this provision would subject the Cigna Provider Agreements to termination. SMF ¶ 98.

45

During the relevant time frame, the Insurers were also parties to agreements with HCPs' patients (i.e. the plan members) through the Insurers' roles as claims administrators for the patients' plans funded by patients' employers or by each of the Insurers. SMF ¶ 99. Regardless of the type of funding, these plans (the "**Plans**") contained important provisions that did not materially differ between the types of Plans. SMF ¶ 100. Specifically, the Plans explicitly required that (1) plan members bear a portion of the cost of treatment by out-of-network providers through payment of cost-sharing obligations such as co-payment, co-insurance or deductible;[31] and (2) plan members satisfy such cost-sharing obligations in order for charges by providers (such as HDL) to be covered under the Plans (collectively, such cost-sharing obligation provisions are "**Cost-Sharing Obligation Provisions**"). SMF ¶ 101.

The Plans also provided that charges which members were not obligated to pay and for which they were not billed were not covered by the Plans and could be determined to be fraudulent or result from abusive billing practices (the "**Billing Exclusion Provisions**"). SMF ¶ 102. Further, the Plans generally prohibited reimbursement for care and treatment that was medically unnecessary and limited repayment for out-of-network services to "maximum reimbursable charges" that may not have been greater than the provider's normal charges for similar services, thereby excluding from coverage out-of-network reimbursements that exceeded such maximums ("**Medical Necessity Exclusion Provision**"). SMF ¶ 103. The Plans authorized the Insurers to recover any overpayments made by the Plans. SMF ¶ 104.

---

[31] "[A] co-payment is typically a small amount that is paid at the time of service if determined by the plan. Co-insurance represents the percentage of an amount that is allowed by the plan that the members is going to owe out of pocket. As just an example, not representative of all plans, but in-network providers, a plan may define that the plan will pay 70 percent, and the customer may pay 30 percent of the allowed amount as determined by the plan. That 30 percent is indicate of the customer's co-insurance in that hypothetical example. And a deductible is an out of pocket amount that an individual customer or insured would have to pay prior to the benefits of the plan kicking in if you will." Kanowitz Decl., Ex. 20, at 14:13-15:1 (Cigna Dep. Tr.).

214874179

In addition to the Provider Agreements and Plans, the Insurers had business expectancy with HCPs and patients that centered on the prospect that business would be referred to lower cost, in-network laboratories, whereby the overall cost of health care to employers and individuals would be maintained at lower levels and the Insurers could retain quality, robust networks. SMF ¶ 105.

Prior to June 1, 2014, HDL was never "in-network" with the Insurers.  SMF ¶¶ 106, 128. This status meant that HDL provided services at higher, non-discounted rates, and that by using an out-of-network provider, patients were supposed to be subject to higher cost-share obligations or Patient Payments.  SMF ¶ 107.

**C.    There is No Genuine Factual Dispute that the Tortious Interference Defendants Knew of the Contractual and/or Business Relationship or Expectancy Among the Insurers and HCPs and the Insurers and Patients**

It is clear that the Tortious Interference Defendants were fully aware of the contractual relationships and business expectancy among the Insurers and HCPs and among the Insurers and individual patients and that HDL was an "out-of-network" laboratory.[32] The Tortious Interference Defendants were experienced sales persons, who operated in the health care field for a number of years prior to joining HDL's independent contractor sale force. SMF ¶ 130.   Additionally, the Tortious Interference Defendants were trained using the same materials, including, but not limited to, copies of P&H Agreements and P&H Position Statement (all of which referenced billing, collections and reimbursement by HCPs from third party payors, including commercial insurers) and Pricing Overview and Patient Brochure (both of which specifically referenced patients with

---

[32] *See* SMF ¶¶ 128-29.  While the Motion summarizes the Liquidating Trustee's evidence establishing each element of the tortious interference claim against all Tortious Interference Defendants, the Kanowitz Declaration includes exhibits for each individual Defendant, listing out evidence that substantiates the knowledge and intent elements of the tortious interference claims against such Defendant.  *See* Kanowitz Decl., Exs. 33 to 44. The Kanowitz Declaration additionally includes an exhibit that lists evidence in support of these elements that were sent to multiple Tortious Interference Defendants. *See* Kanowitz Decl., Ex. 45.

214874179

various types of insurance contracts/plans, including PPO, POS, HMO and the fact that patients receive explanation of benefit forms with cost-sharing obligations). SMF ¶ 131.

During the relevant time period, the Tortious Interference Defendants received and exchanged communications discussing HDL's status as an "out-of-network" laboratory, the existence of contracts among HCPs and the Insurers, and the associated requirement that HCPs refer insured patients to in-network laboratories. SMF ¶ 133. The Tortious Interference Defendants likewise received and exchanged communications regarding the existence of contractual relationships among the Insurers and patients.[33] SMF ¶ 134.

The Tortious Interference Defendants were also aware that the Insurers were investigating the Illicit Scheme and disapproved of such arrangements as Patient Payment Waiver, finding it inconsistent with the Insurers' efforts to provide transparent cost information to their customers and further emphasizing that the Provider Agreements prohibited referral to non-participating laboratories. SMF ¶ 135.

The Tortious Interference Defendants additionally actively participated in HDL's campaign to provide HCPs with form letters that HCPs could use to justify the use of HDL as an out-of-network laboratory. SMF ¶ 136. The form letters were prepared in response to the Insurers' written inquiries to HCPs underscoring the terms of the Provider Agreements pertaining to in-network referral requirement, medical necessity and overbilling. SMF ¶ 137.

---

[33] It must be noted, however, that Tortious Interference Defendants were asked to comply with BlueWave's e-mail retention policy, which provided that e-mails "are only saved for 3 months then purged." SMF ¶ 132.

214874179

**D.    It is Undisputed that the Tortious Interference Defendants Acted Intentionally and Without Justification to Interfere with the Contractual and/or Business Relationship or Expectancy Among the Insurers and HCPs and the Insurers and Patients**

The Tortious Interference Defendants acted to induce HCPs and patients to choose HDL over other laboratories that were in-network with the Insurers for purposes of self-enrichment and in contravention of applicable laws and warnings from HCPs, attorneys, and the Tortious Interference Defendants' competitors. To achieve the intended result of driving HDL testing sales, the Tortious Interference Defendants implemented the fraudulent practices comprising the Illicit Scheme, including, but not limited to, practices required by the BlueWave Agreement, such as payment of P&H, Patient Payment Waiver, and provision of free medical equipment to HCPs. SMF ¶¶ 69-88, 108-127.

Specifically and throughout the relevant time period, the Tortious Interference Defendants actively used P&H as a sales pitch to induce HCPs to order tests from HDL. SMF ¶ 138; *see also* Kanowitz Decl., Ex. 181, at HDL_DO_03374363 (Mallory recognized that P&H was a "critical door opener"). For instance, many of the Tortious Interference Defendants presented HCPs with a document termed a "pro forma" that contained calculations of potential revenues HCPs would receive from payments of P&H by ordering tests from HDL, or simply included such a calculation in their e-mails to HCPs. SMF ¶ 139. The Tortious Interference Defendants were all trained to target "money hungry" physicians and utilize the script instructing the Tortious Interference Defendants to not focus the sale on the tests "too much" and instead, say "Have you heard about this new advanced lab testing company called Health Diagnostic Labs? … They are taking the market by a storm! They have the most advance [sic] tests on the market! They do not balance bill the patients and they have free RD's. All I know is that it is the bomb! All of the doctor's [sic] are

49

doing it." SMF ¶ 87; Kanowitz Decl., Exs. 146; 14, at 261:8-21 (Johnson: "If a physician met the criteria … these were the verbatim words they [sales reps] were to use to get us into the account.").

The Tortious Interference Defendants additionally used Patient Payment Waiver to induce HCPs and patients to order tests from HDL. SMF ¶ 140. This inducement is evidenced by e-mails to HCPs through which the Tortious Interference Defendants touted the Patient Payment Waiver, including through the distribution of the Pricing Overview. SMF ¶¶ 140, 141. The Pricing Overview (in each of its various iterations) expressly stated that HDL would accept the amount the insurance company allowed for each diagnostic and that the patients' out-of-pocket cost would be "ZERO" for initial and follow-up testing. SMF ¶¶ 115-116. The Pricing Overview additionally stated that HDL took all the risk if the patients' insurance company did not pay for the ordered diagnostics, and that the patients could ignore the EOBs received from their insurance company reflecting the patients' cost-sharing responsibilities. SMF ¶ 117. Another document certain of the Tortious Interference Defendants distributed to HCPs was the Patient Brochure, which was likewise aimed to lure HCPs and patients to order tests from HDL by assuring that "[l]ab costs and bills are worry-free with HDL, Inc." because "if it turns out your insurance company does not cover a specific test, HDL, Inc. assumes all the risk." SMF ¶ 118.  The Patient Brochure also provided a sample EOB with a similar message to that on the Pricing Overview, which advised that patients "DO NOT PAY the amount the insurance company says is the patient responsibility." SMF ¶ 119.

The Tortious Interference Defendants also facilitated the Illicit Scheme through their requests of waivers or refunds for HDL tests. Examples of such activity include an internal HDL e-mail chain dated February 1, 2012, with a chart of "all of the comps, trials and refunds we've done over the past year at the sales reps requests" and an internal HDL e-mail chain dated April

214874179

23, 2013, with a spreadsheet listing a number of Tortious Interference Defendants who requested "comps" or "no bills" for patients. SMF ¶ 127; Kanowitz Decl., Exs. 95-96. In analyzing the chart included with the February 1, 2012 e-mail chain, an HDL employee remarked that the "number of comps seems excessive to me," to which Mallory replied, "the comps are not an issue … if this were to be communicated to the field it would have a huge negative impact to sales and is a very sensitive area." Kanowitz Decl., Ex. 95.

The Tortious Interference Defendants further perpetuated the Illicit Scheme by circumventing laws of several states that prohibited Patient Payment Waiver and mandated billing and good faith collections of patient cost-sharing obligations. SMF ¶ 144.[34] Numerous e-mails show the extreme measures taken by the Tortious Interference Defendants to preserve the Patient Payment Waiver and the competitive advantage it afforded HDL over in-network laboratories in those states. SMF ¶ 145. Examples of such measures include reimbursing patients' HRA/HSA accounts and informing HCPs and patients that, despite the receipt of an HDL bill, HDL would never pursue collection attempts. *Id.*

Another inducement marketed to HCPs included an invitation to enter into consulting agreements to serve on MAB and Speakers' Bureau in exchange for which HDL paid such HCPs $2,500 to $3,000 per month on top of P&H these HCPs received to order HDLs tests. SMF ¶ 123-124. The process of selecting a HCP to MAB or Speakers' Bureau centered on the volume of tests HCP ordered from HDL, as evidenced by correspondence among Mallory, Dent, Johnson, Lively and another sales representative, who states: "I am confident that if we don't add him as MAB we will lose whatever business we get from him. He looked at this opportunity as a reason to select

---

[34] By implementing the Patient Payment Waiver, the Tortious Interference Defendants violated the law of multiple states that prohibit the Patient Payment Waiver as set forth in the Patton Boggs memos. *See* Kanowitz Decl., Exs. 100-101. For similar reasons, the BlueWave Agreement's contractual requirement that HDL utilize Patient Payment Waiver violated applicable state law.

HDL over BHL. Brad won't be impressed with the volume."  SMF ¶ 125; Kanowitz Decl., Ex. 184).

Pursuant to the BlueWave Agreement, certain of the Tortious Interference Defendants additionally provided HCPs with free medical equipment, including centrifuges. SMF ¶ 126. An example of this practice is reflected in an e-mail to Johnson dated July 1, 2010, in which one of HDL's employees explains that a BlueWave sales representative requested a centrifuge for a HCP at a cost of $7,000, but "[o]bivously, the Jones Center [HCP] does enough volume to justify it." Kanowitz Decl., Ex. 195.

Based on the forgoing, it is undisputed that the Tortious Interference Defendants acted intentionally to entice HCPs and patients to use HDL's tests and divert testing business from laboratories that were in-network with the Insurers. In addition to being intentional, the Tortious Interference Defendants' actions were not privileged or justified under Pennsylvania and Minnesota law, since in pursuing the HCPs' business, the Tortious Interference Defendants were motivated by their own financial interests. As reflected in Ex. 1 to the Arrowsmith Decl., BlueWave received over $220.3 million from HDL from 2010 through 2014. Of this sum, BlueWave transferred millions of dollars to the Tortious Interference Defendants, including through their affiliates, subsidiaries, or corporations they controlled. *Id.*, Ex. 3.

Further, the Tortious Interference Defendants' conduct was completely unreasonable under the circumstances, given that the Tortious Interference Defendants proceeded with the interference despite knowledge of issues related to collections from third party insurers and despite numerous questions, red flags and warnings regarding the high risk of the Illicit Scheme, which the Tortious Interference Defendants received from attorneys, HCPs, and competitors, and all of which the Tortious Interference Defendants ignored. SMF ¶¶ 146-47.

### E. The Tortious Interference Defendants Induced or Caused a Breach or Termination of the Contractual and/or Business Relationship or Expectancy Among the Insurers and HCPs and the Insurers and Patients

Through their deliberate, intentional and unjustified acts, the Tortious Interference Defendants induced HCPs and patients to breach their respective contractual and/or business relationships or expectancy of the same with the Insurers. The Tortious Interference Defendants lured HCPs to use HDL by paying P&H and providing HCPs with other inducements, such as free medical equipment, MAB and/or Speaker Bureau honorariums, and by misrepresenting the patients' responsibilities under the Plans. The patients were also induced to choose HDL over in-network providers by the promise of Patient Payment Waiver.

All of these actions undermined the Insurers' agreements with HCPs and patients and caused them to breach their respective agreements with the Insurers. Specifically, HCPs breached the provisions in the Provider Agreements related to the In-Network Referral Requirement, Legal Compliance Requirement, Medically Unnecessary Services Exclusion and Patient Responsibility Collection Requirement. The patients breached the provisions of the Plans that related to Cost-Sharing Obligation Provisions, Billing Exclusion Provision and Medically Necessary Exclusion Provision.

Furthermore, by ordering HDL's tests, HCPs and patients enabled HDL to submit claims to the Insurers that included phantom, exorbitant and unjustified rates, which did not represent the rates HDL intended to collect from the patients. As a result, the Insurers paid more for services than they would be obligated to pay otherwise and suffered damages in amounts of their filed proofs of claim, which the Liquidating Trustee will prove at trial. SMF ¶¶ 247-249.

214874179

## VI.    The Liquidating Trustee is Entitled to Summary Judgment on the Defendants' Affirmative Defense of Statute of Repose (Golias Defendants' A.D. 1; BlueWave Defendants' A.D. 1; Carnaggio Defendants' A.D. 1)

All of the Defendants have raised the statute of repose as a temporal defense to the Liquidating Trustee's fraudulent transfer claims.  All of those defenses fail because the Liquidating Trustee's and Assigning Creditors' claims were either timely on their face or subject to the discovery rule that renders such claims timely under applicable law.

A "statute of repose acts to define temporally the right to initiate suit against a defendant after a legislatively determined time period. Unlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit."  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 103 (2d Cir. 2004). Courts have generally characterized the limitations period applicable to various fraudulent transfer claims as statutes of repose rather than statutes of limitations.  Each of the applicable statutes of repose for the Liquidating Trustee's fraudulent transfer claims is set forth below:

| Statute | Limitations Period | Citation |
|---|---|---|
| 11 U.S.C. § 547 | 90 days from the Petition Date, or 1 year from the Petition Date for an insider. | 11 U.S.C. § 547(b)(4). |
| 11 U.S.C. § 548 | 2 years from the Petition Date. | 11 U.S.C. § 548(b). |
| UFTA | 4 years after the transfer was made for constructive fraud.[35] For actual fraud, either 4 years after the transfer was made (or six years in Alabama) or 1 year after the transfer was or | UFTA, §4(a)-(b). |

---

[35] All of the UFTA states have a four year statute of limitations for constructive fraud. *See* Ala. Code § 8-9A-9(4); Cal. Civ. Code § 3439.09(b) (2014); 740 Ill. Comp. Stat. § 160/10(b); Mass. Gen. Laws ch. 109A, § 10(b); N.C. Gen. Stat. § 39-23.9(2) (2014); Tenn. Code Ann. § 66-3-310(2); Tex. Bus. & Com. Code § 24.010(a)(2); Wis. Stat. § 893.425(2).

214874179

| | could reasonably have been discovered by the claimant.[36] | |
|---|---|---|
| FDCPA | 6 years after the transfer was made for constructive fraud. For actual fraud, 6 years after the transfer was made or 2 years after the transfer was or could reasonably have been discovered by the claimant. | 28 U.S.C. § 3306(b)(1)-(2). |
| Maryland Code, Com. Law, §§ 15-204 & 15-205 | 3 years | Md. Code Ann., Cts. & Jud. Proc. § 5-101 |
| Virginia Code §§ 55-80 and 55-81 | 5 years, or one year from when the transfer was or should have been discovered for constructive fraud. No statute of repose for actual fraud. | Va. Code § 8.01-253; *Gold v. Sovereign Bank (In re Taneja)*, 453 B.R. 618, 621 (Bankr. E.D. Va. 2011). |

A.    **The Statute of Repose Defenses Should Be Dismissed Because, In Each Count, The Liquidating Trustee Is Only Seeking To Recover Transfers Within The Applicable Limitations Period**

The Liquidating Trustee's constructive fraud claims only seek to recover transfers made within the limitations period applicable to each statute, i.e., the reposing periods set forth above. Moreover, the FDCPA allows the Liquidating Trustee to recover all of the Transfers because they were made within 6 years of the Petition Date. Thus, the Court should dismiss any statute of repose defense to the extent that it purports to bar the Liquidating Trustee from bringing timely claims under applicable law.

---

[36] All of the UFTA states other than Alabama have a four year statute of limitations for actual fraud, or within one year after the transfer was or could reasonably have been discovered by the claimant. *See* Ala. Code § 8-9A-9(2) (6 years); Cal. Civ. Code § 3439.09(a) (2014) (4 years); 740 Ill. Comp. Stat. § 160/10(a) (same); Mass. Gen. Laws ch. 109A, § 10(a) (same); N.C. Gen. Stat. § 39-23.9(1) (2014) (same); Tenn. Code Ann. § 66-3-310(1) (same); Tex. Bus. & Com. Code § 24.010(a)(1) (same); Wis. Stat. § 893.425(1) (same).

214874179

B.    **The Liquidating Trustee is Entitled to Summary Judgment That The Actual Fraud Claims Are Timely**

In addition, the actual fraud claims are timely because they were brought within one year of when the transfer was or reasonably could have discovered by a creditor.[37]  Under the UFTA, the limitations period does not accrue until the claimant "knew or reasonably could have known *both* of the transfer *and* that it was fraudulent in nature."  *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 188-89 (5th Cir. 2013).  The start of the limitations period can be determined as a matter of law from the facts in the record because "reasonable minds could not differ about the conclusion to be drawn." *Id.*

Here, at least one general unsecured creditor[38] held an allowable claim as required by section 544(b) of the Bankruptcy Code, including the DOJ and the Assigning Creditors. *See* SMF ¶¶ 246-249, 251.[39] And there is no genuine dispute of material fact as to whether individual creditors knew of the Transfers at issue. As demonstrated by their undisputed deposition testimony, there is no evidence that the Assigning Creditors, including the Insurers, were aware of the Transfers. Among other things, the Assigning Creditors testified that they had little or no knowledge of HDL's internal operations, nor could they identify BlueWave and the Carnaggio Defendants. *See, e.g.*, SMF ¶ 250; Colonial Webb Dep. Tr. at 24:19-25:16 (explaining that creditor

---

[37] The actual fraudulent transfer claims under the FDCPA and Alabama law are timely without the need for a "knew or should have known" analysis because they were brought within six years of the transfers.

[38] Under section 544(b) of the Bankruptcy Code, this means that the Liquidating Trustee must identify at least one general unsecured creditor who could have brought an actual fraud claim as of the Petition Date.  *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 658 (S.D. Tex. 2007).

[39] The existence of a single creditor, even if the amount of its claim is less than the total amount of the transfers, is sufficient to invoke section 544(b) of the Bankruptcy Code. *See Acequia v. Clinton (In re Acequia)*, 34 F.3d 800, 807-09 (9th Cir. 1994) (holding that trustee can sue to avoid transfers under section 544 so long as there is an eligible creditor who could have standing to avoid them, even though the amount of that creditor's claim - or the total amount of all unsecured claims - is less than the transfer); *Abramson v. Boedeker*, 379 F.2d 741, 748 n.16 (5th Cir. 1967) ("[I]f the transfer is avoidable at all by any creditor, it is avoidable in full for all creditors regardless of the dollar amount of the prevailing claim."); *Carroll v. Robert F. Craig P.C. (In re Innovative Commun. Corp.)*, 507 B.R. 841, 849 (Bankr. D.V.I. 2014) (Walrath, J.).

had "no knowledge of who the Carnaggio Defendants were."), 26:13-15, 29:19-31:7, 40:5-42:2,

42:9-79:23, 80:22-81:2, 88:25-89:24 (creditor did not know the nature of HDL's corporation or

the other companies involved, or who the officers and directors were); B&B Printing Dep. Tr. at

36-37 (explaining that creditor did not perform any "any independent investigation into HDL or

the BlueWave sales force"), 42:8-12 ("I did not know they [HDL] had entered into a settlement

with the Department of Justice."), 97-98 (B&B was unaware that HDL had been accused of

engaging in the Illicit Scheme); Econ. Dev. Dep. Tr. at 22:11-14, 25:6-28:11, 28:13-29:5, 39:6-

48:5; 43:16-19 (creditor was unaware of what BlueWave was); 48:6-16, 51:24-55:7, 67:18-68:5,;

76:4-102:1, 103:16-104:2; Va. Adv. Health Servs. Dep. Tr. at 11:6-24,16:19-18:8, 22:4-24, 24:9-

16, 27:11-28:14, 31:5-32:25, 43:7-80:24, 81:7-15, 82:13-83:6; Cavalier Dep. Tr. at 16:18-17:9,

34:11-16, 35:19-37:21, 40:16-69:73, 70:24-71:4, 75:15-76:13; Entec Dep. Tr. at 14:1-16, 40:19-

61:12, 63:2-10.[40]

Not only were HDL's creditors unaware of the Transfers, they did not discover their

fraudulent nature until, at the earliest, after the Petition Date. *See id.* Nor could they reasonably

have discovered them until, at the earliest, the Petition Date. HDL was a private company and the

full extent of the Illicit Scheme and its financial condition was not publicly-known until, at the

earliest, the Petition Date. Prior to that time, the undisputed material facts make clear that a

---

[40] *See also* **Aetna Tr.** at 34:16-35:14 (Aetna had to investigate to discover the practices that were the subject of its lawsuit), 28:11-18 (Aetna was asked to stop investigating HDL in 2011 by the OIG so that the government could conduct its own investigation), 107:7-110:17 (Aetna was unaware of P&H Fees and zero-balance billing until it filed amended complaint on August 31, 2015), 126:1-127:10 (Aetna had not seen P&H Agreements with HCPs before), 138:11-152:12 (Aetna was not aware HDL, BlueWave, and Carnaggio Defendants received communications indicating the P&H Fees and zero balance billing practices were illegal) 386:2-6 (HDL hid P&H Fees from Aetna); **UHC Tr.** at 31:19-36:1 (UHC first saw the BlueWave Agreement after Aetna's 2015 Amended Complaint was filed), 94:-101:17 (UHC was not aware of P&H Fees, until after June 2014), 107:5-14 (UHC had no relationship with BlueWave); **Cigna Tr.** at 36:3-7 (Cigna did not know about cost waiver when it filed its complaint on October 15, 2014), 58:5-25 (Cigna had no knowledge that HDL was asking its lawyers whether its billing practices were legal), 78:3-79:7 (UHC did not know the BlueWave contract required P&H Fees and commissions), 89:6-90:2 (UHC was not aware that HDL was entering the P&H agreements), 124:7-11 (UHC did not know HDL provided HCPs template letters for communications with insurers).

214874179

creditor could not have discovered the existence of HDL's transfers to the Golias Defendants, BlueWave Defendants, and AMS Defendants given that such records were proprietary and not generally disclosed to the public. *Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus.)*, Nos. 12-12057, 14-50377 (MFW), 2015 Bankr. LEXIS 2029, at \*24 (Bankr. D. Del. June 18, 2015); *In re Innovative Commun. Corp.*, 507 B.R. at 856 (granting summary judgment to trustee under discovery rule and relying upon unrebutted testimony from a creditor that it never received a debtors' financial statements given they were not publicly-available, did not conduct an investigation into the debtors' financial affairs, and did not know of any allegedly fraudulent transfers).

Moreover, a creditor could not have discovered the fraudulent nature of those payments given that HDL did not publicly disclose the legal advice or warnings it received that its practices were high risk or inform the Assigning Creditors that such advice or warnings existed. *See* SMF ¶ 250. Courts have found actual fraud claims timely under similar circumstances. *See Janvey*, 712 F.3d at 196-97 (holding that earliest date a receiver could have discovered fraudulent transfers was upon his appointment); *In re Innovative Commun. Corp.*, 507 B.R. at 856.

In the alternative, the earliest possible date that creditors could reasonably have discovered the Transfers was after September 8, 2014, when the Wall Street Journal Article was published. SMF ¶ 197; s*ee Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 242 (Bankr. S.D.N.Y. 2011) (holding that actual fraud claims were timely because the trustee filed a complaint within two years of the public announcement of a Ponzi scheme). That date is less than one year from the Petition Date. Thus, the Liquidating Trustee's claims for actual fraud are all timely and any statute of repose defense should be dismissed on summary judgment.

214874179

**VII.    The Liquidating Trustee is Entitled to Summary Judgment on the Golias Defendants'
and BlueWave Defendants' Good Faith Transferee for Value Affirmative Defenses
under 11 U.S.C. § 548(c), 550(b), and Applicable Law (Golias Defendants' A.D. 4-6;
BlueWave Defendants' A.D. 5-7)**

**A.    Good Faith Transferee Defense**

The Golias Defendants and BlueWave Defendants both assert the so-called good faith

transferee for value defenses to the Liquidating Trustee's constructive fraudulent transfer claims.

Neither of those parties is entitled to assert the good faith transferee defense because they did not

give any value to HDL nor can they demonstrate that they acted in good faith.[41]

*1.    Sections 548(c) and 550(b) of the Bankruptcy Code*

Section 548(c) of the Bankruptcy Code states that "a transferee . . . of such a transfer . . .

that takes for value and in good faith . . . may retain any interest transferred . . . to the extent that

such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."

11 U.S.C. § 548(c).   Similarly, section 550(b) of the Bankruptcy Code bars a debtor from

recovering from  "a [subsequent] transferee that takes for value, including satisfaction or securing

of a present or antecedent debt, in good faith, and without knowledge of the voidability of the

transfer avoided."   11 U.S.C. § 550(b). "Value" is defined to include a transfer in exchange for

property or satisfaction of a present or antecedent debt of the debtor. 11 U.S.C. § 548(d)(2)(A).

In defining "good faith," courts in the 4th Circuit follow *In re Nieves*, 648 F.3d 232 (4th

Cir. 2011) and *In re Taneja*, 743 F.3d 423 (4th Cir. 2014).  Both cases conclude that "good faith"

has a subjective component ("honesty") and objective component ("observance of reasonable

commercial standards"). Courts follow a two-step inquiry in defining good faith: (1) what facts

were known to the defendant at the time of the transfer (i.e. was the defendant placed on inquiry

notice); and (2) identify whether a reasonable inquiry would have disclosed the voidability of the

---

[41] The AMS Defendants did not assert the good faith transferee defense.

transfers at issue. *See In re Whitley*, No. 10-10426C, 2014 WL 1871823 (Bankr. M.D.N.C. May 7, 2014). If there are facts sufficient to find inquiry notice, then there are facts sufficient to defeat good faith that is essential to section 548(c). *In re Lull*, 386 B.R. 261 (Bankr. D. Haw. 2008).

>   2.      *UFTA Section 8(a)*

Section 8(a) of the UFTA provides that a "transfer or obligation is not voidable under Section 4(a)(1) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." *See* UFTA § 8(a).[42]  In order to demonstrate the element of good faith, the transferee must prove that he received the conveyance in objective good faith and his lack of actual knowledge is relevant but not determinative. *Terry v. June*, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006).  The FDCPA contains an identical defense. *See* 28 U.S.C. § 3307(a).

>   3.      *MUFCA*

Section 15-203 of the MUFCA provides that a transfer is not fraudulent if the transferor receives "fair consideration," which is when:

>   (a) In exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
>   (b) The property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

"'[F]air consideration has two components—the exchange of fair value and good faith—and both are required.'" *SEC v. Universal Express, Inc.*, 2008 WL 1944803, at *5 (S.D.N.Y.2008)

---

[42] All of the UFTA states have a defense for a person who takes in good faith and for a reasonably equivalent value. *See* Ala. Code § 8-9A-8(a); Cal. Civ. Code §3439.08(d)(3) (2014); 740 Ill. Comp. Stat. § 160/9(a); Mass. Gen. Laws ch. 109A, § 9(a);  N.C. Gen. Stat. § 39-23.8(a) (2014); Tenn. Code Ann. §§ 66-3-309(a); Tex. Bus. & Com. Code § 24.009(a); Wis. Stat. §§ 242.09(1).

(quoting *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 376–77 (S.D.N.Y.2003)).[43] The concept of

"fair consideration" is an "elusive one that defies any one precise formula," and "[w]hat constitutes

fair consideration under [section 203] must be determined upon the facts and circumstances of

each particular case." *Id.* (internal quotation marks and citation omitted).  In assessing a party's

good faith, courts have found:

> "[A] person seeking to set aside a conveyance upon the basis of lack
> of good faith must prove that one or more of the following factors is
> lacking: (1) an honest belief in the propriety of the activities in
> question; (2) no intent to take unconscionable advantage of others;
> and (3) no intent to, or knowledge of the fact that the activities in
> question will hinder, delay, or defraud others...." In short, "the lack
> of good faith imports a failure to deal honestly, fairly and openly."

*Ostashko v. Ostashko*, No. 00-cv-7162, 2002 WL 32068357 at *22–23 (E.D.N.Y.2002) (quoting

*Southern Indus., Inc. v. Jeremias*, 66 A.D.2d 178, 183, 411 N.Y.S.2d 945, 948–49 (2d Dep't

1978)). Courts interpreting the UFCA have found that transfers to corporate insiders are "presumed

to be in bad faith." *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 448 (S.D.N.Y. 2014);

*A.F.L. Falck, S.p.A. v. E.A. Karay Co., Inc.*, 722 F. Supp. 12, 17 (S.D.N.Y. 1989) (insolvent

debtor's repayment of loans from its sole shareholder was not made in good faith), *on reargument*,

131 F.R.D. 46 (S.D.N.Y. 1990).

### B.      The Golias Defendants Are Not Good Faith Transferees for Value

#### 1.      *The Golias Defendants Provided No Value to HDL*

As set forth *supra* in section IV.D-E, the Golias Defendants did not provide **any** value in

exchange for the Shareholder Distributions.  *See also Boyer v. Crown Stock Distribution, Inc.*, 587

F.3d 787, 796 (7th Cir. 2009) (holding that individual shareholders did not provide value under

section 550(b) in exchange for receiving distributions); *In re Agricultural Research & Tech. Grp.*,

---

[43] New York also follows the UFCA.

916 F.2d 528, 540 (9th Cir. 1990) (distributions on account of partnership interest were not for value under section 9 of the UFTA or section 550(b) of the Bankruptcy Code); 5 Collier on Bankruptcy ¶ 548.05(2)(a) ("Transactions that satisfy, discharge or secure all or part of an otherwise legitimate obligation are for "value;" transactions that are gifts or effectively gifts, such as corporate dividends, are not.").

2.      *The Golias Defendants Did Not Receive the Payments in Good Faith*

The Golias Defendants cannot assert the good faith defense because there is no genuine dispute of material fact that they had both actual and constructive notice of HDL's fraud and insolvency from the inception of HDL.  As to actual knowledge, the Golias Defendants knew the following prior to and while receiving the Shareholder Distributions:

- The Golias Defendants were involved in negotiating the BlueWave Agreement, failed to conduct any pre-investment diligence, and repeatedly relied upon Mallory's assurances that HDL's business was legal without requesting copies of the underlying legal opinions.  SMF ¶¶ 14, 24-28.

- From the start of HDL's business, the Golias Defendants were aware that HDL's performance vastly exceeded the PPM's projections, which projections did not include the Illicit Scheme.  SMF ¶¶ 4-5, 17, 156-58.

- T. Golias believed the proposed Discretionary Distribution amount was too high and conducted his own diligence. SMF ¶¶ 153-54.

- The Golias Defendants regularly received regular financial updates on HDL's business and any related legal issues.  SMF ¶ 159-60.

- On November 9, 2012, Ryan forwarded S.L. Greenberg the minutes for HDL's September 4, 2012, Board meeting, which reflected that the Board reviewed a "Memorandum from Derek/Dennis," a/k/a the Kung Memo. SMF ¶ 161.

- In early 2013, the Golias Defendants participated in biweekly conference calls where changes to P&H and other practices were discussed.  SMF ¶ 162.

- The Goliases were "in the loop on everything . . . one of the things that we agreed to, starting in early 2013, was to have regular weekly or biweekly meetings, where we would go through everything, and so on a regular basis we gave financials, regulatory, operational, technical, legal, everything, updates. . . . [T]hey wanted more communication and they got it."  Kanowitz Decl., Ex. 17, at 128:10-18.

214874179

- The Golias Defendants were aware of the DOJ Subpoena shortly after it was served in January 2013.  SMF ¶ 165.

- In January 2013, the Golias Defendants' counsel sent HDL an extensive information request, including for legal opinions. SMF ¶ 166-67.

- The Golias Defendants' counsel regularly communicated with Ropes & Gray throughout 2013 and 2014. SMF ¶¶ 193.

- The Golias Defendants were aware of the Special Fraud Alert after it was issued. SMF ¶ 193.

- The Golias Defendants regularly attended Board meetings starting in October 2014. SMF ¶ 203.

- The Golias Defendants had Board designees, Galen and Bartlett, commencing in October 2014. SMF ¶¶ 201-202.

- The Golias Defendants were aware that HDL had serious liquidity issues commencing in October 2014 and that it later was in a cash flow negative position. SMF ¶¶ 204, 208.

- The Golias Defendants' counsel prepared a memorandum on November 10, 2014, making clear that the Patient Payment Waiver raised legal concerns. SMF ¶ 207.

- The Golias Defendants met with Dent and Johnson in November 2014 to discuss terminating the BlueWave Agreement. SMF ¶ 227.

- The Golias Defendants were aware that Aetna and Cigna filed lawsuits against HDL. SMF ¶¶ 214, 216.

The Golias Defendants cannot maintain a good faith defense given their actual knowledge at all relevant times that HDL's business practices were suspect at best, and extremely risky at worst.

As to constructive knowledge, the Golias Defendants were willfully ignorant of HDL's fraud and financial difficulties despite financing the company and actively participating in its Illicit Scheme. *Jones v. Revels (In re Revels)*, No. 05-13351-3P7, 2007 Bankr. LEXIS 4687, at **17-18 (Bankr. M.D. Fla. Jan. 31, 2007) (internal quotation marks omitted).  The Golias Defendants knew or should have known that HDL's business was suspect from the very start.  They were involved in negotiating the BlueWave Agreement but failed to conduct any diligence, SMF ¶¶ 14, 24-28,

63

knew that HDL had outlandishly higher revenues than what had been predicted in the PPM, SMF ¶¶ 4-5, 17, 156-58, approved a Discretionary Distribution despite initially believing it was too high, SMF ¶¶ 153-54, and regularly received financial updates on HDL's business and legal issues, SMF ¶¶ 159-160.  After the DOJ Subpoena was served in January 2013, there is no doubt that the Golias Defendants knew HDL's business had serious issues that warranted their own investigation. Indeed, their counsel sent an information request that very month recognizing as much. SMF ¶¶ 166-67.  The Golias Defendants then received updates from HDL and their own counsel making clear that HDL's business was suspect and its financial condition precarious. SMF ¶¶ 201-208, 214, 216, 227.

Those circumstances would have placed a reasonable person on notice of HDL's fraud and insolvency and required them to conduct an investigation.  *See In re Bayou Grp., LLC*, 396 B.R. 810, 844 (Bankr. S.D.N.Y. 2008) (noting that transferee "cannot be found to have taken a transfer in good faith 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose.'"), *aff'd in part, rev'd in part*, 439 B.R. 284 (S.D.N.Y. 2010).  But the Golias Defendants failed to undertake such an investigation and from the start relied upon HDL's assurances that its conduct was compliant with applicable law and contracts with Insurers. SMF ¶ 14.  Given that there are no genuine disputes of material facts regarding the Golias Defendants' knowledge, failure to conduct an investigation, and active participation in HDL's Illicit Scheme, the Golias Defendants' good faith defense fails.  *See In re Grove-Merritt*, 406 B.R. 778, 784 (Bankr. S.D. Ohio 2009) (finding that a defendant could not assert the good faith defense where he was "aware of sufficient facts concerning the Debtor's precarious financial situation to place him on inquiry notice. Based on his in-depth involvement in all aspects of the Debtor's life during the course of their relationship, the

Defendant had long known of the Debtor's financial problems."); *In re SunSport, Inc.*, 260 B.R. 88, 117 (Bankr. E.D. Va. 2000) (transferee lacked good faith where he knew the debtor's financial condition was "precarious," that a lawsuit was "creating a great financial burden," and that the debtor had liabilities).

### C.      The BlueWave Defendants are Not Good Faith Transferees For Value

#### 1.      *The BlueWave Defendants Provided No Value*

As set forth supra in section VI.F, the BlueWave Defendants did not provide value in exchange for the BlueWave Payments based upon the illegality of the contractual relationship between BlueWave and HDL.   Because BlueWave performed services under the BlueWave Agreement in exchange for illegal consideration, it did not provide any value to HDL.   *Armstrong v. Collins*, 2010 U.S. Dist. LEXIS 28075, 2010 WL 1141158 (S.D.N.Y. 2010) (payments to owner of illegal service lacked reasonably equivalent value because the services were illegal); *Tabas v. Lehman (In re Capitol Invs., Inc.)*, 473 B.R. 838, 845 (Bankr. S.D. Fla. 2012).

#### 2.      *The BlueWave Defendants Did Not Receive The Transfers in Good Faith*

Undisputed facts establish that the BlueWave Defendants did not receive transfers in good faith. The BlueWave Defendants were repeatedly placed on notice that the Illicit Scheme involved high risk and could violate applicable law numerous times from 2009 through 2015.   SMF ¶¶ 148-149, 179, 184.   Rather than deal with those concerns by taking mitigating steps, the BlueWave Defendants failed to engage healthcare counsel and challenged all attempts to terminate the Illicit Scheme. SMF ¶ 179, 186.   Dent was also found responsible for violating the FCA in the Qui Tam, and the Qui Tam court also found that Dent acted willingly and attempted to silence those who warned him about the possible illegality of his conduct. SMF ¶¶ 257-58.   Accordingly, the BlueWave Defendants had both actual and constructive knowledge of HDL's fraud and insolvency, and cannot maintain a good faith defense.

65

**D.      The Good Faith Transferee Defense Does Not Apply to Va. Code § 55-81**

Virginia's fraudulent transfer statute does not contain a good faith transferee defense and the Liquidating Trustee is entitled to summary judgment that the Golias Defendants' and BlueWave Defendants' good faith transferee defenses are inapplicable to such claims brought under those statutes.

**VIII.   The Liquidating Trustee is Entitled to Summary Judgment on the Golias Defendants' Advice of Counsel Defense in the Tax Action (Golias Defendants' Tax Answer, A.D. 2)**

Only the Golias Defendants asserted advice of counsel as an affirmative defense, and they did so only in their answer to the Amended Tax Complaint [Adv. 17-4300 Dkt. No. 99].  No other remaining Defendant raised an advice of counsel defense in their answers to either complaint, which, for substantially the reasons set forth in section IX, *infra*, waived the defense.  The Golias Defendants' advice of counsel defense fails as a matter of law.

**A.      The Golias Defendants Cannot Assert the Advice of Counsel Defense Because They Asserted Privilege Over Their Attorneys' Documents**

"When a party asserts an advice of counsel defense, he waives the attorney-client privilege as to the entire subject matter of that defense: 'Were the law otherwise, the client could selectively disclose fragments helpful to its cause, entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking process.'"  *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, No. 9:11-CV-1593-RMG, 2017 WL 1282012, at *3 (D.S.C. Apr. 5, 2017) (quoting *XYZ Corp. v. United States*, 348 F.3d 16, 24 (1st Cir. 2003)).  Wavier in this context is broad— it applies to relevant advice from all attorneys, including trial counsel.  *Berkeley Heartlab, Inc.*, 2017 WL 1282012, at *3 (citing *LifeNet, Inc. v. Musculoskeletal Transplant Found., Inc.*, 490 F. Supp. 2d 681, 688 (E.D. Va. 2007) (ordering defendant to produce communications from trial counsel after defendants

asserted an advice of counsel defense, because "excluding trial counsel from the scope of the waiver would permit a party to use the attorney-client privilege as both a sword and a shield")).

A critical corollary to the broad scope of waiver accompanying assertion of an advice of counsel defense is that once asserted, that party may not then shield relevant communications under the guise of privilege. *See Sedillos v. Board of Educ.*, 313 F. Supp. 2d 1091, 1094 (D. Colo. 2004) (defendant cannot claim reliance on advice of counsel while "prevent[ing] the plaintiffs from exploring fully the substance and circumstances of that advice").  Doing so would "kidnap the truth seeking process" and permit the party to use the privilege "as both a sword and a shield." This is precisely what the Golias Defendants did in asserting their advice of counsel defense to claims advanced by the Plaintiff in this case.

In connection with their written discovery responses, the Golias Defendants produced at least four separate privilege logs.  SMF ¶ 274.  The privilege logs contain multiple entries showing that the Golias Defendants received advice from counsel on payment of tax distributions and the proposed conversion from a S to a C Corporation.  *Id.*  The Golias Defendants waived privilege over these communications by asserting an advice of counsel defense in their answer to the Amended Tax Complaint, yet blocked the Liquidating Trustee "from exploring fully the substance and circumstances of that advice." *Sedillos*, 313 F. Supp. 2d at 1094.  Accordingly, the Golias Defendants may not now assert a viable defense based on advice of counsel.

### B.    The Golias Defendants Cannot Rely Upon the Advice of HDL's Attorneys As A Defense

To the extent that the Golias Defendants purport to rely upon the advice that HDL's attorneys may have rendered to them in connection with the S Revocation, such a defense also fails as a matter of law.  The attorney-client privilege attaches only to communications between an attorney and a *client*, and only the *client* can waive the privilege. *See, e.g.*, *United States ex rel.*

*Lutz v. Berkeley Heartlab, Inc.*, No. 9:11-CV-1593-RMG, 2017 WL 1282012, at *3 (D.S.C. Apr.

5, 2017) (holding that advice of counsel defense waived privilege and noting that "[t]he party

asserting the privilege must '*establish not only that an attorney-client relationship existed* ….'")

(emphasis added, citation omitted); *Ross v. City of Memphis*, 423 F.3d 596, 604 (6th Cir. 2005)

(holding that city employee's invocation of the advice of counsel defense did not impliedly waive

the attorney-client privilege held by the City— "It is not unfair to prevent [defendant] from

releasing privileged communications with counsel *in which he was not the client*.").  Accordingly,

because a non-client cannot waive attorney-client privilege, the advice of counsel defense is not

available to that party's purported reliance on someone else's lawyer's advice.  *See United States

v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558, 566 (S.D.N.Y. 2015) (surveying applicable case

law and holding that an employee was "precluded from asserting an advice-of-counsel defense in

light of [employer's] refusal to waive its attorney-client privilege.").

     Here, the Golias Defendants were never represented by HDL's attorneys and thus could

not force HDL, or now the Liquidating Trustee, to waive HDL's attorney-client privilege.

Accordingly, the Golias Defendants cannot rely upon the advice of counsel defense and the

Liquidating Trustee is entitled to summary judgment on that defense.

## IX.    The Liquidating Trustee is Entitled to Summary Judgment on the BlueWave Defendants' Purported Voluntary Payment Affirmative Defense

     The Bluewave Defendants filed a Second Amended Answer and Affirmative Defenses on

July 26, 2018 [Adv. 16-03271, Dkt. No. 640] that asserted the voluntary payment doctrine[44] as an

affirmative defense.  However, when they withdrew that pleading by notice dated August 13, 2018

---

[44] The voluntary payment doctrine is a rule recognized by several states that, under certain circumstances, bars a
plaintiff who, with full knowledge of all facts, voluntarily pays money to satisfy the colorable legal demand of another.
*See, e.g.*, *D.R. Horton, Inc. v. Bd. Of Sup'rs for Cty. Of Warren*, 737 S.E.2d 886, 888 (Va. 2013).

[Adv. 16-03271, Dkt. No. 648] they forfeited[45] this affirmative defense and the Court should grant summary judgment holding that the voluntary payment doctrine does not apply.

A party must "affirmatively state any avoidance or affirmative defense" in its responsive pleading. Rule 8(c)(1). An amended pleading replaces and supersedes all earlier pleadings, unless it expressly incorporates the prior pleading. *See Wood v. Milyard*, 566 U.S. 463, 470 (2012); *Brinkley*, 180 F.3d at 612 ("[I]t is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver. . . ."); *Marquez v. Wilshire Credit Corp.*, No. CV C-07-245, 2008 WL 11464717, at *8 (S.D. Tex. Apr. 4, 2008) (rejecting affirmative defense pled in an original answer but omitted from subsequent answers).

Here, the Bluewave Defendants have forfeited or waived their voluntary payment doctrine defense. They have not mentioned the voluntary payment doctrine since they withdrew their Second Amended Answer. They did not seek any discovery to support it, and did not affirmatively raise it through motion practice. Because it was omitted from the operative pleading, and the Bluewave Defendants did not notify the Liquidating Trustee that they were still asserting this defense, the Liquidating Trustee did not seek discovery on this defense and would be prejudiced in its ability to rebut the voluntary payment doctrine at trial. The Court should enter judgment that the Bluewave Defendants forfeited this defense and cannot rely on it at trial.[46]

---

[45] Omitting a defense from the operative answer is properly considered a forfeiture, *Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012), but some courts refer to it as a waiver. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999) ("[I]t is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver. . . ."). The Liquidating Trustee relies upon forfeiture, but moves under either theory to the extent waiver applies.

[46] In any event, there is no genuine dispute of material fact as to whether the voluntary payment defense applies. First, the doctrine does not apply to any claims that the Liquidating Trustee has brought against the BlueWave Defendants under sections 544, 547, or 548 of the Bankruptcy Code. *In re Racing Servs., Inc.*, 482 B.R. 276, 294 (Bankr. D.N.D. 2012), *rev'd and remanded on other grounds*, 504 B.R. 549 (D.N.D. 2014), *aff'd*, 779 F.3d 498 (8th Cir. 2015). Second, the defense does not apply where, as here, the Insurers whose claims the Liquidating Trustee asserts did not have "full knowledge" of the facts or where there was fraud, duress or extortion. *D.R. Horton, Inc.*, 737 S.E.2d at 888. As set forth *supra* in section VI, the Insurers lacked complete knowledge of the BlueWave Defendants' conduct in furthering the Illicit Scheme, including P&H, the Patient Payment Waiver, and warnings the BlueWave Defendants

X.     **The Liquidating Trustee is Entitled to Summary Judgment on the Carnaggio Defendants' Affirmative Defenses That The Claims Against Them Are Barred by the APA Release (Carnaggio Defendants' A.D. 2)**

The Carnaggio Defendants' second affirmative defense is that the releases contained in sections 3.1 and 3.2 of the Asset Purchase Agreement dated September 29, 2015, among True Health Diagnostics, LLC ("**True Health**") and the Debtors (the "**APA**"), and paragraph 35 of the Court's order approving the APA [Bankr. Dkt. No. 512] (the "**Sale Order**") bar all of the Liquidating Trustee's claims against them.  See Carnaggio Defendants' Answer, Affirmative Defense No. 2.  However, this Court previously held in a memorandum opinion dated October 4, 2017 [Bankr. Dkt. No. 3443] (the "**TH Memorandum Opinion**") that the APA and Sale Order do not bar the Liquidating Trustee from asserting the Assigning Creditor Claims against the Carnaggio Defendants.  Accordingly, the Liquidating Trustee is entitled to summary judgment on the Carnaggio Defendants' second affirmative defense for the reasons set forth in the TH Memorandum Opinion.[47]

---

received regarding the same.  *See* SMF ¶ 250.   Accordingly, there is no genuine dispute of material fact that this defense is unsupportable and the Liquidating Trustee is entitled to summary judgment on the defense.

[47] The Carnaggio Defendants' Answer acknowledges that this defense is raised solely for purposes of appeal.

214874179

## <u>CONCLUSION</u>

WHEREFORE, the Liquidating Trustee respectfully requests that the Court enter an order

granting the relief requested in the MSJ and entering such other and further relief as may be just

and proper.[48]

Dated: December 17, 2019

/s/ Cullen D. Speckhart
Cullen D. Speckhart (VSB No. 79096)
Eric Kuwana (admitted pro hac vice)
**COOLEY LLP**
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Direct: (202) 776-2052
Email: cspeckhart@cooley.com
Email: ekuwana@cooley.com

Richard S. Kanowitz (admitted pro hac vice)
Evan M. Lazerowitz (admitted pro hac vice)
**COOLEY LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: rkanowitz@cooley.com
Email: elazerowitz@cooley.com

*Counsel to Plaintiff Richard Arrowsmith,*
*Liquidating Trustee of the HDL Liquidating*
*Trust*

---

[48] Because the Liquidating Trustee seeks only partial summary judgment, this Court need not decide what issues, if any are core/non-core or *Stern* claims. *In re Lancelot Inv. Fund, L.P.*, 467 B.R. 643, 646 n.1 (Bankr. N.D. Ill. 2012) (noting denial of summary judgment motion is not final order implicating bankruptcy court's authority, as non-Article III court, to enter final judgments); *In re Tri-Union Dev. Corp.*, 479 B.R. 425, 430 (Bankr. S.D. Tex. Sept. 3, 2012) (motion for partial summary judgment is interlocutory, so constitutional limitations on bankruptcy court's authority to enter final judgments are not implicated).

214874179