**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re:<br><br>**HEALTH DIAGNOSTIC LABORATORY, INC.**, *et al.*,[1]<br><br>    **Debtors.** | **Chapter 11**<br><br>**Case No.: 15-32919 (KRH)**<br><br>**Jointly Administered** |
| **RICHARD ARROWSMITH, LIQUIDATING TRUSTEE OF THE HDL LIQUIDATING TRUST,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**G. RUSSELL WARNICK,** *et al*,<br><br>    **Defendants.** | **Adv. Proc. No. 16-03271** |

**PLAINTIFF LIQUIDATING TRUSTEE'S REPLY IN SUPPORT OF
HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**
**[Redacted]**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728), and Integrated Health Leaders, LLC (2434).

Cullen D. Speckhart (VSB No. 79096)
Michael J. Klisch (VSB No. 32074)
**COOLEY LLP**
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Direct: (202) 776-2052
Email: cspeckhart@cooley.com
Email: mklisch@cooley.com

Richard S. Kanowitz (admitted pro hac vice)
**COOLEY LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: rkanowitz@cooley.com

*Counsel to Plaintiff Richard Arrowsmith, Liquidating
Trustee of the HDL Liquidating Trust*

## PRELIMINARY STATEMENT

In the face of insurmountable evidence that HDL was insolvent at all relevant times due to the massive liabilities that it accrued to the government and insurance companies, Defendants fail to raise any genuine disputes of material fact as to any of Plaintiff's operative claims. Instead, Defendants try to re-write the rules of solvency and create a *tabula rasa* where HDL operated above board, without any chance that it risked violating applicable law. The Court should reject this false narrative and decline to engage in insolvency analysis that flies in the face of well-trodden legal principles.

Defendants' other arguments in opposition to Plaintiff's causes of action and in support of their affirmative defenses lack merit because they misstate the evidentiary record or rely entirely on arguments without any legal or factual support. As to Defendants' arguments regarding insolvency, Defendants fail to identify any genuine disputes of material fact that preclude entry of summary judgment. The Court should grant the Motion. *See* Dkt. No. 1041 ("**LT MSJ**").

## ARGUMENT

**I.     The Court Should Reject the Golias and BlueWave Defendants' Argument That HDL was Solvent and did not Make any Fraudulent Transfers.**

The Golias Defendants and BlueWave Defendants argue that an insolvency case allegedly "requires a finding that there were violations of the AKS and FCA that rendered HDL insolvent," and that material facts regarding this issue are in dispute. Dkt. No. 1378 ("**BW Opp.**") at 6; Dkt. No. 1350 ("**Golias Opp.**") at 5. That argument is misplaced and designed to divert the Court's focus away from foundational matters of bankruptcy law. Whether the Illicit Scheme violated the AKS and FCA is a question of no moment to this Court's analysis of HDL's

insolvency because the liabilities that HDL owed to the DOJ and the Insurers were

noncontingent and must be fully accounted for as a matter of law.  There is no genuine dispute of

material fact on insolvency or capitalization,[2] and the Defendants' other arguments have no

merit.

> **A.    HDL's Liabilities Were Noncontingent and Must be Accounted for as a Matter of Law.**

The Golias and BlueWave Defendants argue that the fact HDL owed massive liabilities

to the DOJ and Insurers, "is appealingly simple -- even simplistic -- it cannot withstand its

encounter with either the applicable law or the facts of this case."  Golias Opp. at 4; BW Opp. at

5.  They are mistaken, as it is well-settled that the DOJ's claim is noncontingent and must be

factored at face value, notwithstanding that HDL may have defenses to the claim or that the

claim has not been reduced to a judgment.  Specifically, section 101(5) defines a claim as a

"right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated,

fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured."  11 U.S.C. § 101(5).  And, the legislative history makes clear that, by including:

> this broadest possible definition, and by use of the term throughout title 11,
> especially in subchapter I of chapter 5, the bill contemplates that all legal
> obligations of the debtor, ***no matter how remote or contingent***, will be able to be
> dealt with in the bankruptcy case.  It permits the broadest possible relief in the
> bankruptcy court.

H.R. Rep. No. 95-595, at 309 (1977) (emphasis added); S. Rep. No. 95-989, at 22 (1978) (same);

*Stewart Foods, Inc. v. Broecker (In re Stewart Foods, Inc.)*, 64 F.3d 141, 144 (4th Cir. 1995)

---

[2] Defendants do not dispute that Plaintiff has proved that the Transfers were made with HDL's property.

("Congress intended to adopt the broadest possible definition of the term 'claim,' so that a bankruptcy case would deal with all of the debtor's legal obligations.").[3]

A debtor is insolvent when its debts exceed its assets -- the traditional bankruptcy balance sheet test. This test is codified at 11 U.S.C. § 101(32)(A), which defines insolvency for an entity other than a partnership or municipality as financial conditions such that the sum of such entity's debts exceeds all of such entity's property, at a fair valuation, excluding certain exempted or fraudulently transferred property. Under the Bankruptcy Code, the term "debt" means liability on a claim. *Id.* at § 101(12). And the term "claim" is defined under the Code to include any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* at § 101(5)(A).

Thus, when courts analyze a debtor's insolvency, they include the debtor's "noncontingent" debts at face value. *E.g.*, *In re Trans World Airlines, Inc.*, 134 F.3d 188, 196-97 (3d Cir. 1998). That is because the phrase "at a fair valuation" under section 101(32)(A) of the Bankruptcy Code "does not modify the phrase 'the sum of [the] entity's debts.'" *In re Merry-Go-Round Enters., Inc.*, 229 B.R. 337, 342 (Bankr. D. Md. 1999) ("An entity's liability on a claim is the amount of the claim.").

The Fourth Circuit defines a contingent claim as:

> Possible, but not assured; doubtful or uncertain; conditioned upon the occurrence of some future event which is itself uncertain, or questionable. Synonymous with provisional. This term, when applied to a use, remainder, devise, bequest, or other legal right or

---

[3] The UFTA, UFCA, and FDCPA have substantially similar definitions. *See* UFTA § 1(3); 28 U.S.C. § 3301(3) ("FDCPA"); UFCA § 1 (defining "creditor" to include broad range of claims).

> interest, implies that no present interest exists, and that whether
> such interest or right ever will exist depends upon a future
> uncertain event.

*Grady v. A.H. Robins Co.*, 839 F.2d 198, 202-03 (4th Cir. 1988) (finding that a creditor's claim

for injury as a result of an implanted medical device was contingent because it was dependent

upon "a future uncertain event, that event being the manifestation of injury from use of the

[implanted device]").

     Thus, a claim is not contingent merely because it is unknown or disputed by the debtor.

So long as all the events giving rise to the debtor's alleged liability occurred prepetition, the

claim is noncontingent.  *See, e.g.*, *In re W.R. Grace & Co.*, 281 B.R. 852, 863-65 (Bankr. D. Del.

2002) ("[I]n 1998 W.R. Grace knew it had an existing liability [for asbestos claims], it just did

not know how big that liability was. . . .   The liability may have been unknown and the best

estimates may have erred in projecting who would come forward with a claim of asbestos injury.

This does not mean that liability for such claims was contingent."); *In re Albano*, 55 B.R. 363,

368 (N.D. Ill. 1985) ("Merely because a debtor disputes a debt, or has defenses or counterclaims,

that does not render that debt contingent or unliquidated.").

     When the Court values a noncontingent claim, it does so objectively at the full amount of

the claim, without applying "a probability discount to determine the value of these debts at the

time of the transfers."  *See, e.g.*, *Ind. Bell Tel. Co. v. Lovelady*, 2008 WL 11408781, *4-5 (W.D.

Tex. 2008) (granting summary judgment for plaintiff and finding that constructive fraudulent

transfer claims were noncontingent despite not being reduced to judgment because "[debtor's]

conduct . . . is what triggered liability.  The fact that [the creditor] had neither filed suit nor

obtained a judgment against [the debtor] . . . does not render [debtor's] debt contingent as of that date").

Accordingly, claims asserted by the government for fines and penalties or that arise from torts are noncontingent even when not reduced to judgment.[4]  *In re Knight*, 55 F.3d 231, 235-36 (7th Cir. 1995) (holding that disputed claim was noncontingent even though not determined by a civil lawsuit because the debtor's "legal duty to pay and the amount of payment due were established by statute, and were easily calculable"); *In re Terry*, 2001 WL 1700151, *2 (Bankr. M.D.N.C. 2001) (holding that disputed claim asserted by the GSA under the FCA was noncontingent).[5]

Applied here, there is no genuine dispute of material fact that HDL's claims submitted to the DOJ and Insurers were noncontingent because all of the events necessary for HDL to be liable on those occurred prepetition.  Each time the government or an Insurer paid HDL on a

---

[4] "Case law has primarily focused on defining 'contingent' in the context of section 303 (threshold requirements for chapter 7 and 11 involuntary petitions), section 109(e) (debtor eligibility for chapter 13 relief) and section 502(c) (estimation of claims).  In each of these contexts, courts have held that a claim is not contingent if all events giving rise to liability occurred prepetition." (internal quotation marks and citations omitted)).  *In re Imagine Fulfillment Servs., LLC*, 489 B.R. 136, 147 (Bankr. C.D. Cal. 2013).  Nonetheless, those cases assessed the meaning of "claim" under section 101(5), which has a uniform definition throughout the Bankruptcy Code.

[5] *See also In re Mazzeo*, 131 F.3d 295, 303-04 (2d Cir. 1997) (finding that disputed tax claims were noncontingent despite not being fixed by a court because the "obligation to pay [taxes] is not contingent on any extrinsic event" and that the "existence of a dispute, and the prerequisite that the claimant establish its claim by a given quantum of proof, mean only that the claim is disputed, not that it is 'contingent' in the sense of depending on the occurrence of an extrinsic event"); *In re Pantazelos*, 540 B.R. 347, 351 (Bankr. N.D. Ill. 2015) (disputed claim asserted by FDIC for negligence, breach of fiduciary duty, and gross negligence was noncontingent); *In re Huelbig*, 299 B.R. 721, 723 (Bankr. D.R.I. 2003) (disputed RICO claims asserted by insurance companies were noncontingent), *aff'd*, 313 B.R. 540 (D.R.I. 2004).

claim, all events necessary for liability occurred.  *See United States v. First Choice Armor & Equip., Inc.*, 808 F. Supp. 2d 68, 79 (D.D.C. 2011) ("[A] party that violates the FCA incurs a debt to the government as soon as the government pays the fraudulent claim."); *Albano*, 55 B.R. at 366-67 (holding that liability on contract becomes noncontingent when contract is made, even if some later occurrence might void liability); *In re Dill*, 30 B.R. 546, 549 (B.A.P. 9th Cir. 1983) ("A tort claim ordinarily is not contingent as to liability . . . .").

The amounts of the DOJ and Insurer claims are also not disputed.  As to the DOJ claims, HDL's own attorneys at Ropes & Gray quantified those liabilities at HDL's March 25, 2013 Board meeting.  Dkt. No. 1042 ("**LT SMF**"), ¶ 178.[6]  Specifically, Ropes & Gray made the following assessments of liability "based on preliminary 2012 figures and [its] rough review of past financials":

- Criminal fine based on net sales revenue and 2x multiplier: $1,270,000,000.
- FCA/civil liability based on:
  - Total Medicare payments accounting for treble damages: $687,000,000.
  - Total submitted Medicare claims: $2,160,000,000.
- Stark law based on tests performed times $15,000: $11,700,000,000.
- Total damages:
  - Using Medicare payments made: **$13,657,000,000**
  - Using Medicare claims submitted: **$15,130,000,000**[7]

---

[6] *See In re Mama D'Angelo, Inc.*, 55 F.3d 552, 556 (10th Cir. 1995) (holding that a court "may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date") (internal quotations and citation omitted).

[7] *See* Dkt. No. 1045 ("**Kanowitz Decl.**"), Ex. 120 at -5290.

The Defendants do not substantively dispute the existence of Ropes & Gray's calculations. *See* Dkt. No. 1352 ("**Golias SDF**"), ¶ 176 (characterizing calculations as a Redacted

Redacted                    ); Dkt. No. 1377 ("**BW SDF**"), ¶ 176 (asserting lack of personal knowledge). Their experts also do not challenge Ropes & Gray's calculations. Indeed, their insolvency expert, Marc Brown, admits that "Ropes & Gray's conclusions [in March 2013] were based on an actual DOJ investigation that was taking place . . . and Ropes & Gray's analysis illustrated potential exposure to its client." *See* Dkt. No. 1353 ("**Griffin Decl.**"), Ex. 111, ¶ 9. Thus, there is no genuine dispute of material fact as to the amount of HDL's noncontingent liabilities owed to the DOJ.

The Insurer claims are valued, at a minimum, at the amounts of their proofs of claim:[8]

- Aetna: $77,400,000
  (consisting of a $49,500,000 Class 3 Claim and a $27,900,000 Class 4 Claim)

- Cigna: $59,000,000

- UHC: $97,305,988.71
  (consisting of a $92,936,994.65 Class 3 Claim, a $3,171,111.41 Class 1 Claim and a $1,197,882.65 Administrative Priority Claim).

- **Total: $233,705,988.71**

*See* LT SMF, ¶¶ 248-49; Kanowitz Decl., Ex. 54, pt. 1 at 106, pt. 2 at 67.

As for the DOJ claim, the Defendants do not dispute the amounts of the Insurers' claims nor have they filed claims objections thereto. *See* Golias SDF, ¶¶ 245-247; BW SDF, ¶¶ 245-247. They also do not dispute that Ropes & Gray advised HDL in March 2013 that the Insurers

---

[8] Plaintiff expressly reserves the right, if necessary, to prove at trial that the Insurers' claims were higher but relies upon the filed amounts of the proofs of claim for purposes of this MSJ.

7

"may begin to withhold reimbursement going forward, putting HDL at risk of losing multiple revenue streams."  LT SMF, ¶ 177; *see* Golias SDF, ¶ 177; BW SDF, ¶ 177.

Those undisputed facts are fatal to the Defendants' argument because they do not assert that the DOJ's claims were frivolous or lacking any legal basis.  Nor do they dispute that HDL was on notice of potential liabilities to the DOJ and received warnings from HCPs and their attorneys, as well as threatening letters from insurance companies. *E.g.* Golias SDF, ¶¶ 146, 147[9]; BW SDF, ¶¶ 148(d), 149.  Instead, they argue about the *import* of that evidence and contend that HDL had defenses to the DOJ's claims that allegedly raise material issues of fact that preclude summary judgment. *See* Golias Opp. at 16-42; BW Opp. at 18-47.

And, if their argument is accepted, it is insufficient to create a genuine dispute of material fact because, at best, it only establishes that the DOJ's claim was disputed, not contingent. *See Imagine Fulfillment*, 489 B.R. at 149 ("[A] dispute over a claim does not render the claim contingent.").  The mere existence of defenses to DOJ liability is also irrelevant because, as the *W.R. Grace* court held, the mere possibility that claims are subject to a "number of other supposed contingencies" such as that the plaintiffs might fail to meet their burden of proof does not change their status as claims and "just because claims are defeasible through later acts or omissions of the claimants does not mean they were never claims in the sense of being a 'right to payment.'" *W.R. Grace*, 281 B.R. at 864.  Under those circumstances, there is no genuine dispute of material fact as to either the amount of the DOJ and Insurer claims or their noncontingent nature.

---

[9] The Golias SDF assigns paragraph numbers that are one less than the paragraph numbers assigned to the same statement in the LT SMF starting at ¶ 67.

**B.      If the DOJ and Insurer Claims are Contingent, There is Still no Genuine
Dispute of Material Fact That They Must be Factored at Their Probable
Amounts.**

Even if the Court determines that any of HDL's liabilities to the DOJ and Insurers were

contingent, Plaintiff is still entitled to summary judgment as to HDL's insolvency because there

is no genuine dispute of material fact that HDL faced a high probability of incurring massive

liabilities.

In contrast to the Generally Accepted Accounting Principles ("**GAAP**"), which generally

do not provide for the inclusion of contingent liabilities unless they are probable and can be

reasonably calculated, a bankruptcy court must account for all contingent liabilities.  *Merry-Go-*

*Round*, 229 B.R. at 343; *see also In re Turner & Cook, Inc.*, 507 B.R. 101, 109 (Bankr. D. Vt.

2014) ("[I]t is reversible error to exclude a potential liability from the insolvency calculation

merely because the liability is contingent or because the debtor disputes the claim.").

If contingent, then a court values the claim by "discount[ing] it by the probability that the

contingency will occur and the liability become[s] real."  *In re Xonics Photochemical, Inc.*, 841

F.2d 198, 200 (7th Cir. 1988); *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 659

(7th Cir. 1992) (affirming bankruptcy court's valuation of a contingent claim on a guarantee

based on a 60% chance that the bank would turn to the debtor for payment); *FDIC v. Bell*, 106

F.3d 258, 264 (8th Cir. 1997) (finding contingent liabilities should be excluded only where

"liability is contingent on an impossible or an extremely unlikely event"); *Merry-Go-Round*, 229

B.R. at 342 ("An entity's liability on a claim is the amount of the claim. The amount of a

contingent claim, however, is determined in accordance with the probability that the contingency

will occur.").  Discounting a contingent claim to zero is "the equivalent of saying that there was

9

no chance whatsoever any liability would be incurred." *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007).

Applied here, there are no genuine disputes of material fact that HDL faced substantial risks of incurring liabilities to the DOJ and Insurers based upon the numerous warnings that HDL received about the risky nature of its conduct. *See* LT SMF, ¶¶ 148-149. While the Defendants argue about the significance of these warnings, they do not (and cannot) refute their existence. *See, e.g.*, Golias SDF, ¶ 146(k) (admitting that the Kung Memo **Redacted**          ); BW SDF, ¶ 148(k) (same). In light of the warnings HDL received at the time, there was a likelihood substantially greater than zero that HDL faced liabilities to the DOJ and Insurers. *Advanced Telecomm.*, 490 F.3d at 1336 (reversing bankruptcy court's decision to assign a zero value to a contract claim that was later settled because "[the debtor's] own lawyers had advised it -- more than a year *prior* to the settlement -- that the company faced millions of dollars in liability"). This is also true given the fact that HDL entered into a multimillion dollar settlement with the DOJ predicated solely upon HDL's ability to pay, and because Mallory, Dent, and Johnson were found liable for violating the FCA by the *qui tam* court. *See* LT SMF, ¶¶ 210, 257-58; Dkt. No. 1325 ("**LT SDF**"), ¶ 83.

Given the magnitude of the claims in relation to the size of HDL's assets (as set forth *infra*), this Court need not determine the chance of liability with "absolute precision." *See Advanced Telecomm.*, 490 F.3d at 1336. Nonetheless, the undisputed expert evidence in this case gives the Court a clear basis to value the DOJ and Insurer claims to the extent it finds they are contingent. Kearns calculated high and low liability estimates of the DOJ claims by applying Ropes & Gray's fine calculations to HDL's revenue data as analyzed and adjusted by Dixon:

| Summary of HDL Liability Associated with Inducement Scheme | | | | | |
|---|---|---|---|---|---|
| *In $ Millions* | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
| Low | $ 33.3 | $ 219.0 | $ 610.4 | $ 984.8 | $ 1,271.6 |
| High | $ 103.7 | $ 655.1 | $ 1,872.4 | $ 3,091.0 | $ 4,019.9 |

*See* Kanowitz Decl., Ex. 31, at Exhibit 3; *see also id.*, Ex. 30, ¶¶ 19 (table 1), 80 (table 3).

Kearns' liability calculations are more conservative than Ropes & Gray's because he did not

include possible liabilities under the Stark Law. *See id.*, Ex. 31, at Exhibit 3. Similarly, Dixon

determined that even under the more restrictive definition of contingent claim under GAAP,

"liabilities as reflected on [HDL's] financial statements are understated as a result of HDL's

failure to . . . record increasing liabilities related to contingent claims due to fines and penalties

for violation of AKS, FCA and Stark Law." *See id.*, Ex. 30, ¶ 146.

Kearns' estimates of the possible range of possible liabilities are undisputed and

constitute an adequate basis for this Court to make the probability analysis as set forth in

*Xonics*.[10] Defendants rely solely upon Brown's opinion, which is erroneously predicated upon

the instruction of his counsel to value all DOJ and Insurer liabilities at zero. This is clear error as

set forth in *Advanced Telecomm.* and given that the record simply does not support such a

complete discount of the DOJ's and Insurer's claims that amounts to an opinion that they were

an impossibility. As a result, Brown's opinions as to the value of the DOJ and Insurer claims

---

[10] Given the magnitude of the DOJ's claims, even at the low range, in relation to HDL's assets, this Court need not value the Insurer claims with absolute precision to find that HDL was insolvent. Nonetheless, given the fact that the Insurers filed proofs of claim, sent numerous warnings to HDL, and that it is undisputed that Ropes & Gray warned HDL of Insurer-related liabilities, this Court should also find there was a substantial risk that HDL would incur liabilities to the Insurers. *See* LT SMF, ¶¶ 149, 247-49.

should not be considered on summary judgment and do not create genuine disputes of material

fact. *See Kipperman v. Onex Corp.*, 411 B.R. 805, 850-51 (N.D. Ga. 2009) (granting summary

judgment because party relied on excluded expert evidence to prove insolvency).

> **C.**   **After Properly Accounting for the DOJ and Insurer Claims, HDL was**
> **Insolvent at all Relevant Times.**

Out of whole cloth, Defendants have invented their own unprecedented insolvency test.

Their test is predicated upon the false assumption that to assess HDL's solvency, this Court must

determine that "no reasonable jury" could find that HDL had not violated the AKS and FCA.

*See* Golias Opp. at 37; BW Opp. at 41-42.  But that novel theory is not the law.  If this Court

applies the correct balance sheet insolvency test and the correct definition of a claim under the

Bankruptcy Code, it must find there is no genuine dispute of material fact that HDL was

insolvent.[11]

Plaintiff has demonstrated, through the undisputed factual record and the Kearns Report

and testimony, that HDL was insolvent at all relevant times because the Illicit Scheme tainted

virtually all of HDL's revenue.  *See* LT SMF, ¶ 262; Kanowitz Decl., Ex. 31 at 22.  Kearns

estimated the value of those liabilities at all relevant times based on Ropes & Gray's analysis and

HDL's books and records and found that they rendered HDL insolvent at all relevant times:

---

[11] In addition, Brown only considered HDL's solvency on two specific dates: December 7, 2012
and January 11, 2013.  Kanowitz Decl., Ex. 29, ¶¶ 44, 48-49.  To the extent the Court determines
that a genuine dispute of material fact exists on insolvency, such a determination should be
limited to transfers that took place on December 7, 2012 and January 11, 2013.  The Defendants
do not dispute this point.  *See* Golias Opp. at 44 n.6 ("Brown assessed HDL's solvency as of
December 7, 2012 . . . and as of January 11, 2013 . . . .").

| In $ Millions | | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Total Assets - Low Estimate | | $ 11.8 | $ 24.8 | $ 65.7 | $ 67.6 | $ 62.0 |
| Total Assets - High Estimate | | 16.2 | 34.4 | 82.0 | 92.0 | 98.4 |
| Total Liabilities - Low Estimate | [1] | 108.4 | 675.3 | 1,907.2 | 3,153.1 | 4,082.4 |
| Total Liabilities - High Estimate | [2] | 38.0 | 239.2 | 645.3 | 1,046.8 | 1,334.2 |
| Value of Equity (Solvency Test) - Low Estimate | | $ (96.6) | $ (650.6) | $ (1,841.5) | $ (3,085.4) | $ (4,020.4) |
| Value of Equity (Solvency Test) - High Estimate | | $ (21.8) | $ (204.9) | $ (563.3) | $ (954.9) | $ (1,235.8) |

Kanowitz Decl., Ex. 31 at 8.

Even without adding the over $230 million in Insurer claims, HDL was insolvent. This is true regardless of whether the Court views the liabilities owed to the DOJ and Insurers as noncontingent or contingent because in either event, the liabilities dwarfed HDL's assets by several orders of magnitude. As an illustration, even a slim 10% chance of the DOJ successfully prosecuting its $13 billion claim is $1,300,000,000. That value greatly exceeds HDL's assets as calculated by either Kearns or Brown. But, as set forth herein, there is no genuine dispute of material fact that HDL faced a substantially higher risk of the DOJ and Insurers prevailing on their claims. *See supra*, Section I.B.

Nor does the report and opinion offered by Defendants' insolvency expert, Marc Brown, create a genuine dispute of material fact as to HDL's insolvency because Brown was instructed by counsel to value HDL's governmental liabilities at zero. Kanowitz Decl., Ex. 29, ¶¶ 133-34. This instruction conflicts with the Bankruptcy Code's definition of claim as set forth *supra* in Section I.A. Brown also admitted that if the Court determines that HDL had liabilities that exceeded the equity value of HDL's business, it would "trip the binary switch from solvent to insolvent." Kanowitz Decl., Ex. 3 at 89:13-90:4. Brown's testimony is in accord with Kearns' Rebuttal Report, which found that including HDL's liabilities to the DOJ in Brown's own analysis shows that HDL was insolvent on all of Brown's testing dates. *Declaration of Richard*

13

*Kanowitz in Support of Liquidating Trustee's Reply in Support of His Motion for Partial*

*Summary Judgment* ("**Kanowitz Reply Decl.**"), Ex. 371 at 16-19.

Thus, Plaintiff has satisfied his burden of proving that no genuine dispute of material fact

exists as to whether HDL was insolvent and is entitled to a finding on summary judgment that

HDL was insolvent under the balance sheet test.

### 1.    *HDL was Unable to Pay its Debts as They Came Due.*

Plaintiff is also entitled to summary judgment on the cash flow test to establish

insolvency.  *See In re Blixseth*, 514 B.R. 871, 884 (Bankr. D. Mont. 2014), *aff'd in part, rev'd in*

*part on other grounds*, 679 F. App'x 611 (9th Cir. 2017).  Other than generally relying upon the

erroneous conclusions of Brown's report, Defendants do not present any argument specific to the

adequate cash flow test.  For the same reasons set forth *supra* and as detailed in the Kearns

Report, once the Court determines that HDL owed substantial liabilities to the DOJ, it is clear

that HDL lacked the expected future cash flows sufficient to meet those liabilities.  Kanowitz

Decl., Ex. 31 at 59.

### 2.    *HDL was Inadequately Capitalized.*

Plaintiff has also proven that HDL was inadequately capitalized, and is thus entitled to

summary judgment on this issue.  *See Blixseth*, 514 B.R. at 883.  Other than generally relying

upon the erroneous conclusions of Brown's report (Golias Opp. at 43-45; BW Opp. at 47-50),

Defendants do not present any argument specific to the inadequate capitalization test.

Plaintiff's experts, Dixon and Kearns, both opined that in light of how HDL's financial

statements improperly accounted for revenue and liabilities, the projections in the PPM were

entirely disconnected from the actual performance of the company.  Kanowitz Decl., Ex. 31 at 55

n.230; Ex. 30 at 54 (table 14).[12]  As a result, because HDL lacked the "financial resources to

sustain a rapid deterioration in operational and financial performance and simultaneously deal

with substantial accrued liabilities," HDL was inadequately capitalized at all relevant times.  *Id.*,

Ex. 31 at 59.  *See In re O'Day Corp.*, 126 B.R. 370, 406-07 (Bankr. D. Mass. 1991) (finding

company did not maintain sufficient capital where it relied on unreasonable financial

projections).

>    D.    **The BlueWave Defendants did not Provide Reasonably Equivalent Value in Exchange for the BlueWave Transfers.**

The BlueWave Defendants contend that there are genuine disputes of material fact as to

whether they provided reasonably equivalent value in exchange for the BlueWave Transfers

because the BlueWave Agreement's commission provisions did not violate applicable law.  *See*

BW Opp. at 53-54.

As set forth *infra* in Section II, there is no genuine dispute of material fact that the

BlueWave Agreement violated applicable law.  Plaintiff is therefore entitled to summary

judgment that the BlueWave Transfers did not provide reasonably equivalent value.  *See* LT MSJ

at 39-40.

>    E.    **The Golias Defendants did not Provide Reasonably Equivalent Value in Exchange for the Shareholder Distributions and March 1, 2010 Note.**

The Golias Defendants argue that they provided reasonably equivalent value for the

Shareholder Distributions and March 1, 2010 Note for the reasons set forth in their *Memorandum*

*of Law in Support of Partial Summary Judgment.*  Dkt. No. 1111 ("**Golias MSJ**") at 39-43, 47-

---

[12] The Defendants do not dispute the material facts underlying the PPM projections.  *See* Golias
SDF, ¶¶ 4-5, 154, 156; BW SDF at 2 (incorporating Golias SDF responses).

51. This argument is without merit as set forth in Plaintiff's Opposition to the Golias MSJ, Dkt.

No. 1323 ("**LT MSJ Opp.**") at 11-20, which Plaintiff incorporates herein by reference.

### F. Plaintiff is Entitled to Summary Judgment on the Golias Defendants' and BlueWave Defendants' Good Faith Transferee for Value Affirmative Defenses Under 11 U.S.C. § 548(c), 550(b), and Applicable law (Golias Defendants' A.D. 4-6; BlueWave Defendants' A.D. 5-7).

#### 1. *The Golias Defendants are not Good Faith Transferees for Value.*

The Golias Defendants argue that they are good faith transferees for value for the reasons

set forth in the Golias MSJ at 43-46.  This argument is without merit as set forth in the LT MSJ

Opp. at 3-8, which is incorporated herein by reference.

#### 2. *The BlueWave Defendants are not Good Faith Transferees for Value.*

The BlueWave Defendants contend that there are genuine disputes of material fact as to

whether they are entitled to maintain the good faith transferee for value defense because (i) there

are disputes as to BlueWave's state of mind; and (ii) the *qui tam* court allegedly found that

BlueWave acted in good faith.  *See* BW Opp. at 53-54.  Both of these contentions lack merit and

BlueWave has failed to meet its burden of proof on this affirmative defense.

As a gating issue, the BlueWave Defendants have offered no evidence or argument

except as to BlueWave itself and Plaintiff is entitled to summary judgment against the other

BlueWave Defendants on this affirmative defense.  And, as set forth *infra* in Section II, the *qui*

*tam* court's determinations as to BlueWave are not entitled to any preclusive effect, and none of

the BlueWave Defendants demonstrated that they provided any value given that every payment

under the illegal BlueWave Agreement was illegal.

As to its good faith, BlueWave does not even attempt to refute the substantial evidence

that it was repeatedly placed on notice that the Illicit Scheme involved high risk and could

violate applicable law numerous times from 2009 through 2015.  LT SMF, ¶¶ 148-149, 179, 184.

Rather than deal with those concerns by taking mitigating steps, BlueWave failed to engage

healthcare counsel and challenged all attempts to terminate the Illicit Scheme.  *Id.*, ¶¶ 179, 186.[13]

In response, BlueWave relies solely upon the arguments of counsel, which patently do not create

genuine disputes of material fact.  *See Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys., Inc.)*,

482 F.3d 1118, 1122 n.1 (9th Cir. 2007) ("[A]rguments and statements of counsel are not

evidence[.]") (citation omitted).

> 3.    *The Good Faith Transferee Defense Does not Apply to Va. Code § 55-81.*

Virginia's fraudulent transfer statute does not contain a good faith transferee defense.

*See* LT MSJ at 66.  Neither the Golias Defendants nor BlueWave Defendants dispute this point

in their Oppositions.  Plaintiff is entitled to summary judgment that these Defendants' good faith

transferee defenses are inapplicable to fraudulent transfer claims brought under Section 55-81 of

the Virginia Code.  *See* Amended D&O Compl., Counts 6 & 31.[14]

**G.    The Court Should Reject BlueWave Defendants' Argument on the Statute of Repose.**

> 1.    *Plaintiff Identified the Claims on Which he is Moving.*

Plaintiff *did* "specifically identify which Counts" (BW Opp. at 58) on which he is

seeking summary judgment on the statute of repose defense.  LT MSJ at 54-55.  A chart in

Plaintiff's opening brief lists the statutes that form the basis of the fraudulent transfer claims

---

[13] The BlueWave Defendants do not dispute either of these SMFs.  BW SDF, ¶¶ 179, 186.

[14] The Golias Defendants contend that only Virginia's fraudulent transfer law is applicable to Plaintiff's fraudulent transfer claims.  *See* Golias Opp. at 45-47.  This argument is incorrect as set forth in the LT MSJ Opp. at 11-15.

upon which Plaintiff is entitled to summary judgment (*i.e.*, Amended D&O Compl., Counts 1-12, 30-33, and 37-50).  *Id.*

2.    *Defendants do not Dispute <u>Material</u> Facts.*

Defendants "dispute" that the Insurers were unaware of HDL's Challenged Practices. BW Opp. at 59-60.  The Court should reject their arguments for the following reasons.

*First*, Defendants' argument is inapplicable to Plaintiff's federal constructive fraudulent transfer claims because the statutes of repose for constructive fraud do not depend on the Insurers' knowledge, and do not run from when the creditors knew or should have known about the fraudulent transfers.  *See, e.g.*, LT MSJ at 54-55.  Rather, they run for various periods of time from the Petition Date.  *See id.*

Plaintiff only seeks to recover on constructive fraudulent transfers during that time period.  *Id.* at 55.  Thus, the Insurers' knowledge is immaterial and wholly inapplicable to those claims.[15]  Accordingly, there is no material fact that is genuinely disputed.

*Second*, Defendants' argument cannot defeat the actual fraudulent transfer claims as a matter of law.[16]  Specifically, Defendants do not dispute that, to prevail on a claim for actual fraudulent transfer, Plaintiff must only show at least *one* unsecured creditor has a claim that was not barred by the statute of repose.  *E.g.*, LT MSJ at 56 nn.38-39 (collecting cases).  Here, Plaintiff identified numerous creditors whose claims are not barred because they did not know (and should not reasonably have known) about the fraudulent transfers, including Colonial Webb; B&B Printing Co., Inc.; Economic Development Authority of the City of Richmond,

---

[15] *See* Amended D&O Complaint, Counts 2, 4, 6, 8, 10, 12, 30-33, 38, 40, 42, 44, 46, 48, 50.

[16] *See* Amended D&O Complaint, Counts 1, 3, 5, 7, 9, 11, 37, 39, 41, 43, 45, 47, 49.

Virginia; Virginia Advanced Health Services, LLC; Cavalier International Air Freight, Inc.; and

Entec Systems, Inc.  *See* LT MSJ at 56-57; LT SMF, ¶ 250.

Defendants do not dispute these facts, nor offer facts to dispute that these unsecured

creditors did not know (and should not reasonably have known) about the fraudulent transfers,

which they were required to do to defeat a summary judgment motion.  *See* BW SDF, ¶ 250.

Thus, even if the Insurers knew (or should have known) about the fraudulent transfers, it is

undisputed that the other unsecured creditors did not.  Thus, Plaintiff is entitled to judgment as a

matter of law.

*Third*, it does not matter if the Insurers knew of any of "HDL's Challenged Practices"

generally.  BW Opp. at 59.  That is because the statute is triggered *only* if the Insurers knew or

reasonably should have known about the transfers (*i.e.*, HDL's payments to BlueWave) *and* that

those transfers were fraudulent (*i.e.*, for example, they violated the AKS).  LT MSJ at 56.

Here, there is no evidence the Insurers knew either of these things.  Rather, the Insurers

testified they did not know about the P&H Fees, had never seen the P&H Agreements, had not

seen the BlueWave Agreement or that it required P&H Fees, and were not even aware that

BlueWave had been paid anything by HDL or was involved in any way.  LT MSJ at 57 n.40.

Defendants do not even identify how the Insurers could have known about the transfers to

BlueWave, or their fraudulent nature, nor do they identify any method the Insurers could have

reasonably used to find out.  Thus, Plaintiff is entitled to judgment as a matter of law.

   3. *Defendants Concede Plaintiff can Recover for Fraudulent Transfers Within the Statutory Time Period.*

Defendants concede Plaintiff is "correct" that the time limits in the statutes of repose do

not bar the recovery of fraudulent transfers "from within those periods."  BW Opp. at 59.

19

Rather, they argue that other claims on which Plaintiff is *not* seeking summary judgment as to the statute of repose "could be precluded" at trial.  *Id.*  They are mistaken.  Whether *other* claims are barred is not at issue at summary judgment, and Defendants do not explain why any of the other claims are time barred.  Accordingly, Defendants' argument has no bearing on Plaintiff's summary judgment motion.

**H.    The Golias and BlueWave Defendants Cannot Assert the Contemporaneous Exchange for New Value or Ordinary Course Transaction Defenses Under Section 547.**

The Golias and BlueWave Defendants assert that Plaintiff's preference claims are barred by the contemporaneous exchange for new value and ordinary course of business defenses in section 547 of the Bankruptcy Code.  *See* Golias Opp. at 48-52; BW Opp. at 54-57.  Neither of those defenses is available here.[17]

> *1.    Plaintiff is Entitled to Summary Judgment on the Defendants' Contemporaneous Exchange for New Value Affirmative Defense.*

Defendants assert that Plaintiff's preference claims are barred by the contemporaneous exchange for new value defense in section 547(b) of the Bankruptcy Code.  *See* Golias Opp. at 48-50; BW Opp. at 55-56.  However, that defense is inapplicable because the Preference Transfers to those Defendants were neither contemporaneous nor for value.[18]  Defendants merely

---

[17] The Golias Defendants also contend, without citing any case law or evidence, that Plaintiff has allegedly failed to meet his burden of proof on the preference counts.  *See* Golias Opp. at 49-50.  This argument lacks merit and the Golias Defendants do not dispute the relevant statements of material fact underlying each of those elements.  *See, e.g.*, Golias SDF, ¶ 274.

[18] Defendants cannot rely upon this defense in response to the preference claims in the Amended D&O Complaint because, as set forth in Sections VII.B and VII.C of the LT MSJ, they did not provide any value to HDL in exchange for the Shareholder Distributions or the BlueWave Payments.  *See* LT MSJ at 61-65.  In addition, the benefits, if any, received by HDL as a result of the Shareholder Tax Distributions were indirect and merely constituted the "extinguishment of [the defendants'] debt" under the Shareholders' Agreement.  *See United Rentals, Inc. v. Angell*,

parrot the language of section 547(c)(4) and offer no evidence (or even argument) in support of their defense.

Nor have the Golias Shareholder Defendants or Dent proven that the Preference Transfers were substantially contemporaneous.  As to the Golias Shareholder Defendants and Dent, the estimated Shareholder Tax Distributions that the Golias Shareholder Defendants and Dent received for their taxes were not contemporaneous because they may have been used to retire old tax debt, were not on account of an antecedent debt considering that tax liability was not incurred until assessed by the IRS or a state, and resulted in overpayments because they were estimated at the highest tax bracket for each shareholder.  Kanowitz Decl., Ex. 107 at -7220; Dkt. No. 1043 (“**Arrowsmith Decl.**”), Ex. 2 at 5-24; *see In re Auto*-TrainCorp*., 55 B.R. 69, 71 (Bankr. D. Co. 1985) (holding that a contemporaneous exchange is generally not a payment for previously invoiced and incurred debt for past services or goods).

As to Helena, there is no genuine dispute of material fact that its invoices called for net 30-day payment terms, which were later changed to 60-day terms on or before December 24, 2014.  LT SMF, ¶¶ 237, 239.  In fact, payments were made to Helena in arrears during the one year prior to the Petition Date.  *Id.*, ¶¶ 236-238; Arrowsmith Decl., Ex. 2 at 3-4.  The contemplated delay in payment means that from the outset, the parties did not intend for payments to Helena to be a contemporaneous exchange and such exchange was not

---

592 F.3d 525, 533 (4th Cir. 2010) (rejecting new value defense where defendant’s only proven benefit to the debtor was the discharge of the defendant’s right to enforce a mechanic’s lien against the debtor).  Therefore, the Shareholder Tax Distributions do not constitute “new value” as defined in section 547(a)(2).  *See id.*

contemporaneous.  *See In re A.J. Lane & Co.*, 164 Bankr. 409, 419 (Bankr. D. Mass. 1994)

(existence of payment terms demonstrates a lack of intent for a contemporaneous exchange); *In*

*re Hall Aluminum Co.*, 1988 Bankr. LEXIS 189, *10 (Bankr. N.D. Ill. 1988) (same).  For the

same reasons, the royalty payments that HDL made to Helena under the Invention Agreement

and the commissions to the BlueWave Defendants under the BlueWave Agreement were not

contemporaneous because they were paid in arrears. LT SMF, ¶ 238.

> 2.     *Plaintiff is Entitled to Summary Judgment on the Golias Defendants' and*
>        *BlueWave Defendants' Ordinary Course Transaction Affirmative Defense.*

Defendants further contend that the Court should deny summary judgment based on their

ordinary course transaction defense under section 547(c)(2).  *See* Golias Opp. at 50-52; BW Opp.

at 56-57.  This defense is unavailable to the Defendants because their transactions with HDL

were not in the ordinary course of business.

Payments to the BlueWave Defendants were not in the ordinary course of business

because the payments under the BlueWave Agreement violated applicable law and were made in

connection with an illegal scheme.  *See First Fed. of Mich. v. Barrow*, 878 F.2d 912, 918 (6th

Cir. 1989) (holding that illegal payments were not in ordinary course of business where the

conduct of the debtor's business is "totally unorthodox and illegal"); *In re Montgomery*, 123

B.R. 801, 814 (Bankr. M.D. Tenn. 1991) (same), *aff'd*, 983 F.2d 1389 (6th Cir. 1993).

Payments to Helena were not in the ordinary course of business because, as stated *supra*,

in Section I.H.1, there was a shift in payment terms during the preference period, which defeats

Helena's ordinary course defense as a matter of law commencing on December 24, 2014.  *See*

*Siegel v. Russellville Steel Co. (In re Circuit City Stores, Inc.)*, 479 B.R. 703, 710 (Bankr. E.D.

Va. 2012) (holding that additional two-week delay in vendor payments as a result of liquidity

concerns "patently establishes that relations between the Debtor and the Defendant were no longer ordinary"); Arrowsmith Decl., Ex. 2 at 3-4, Payment Nos. 22-37.

Further, Helena's ordinary course defense fails because in its argument, Helena relies entirely upon the *Declaration of Joseph Golias in Opposition to Plaintiff's Motion for Partial Summary Judgment*, Dkt. No. 1371-6 ("**J. Golias Decl.**"), which purports to calculate invoice and payment information in Helena's books and records. Golias Opp. at 51-52. That declaration does not create any genuine disputes of material fact because it contains material errors and conclusory calculations.[19] *See Advo-Sys., Inc. v. Maxway Corp.*, 37 F.3d 1044, 1051 (4th Cir. 1994) (dismissing ordinary course transaction defense where defendant "characterized the industry norm at too high a level of generality"); *In re Globe Bldg. Materials, Inc.*, 325 B.R. 253, 258-59 (Bankr. N.D. Ind. 2005) (dismissing ordinary course defense where defendant failed to offer "essentially expert testimony as to the manner in which payments are customarily made in the transferee's industry"), *aff'd*, 484 F.3d 946 (7th Cir. 2007).

Finally, the Golias and BlueWave Defendants cannot maintain the ordinary course defense because each Defendant was on notice that HDL was insolvent at all relevant times. *See,*

---

[19] The J. Golias Decl. should be disregarded because (i) it fails to identify the source of, or attach, the underlying financial data or invoices; (ii) it fails to identify the basis for its unexplained conclusions that particular payments are shielded by the ordinary course transaction defense; (iii) Joseph Golias' conclusory statements about whether the transactions between HDL and Helena are ordinary in Helena's industry are not supported by any facts; and (iv) Joseph Golias does not explain whether Helena's relationship with HDL was ordinary, which is significant considering that the Golias Defendants were insiders of HDL. The J. Golias Decl. also appears to contain material errors. For example, the first invoice on the chart of $16,528.05 indicates a payment date of 6/20/14 and an invoice date of 5/14/14. That would equate to a 37-day payment delay, but the chart incorrectly indicates that the delay is 30 days. *See* J. Golias Decl., Ex.1 at 1.

23

*e.g.*, *Hassett v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 260 (Bankr. S.D.N.Y. 1996) (holding that payment of bonus to a debtor's principal when he knew debtor was insolvent was not in the ordinary course); *see also In re Toy King Distribs., Inc.*, 256 B.R. 1, 124 (Bankr. M.D. Fla. 2000) (holding that payment to debtor's officer when he "knew that the debtor was insolvent at the time the payment was made and that the demise of the debtor was imminent" was not in the ordinary course of business).

The Golias Defendants knew that HDL was insolvent due to their knowledge of HDL's Illicit Scheme. LT MSJ at 62-65. Joe and Tipton Golias began attending board meetings in October 2014 where HDL's precarious financial condition and inability to make payments were discussed. LT SMF, ¶¶ 203-204.[20] The Golias Defendants also knew that HDL was unable to make the Shareholder Tax Distributions because Bartlett sent an email on November 12, 2014 stating that "HDL can't make tax distributions to shareholders due to lack of funds." *Id.*, ¶ 221. The BlueWave Defendants similarly knew that HDL was insolvent when they received the BlueWave Payments in the one year prior to the Petition Date because they knew as early as March 2013 that HDL's financial situation was deteriorating. Kanowitz Reply Decl., Ex. 359 (correspondence from HDL to BlueWave with a graph report reflecting a substantial decline in collected revenue); Ex. 361 (correspondence from BlueWave's CPA, Kristie Garrett, to Dent and Johnson, examining HDL's financial statements for period ending June 30, 2013); *see also* LT SMF, ¶ 149(a), 149(e), 179, 184 (BlueWave attorneys meeting with HDL outside counsel), 186 (Dent challenging Ropes & Gray advice on liability in June 2013).

_____

[20] The Golias Defendants do not dispute this fact. *See* Golias SDF, ¶¶ 201-202.

24

II.     **This Court Should Enter a Summary Declaratory Judgment That the Percentage-Based Commission Structure in the BlueWave Agreement Violated Applicable Law and Grant Plaintiff's Objection to BlueWave's POC.**

Without citing to any authority, the BlueWave Defendants attempt to persuade the Court that it cannot grant a declaratory summary judgment recognizing the illegality of the BlueWave Agreement.  The BlueWave Defendants are wrong.  Section 4 of the BlueWave Agreement sets forth a percentage-based commission structure dependent upon the volume of test sales, which on its face violates the AKS and the FCA.  *See* LT MSJ at 8-13.  Because the BlueWave Agreement violates these laws, it violates the laws of all states, including Georgia, and is unenforceable as a matter of law.  *See id.* at 13-14.  Since the BlueWave Agreement is unenforceable as a matter of law, BlueWave's claim made pursuant to the BlueWave Agreement should be disallowed in its entirety.  *See, e.g.*, *Phillips v. Blankenship*, 554 S.E. 2d 231, 233 (Ga. Ct. App. 2001) ("If the consideration for [a] claim for unjust enrichment were based on [illegal activity], her claim would fail."); *see also O'Cheskey v. Horton (In re Am. Hous. Found.)*, 2011 Bankr. LEXIS 3837, *89 (Bankr. N. D. Tex. 2011) ("A party generally cannot bring a claim that arises from, is founded upon, or is directly related to an illegal contract.").

The BlueWave Defendants' argument that "the determination of 'illegality' of the BlueWave Agreement sought by Plaintiff on summary judgment is improper as it requires detailed analysis of AKS and FCA" ignores the reasoning and holdings of all cases cited by Plaintiff.  BW Opp. at 50.  For instance, in *Nu Tech*, the court, on summary judgment, found that the agreement between a manufacturer and its independent contractor supplier containing a percentage-based commission structure tied to the volume of products sold violated the AKS and was therefore illegal and unenforceable.  *Zimmer, Inc. v. Nu Tech Med., Inc.*, 54 F. Supp. 2d 850,

851-52 (N.D. Ind. 1999). Similar holdings are found in *Joint Tech., Inc. v. Weaver*, 567 F.

App'x 585, 589 (10th Cir. 2014) and *Med. Dev. Network, Inc. v. Prof'l Respiratory Care*, 673

So. 2d 565, 566 (Fla. Dist. Ct. App. 1996). In these cases, the courts concluded that, where, as

here, the compensation of the independent contractor was tied to the degree of its success in

promoting or soliciting the purchase of products for which the federal health care programs paid

in full or in part, such compensation scheme involved prohibited remuneration under the AKS.

*See Weaver*, 567 F. App'x at 589; *Prof'l Respiratory Care*, 673 So. 2d at 566. Because such

percentage-based compensation scheme agreements violated the AKS, the courts found them

void and unenforceable as a matter of law. *See Weaver*, 567 F. App'x at 589; *Prof'l Respiratory

Care*, 673 So. 2d at 566.

The BlueWave Defendants further argue that the BlueWave agreement is "actually

LEGAL" because "the jury in the Qui Tam Case already determined that BlueWave, the counter-

party to HDL in the BlueWave Agreement, was NOT LIABLE for violating the AKS or FCA."

BW Opp. at 50 (emphasis in original); *see generally United States v. BlueWave Healthcare

Consultants, Inc.*, Case No. 9:14-cv-230 ("**BlueWave *Qui Tam***") (Jan. 31, 2018). This

argument is misguided for several reasons, most important of which is that the jury in the

BlueWave *Qui Tam* was never charged with determining whether the BlueWave Agreement

violated the AKS or FCA. In the BlueWave *Qui Tam*, the jury was asked to find whether

"defendants [BlueWave, Dent, Johnson, and Mallory] violated the False Claims Act by

presenting or causing to be presented false or fraudulent claims or false records which were (1)

medically unnecessary; and/or (2) violated the Anti-Kickback Statute." BlueWave *Qui Tam*,

Hr'g Tr. at 2946:11-15 (emphasis added).

The jury found that the United States proved by a preponderance of the evidence that Dent, Johnson, and Mallory violated the False Claims Act.  *Id*. at Dkt. No. 870.  Because the legality of the percentage-based compensation under the BlueWave Agreement was not at issue, and the jury could have relied on several independent grounds to support its FCA violation verdict, there is no collateral estoppel effect that would prevent this Court from granting summary judgment with respect to the illegality of the BlueWave Agreement.[21]

With regards to the BlueWave POC, the BlueWave Defendants merely point to "buckets" of claims against HDL without any attempt to satisfy their burden of proving the validity of their claim following Plaintiff's objection to the same.[22]  BW Opp. at 50-51.  As detailed in Plaintiff's MSJ and immediately *supra*, the Court should disallow the BlueWave POC in its entirety based upon the finding of illegality of the BlueWave Agreement.  LT MSJ at 14-16.

---

[21] For instance, in deciding that claim was false or fraudulent -- one of the elements of a FCA violation -- the jury was instructed that it could have either found that the claim was medically unnecessary or that it violated the AKS.  *Id.* at Hr'g Tr. 2946:13-15.  It is thus not possible to reconstruct the reasoning behind the jury's verdict or which specific grounds the jury relied upon to find the BlueWave *Qui Tam* defendants responsible.  Where a judgment could rest on independent grounds, the Fourth Circuit has held that "the judgment is not conclusive with respect to either issue standing alone" because determination of the issue may not have been "necessary" to the outcome.  *C.B. Marchant Co. v. E. Foods, Inc.*, 756 F.2d 317, 319 (4th Cir. 1985)*; see also Bd. of Cty. Sup'rs of Prince William Cty., Va. v. Scottish & York Ins. Servs., Inc.*, 763 F.2d 176, 179 (4th Cir. 1985) (general verdict not entitled to collateral estoppel effect when it could have rested upon six independent theories of liability because the court "cannot distill special findings from a general verdict and to do so would intrude on the independent role of a jury as much as would a court's unilateral amendment of its verdict").

[22] Once the objecting party presents evidence supporting the objection that is of probative force equal to the allegations in the proof of claim, the burden shifts to the creditor to prove the validity of the claim by a preponderance of the evidence.  *See In re Broadband Wireless Int'l Corp.*, 295 B.R. 140, 145 (B.A.P. 10th Cir. 2003); 4 Collier on Bankruptcy ¶ 502.02[3][e] (16th ed. Rev. 2019).

Additionally, the BlueWave Defendants' quasi-contractual claims are unenforceable because a contract (even one later found to be illegal) exists and because the doctrine of unclean hands bars BlueWave from recovering on payments that violated the law.  LT MSJ at 15.  Moreover, the BlueWave Defendants are not entitled to a claim for "future expectation of commissions for laboratory tests performed by HDL through the remaining term of the BlueWave Agreement" because the agreement was terminable upon thirty days' written notice.  *See* Kanowitz Decl., Ex. 130 at 5.  Such notice was provided to BlueWave on January 9, 2015, which means BlueWave cannot recover any payments that would have been due to BlueWave after February 8, 2015 (i.e., (i) approximately $19,000,000 in unidentified commissions for which HDL allegedly failed to account; and (ii) in excess of $180,000,000 in damages for future lost commissions).  LT MSJ at 15-16; Kanowitz Decl., Ex. 57 at 6-7.  There is no genuine dispute of material fact that BlueWave's POC should be reduced, at a minimum, to the $5,806,638.77 in commissions allegedly due on December 15, 2014, and January 15, 2015.  *See* Kanowitz Decl., Ex. 57 at 6.

Finally, the BlueWave Defendants contend that because the Plaintiff's "entire case hinges on a determination that HDL's Challenged Practices violated AKS and FCA" and there are "factual disputes and fact-finding determinations required . . . (like on the issue of *scienter*)," the Court cannot decide that the BlueWave POC be disallowed.  BW Opp. at 52.  This argument demonstrates the BlueWave Defendants' fundamental misunderstanding of Plaintiff's case and requirements of the AKS.  Irrespective of whether any of HDL's business practices violated the AKS or the FCA, the BlueWave Agreement's percentage-based compensation structure tied to the volume of tests sold makes the BlueWave Agreement illegal and unenforceable.

28

No specific intent to violate the statute is required, but rather that the "prohibited acts (soliciting, receiving, offering, or paying) be done 'knowingly and willfully.'" *Nu Tech*, 54 F. Supp. 2d at 862; *see also Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F. Supp. 835, 843 n.18 (E.D. Ark. 1996), *aff'd*, 112 F. F. 3d 513 (8th Cir. 1997) ("[A] fact question as to the intent element of the statute [AKS] . . . is a non-starter.  While it might be true that the Court, at this point, could not say that anyone is criminally liable . . . the fact remains that the subject matter of the Marketing Agreement is contrary to the public policy of the United States . . . .  As such, the Marketing Agreement itself is illegal, and hence unenforceable[.]") (citation omitted).  Thus, the BlueWave Defendants' knowing and willful operation under the percentage-based commission structure that motivated them to increase sales of tests reimbursable under the Medicare or Medicaid programs is the conduct that determines liability under the statute.  *Nu Tech*, 54 F. Supp. 2d at 862 ("[T]he anti-kickback statute 'is directed at punishment of those who perform specific acts and does not require that one engage in the prohibited conduct with the specific intent to violate the statute[.]'" (quoting *Med. Dev. Network*, 673 So. 2d at 567)).

Based on the foregoing, the Court should grant Plaintiff's Motion.

## III.   The Court Should Enter Summary Judgment on the Recharacterization Claims.

The Golias Defendants fail to refute the material facts regarding the circumstances that gave rise to Tipton Golias's BHL Settlement Note and construct a false narrative in which the BHL Settlement Note constituted bona fide debt.  But accepting that narrative would require this Court to ignore substantial and undisputed evidence that the BHL Settlement Note was always intended to be an equity transaction.  While they correctly refer to the *Dornier* factors and

29

observe that "[n]o single factor is dispositive," their Opposition's rigid application of these

factors is controverted by the material characteristics of this instrument and circumstances at the

time the investment was made.  *See* Golias Opp. at 53-59.  Viewed under the totality of the

circumstances, there is no genuine dispute of material fact that the BHL Settlement Note should

be recharacterized as equity.

Most significantly, the Golias Defendants gloss over the fantastical gains that Tipton

Golias sought and obtained through the BHL Settlement Note.  The absence of a fixed rate of

interest and interest payments is a strong indication that the advances were capital contributions

rather than loans.  *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 750 (6th Cir. 2001). While

conceding that "the interest rate undoubtedly was high," they neglect to even mention the

potential 600% recovery on the amount advanced under the instrument.  Golias Opp. at 54-55;

LT MSJ at 19; *see also* Kanowitz Decl., Ex. 70 at -5203.  Indeed, the 50.27% effective interest

rate was paid by HDL mere days before the amount due to Tipton Golias would have swelled to

250%, as provided for by the instrument's schedule.  LT MSJ at 19; Kanowitz Decl., Ex. 69

at -2688, Ex. 70, at -5203.  Such returns are only realistically achievable through equity

transactions and demonstrate that the BHL Settlement Note was always intended to be an equity

transaction.

Defendants disregard HDL's precarious financial position at the time the transaction was

consummated.  As *AutoStyle* provides, "[t]hin or inadequate capitalization is strong evidence that

the advances are capital contributions rather than loans."  269 F.3d at 751.  Here, HDL was

significantly undercapitalized and facing a massive settlement payment.  LT MSJ at 16-17.

Indeed, the Fourth Circuit has affirmed a bankruptcy court's decision to recharacterize a note that provided for settlement funding and was negotiated by the principals under substantially similar circumstances as here. *See In re Province Grande Olde Liberty, LLC*, 655 F. App'x 971, 975 (4th Cir. 2016) (affirming recharacterization, in which a "settlement agreement [was] the 'substance of the transaction' because it was the basis of the note purchase"). Defendants jumped at the opportunity to execute this transaction, which they knew was necessary for HDL's survival. *See* Kanowitz Decl., Ex. 17 at 46:10-22; LT MSJ at 17.[23]

The Golias Defendants also incorrectly contend that since Tipton Golias only owned 37% HDL's stock but advanced 100% of the funds under this instrument, the investment's equity-to-debt ratio tends to indicate it was debt. Golias Opp. at 57. But, unlike in *AutoStyle*, Tipton Golias was the largest investor in HDL at the time of the investment, and with the Golias Defendants, collectively held a plurality equity position in HDL. LT SMF, ¶ 9. Those circumstances support recharacterizing the BHL Settlement Note as equity.

In sum, there is no material dispute and that the BHL Settlement Note should be recharacterized as an equity investment.

**IV.    The Court Should Enter Summary Judgment on the Equitable Subordination Claims.**

**A.    The BlueWave and Golias Defendants' POCs Should be Equitably Subordinated.**

In opposing Plaintiff's request for equitable subordination of the Defendants' claims, the BlueWave and Golias Defendants make a series of arguments that are unsupported by the

---

[23] Even Dennis Ryan, HDL's outside counsel at LeClairRyan at the time, testified there was no other available financing. *See* Kanowitz Decl., Ex. 22, at 233:22-234:11.

31

evidence, are irrelevant, and include misstatements or omissions of facts.  These arguments break

down into the following: (1) equitable subordination is an extraordinary remedy; (2) the fact that

a creditor is an insider does not warrant subordination of an otherwise valid claim; (3) there is no

material evidence of unfair conduct by either defendant group; and (4) there are material issues

of fact in dispute as to whether HDL engaged in fraudulent conduct such that the Court cannot

decide Plaintiff's equitable subordination argument on summary judgment.  *See Golias Opp.* at

60-61; BW Opp. at 51-52.  But, each argument is flawed, and none preclude the Court from

subordinating the Defendants' claims to offset the harm HDL's creditors have suffered on

account of the Defendants' inequitable conduct.

  *First*, equitable subordination is a remedial doctrine that authorizes the court to

subordinate claims where, as here, defendants are insiders of the debtors and where the

defendants' conduct harms the creditors' ability to recover.  *Hovis v. Powers Constr. Co. (In re*

*Hoffman Assocs.)*, 194 B.R. 943, 965-66 (Bankr. D.S.C. 1995).

  *Second*, the BlueWave Defendants' claim is not an "otherwise valid" claim.  As fully

detailed in the LT MSJ, as well as *supra*, in Section II, the BlueWave Defendants' claim is based

on an illegal agreement and should be disallowed in its entirety.

  *Third*, the courts have found that conduct by which an insider gains an advantage over

creditors constitutes inequitable conduct for purposes of 11 U.S.C. § 510(c).  *See, e.g.*, *Hoffman*,

194 B.R. at 965-66 (finding that effecting preferential transfers and failing to provide adequate

capitalization of the debtor inflicted harm on creditors that justified equitable subordination of

insider's claims).  The Defendants have engaged in such conduct here.

Specifically, Plaintiff presented evidence that the Defendants participated in the Illicit Scheme (LT SMF ¶¶ 69-147; LT SDF ¶¶ 36, 50-52), ignored the red flags that the Illicit Scheme was high risk (LT SMF ¶¶ 148-49, 179, 184, 186; LT SDF ¶¶ 10, 50, 66), and effected the preferential transfers (LT MSJ at 40-41), among other instances of the Defendants' unfair and inequitable conduct.  Such conduct inflicted harm on HDL's creditors, including millions of dollars in damages to the United States and the Insurers, justifying the application of section 510(c) to the Defendants' respective claims.

Lastly, the BlueWave and Golias Defendants fail to substantiate their argument as to the existence of a factual dispute.  Golias Opp. at 61 ("As an initial matter, there are material factual disputes over whether HDL engaged in fraudulent conduct and whether (and if so, when) it became insolvent. [cite] There are also material issues of disputed fact concerning the level of each Golias Shareholder Defendants' knowledge about HDL's business. [cite decs]") (omissions in original); BW Opp. at 52 ("Whether there was an 'Illicit Scheme' as argued by the Trustee is the very essence of this dispute.").  It is insufficient to simply state in the abstract that something is disputed, but not present material facts to the contrary.  *See McMillan v. Cumberland Cty. Bd. of Educ.*, 734 F. App'x 836, 845-46 (4th Cir. 2018) (affirming summary judgment because non-movant failed to present evidence); *Nu Tech*, 54 F. Supp. 2d at 853 853 (nonmoving party must produce evidence); *infra*, Section V.D.  Further, "[w]here a fact is disputed, the nonmoving party must show that the disputed fact is material under the applicable law. . . .  Only disputes that can affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Nu Tech*, 54 F. Supp. 2d at 853 (quoting *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F. 3d 262, 264-65 (7th Cir. 1996)).

33

Defendants' contentions related to HDL's scienter or illegality of HDL's Illicit Scheme under the AKS and FCA do not affect the determination of whether Defendants' claims should be equitably subordinated, and thus, do not preclude this Court from entering summary judgment in Plaintiff's favor.

Because of the foregoing, the Court should subordinate the BlueWave and Golias Defendants' respective claims.

**B.    The Conduct of the BlueWave and Golias Defendants' Agents Should be Imputed to Them for Purposes of Equitable Subordination and Their Alleged Good Faith Transferee Defense.**

*1.    An Irrevocable Proxy Creates an Agency Relationship.*

The Golias Defendants argue that "an irrevocable proxy does <u>not</u> create an agency relationship."  Golias Opp. at 61 (emphasis in original).  But, they disregard the Texas and Virginia cases holding that an irrevocable proxy <u>does</u> create an agency relationship.  *See* LT MSJ at 21-22.[24]

Defendants rely on one sentence (with no citation) in what appears to be an unpublished article by a law professor, who admits the case law "does not explicitly make [her] point."[25]

Defendants also cite *Bonfigli v. Strachan*, which merely held that the power delegated by irrevocable proxy terminates differently than powers granted by traditional agency.  192 Cal. App. 4th 1302, 1311 (2011) (deciding "under what circumstances a power given as security will

---

[24] Defendants do not dispute that Texas law applies.  *See id.* at 21-22 n.10; Golias Opp. at 62 (citing Texas law).

[25] *See* Deborah DeMott, *Irrevocable Proxies* 11, *available at* https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=5493&context=faculty_scholarship.

terminate"). But, the *Bonfigli* court did *not* hold that an irrevocable proxy cannot create an agency relationship. In any event, California law does not apply here. *Infra*, Section V.A.

Lastly, Defendants cite Comment d to Section 3.12 of the Restatement (Third) of Agency ("Designating a proxy to vote creates a relationship of agency as defined in § 1.01 unless the proxy is irrevocable."). But that does not mean an irrevocable proxy does not create an agency relationship. Rather, it simply means it does not create an agency relationship as defined in Section 1.01 -- *i.e.*, it does not create a *revocable* agency. Indeed, the next two sentences (which Defendants omit) explain that, like a traditional agency relationship, a proxy is revocable, while an irrevocable proxy is not revocable. *See* Rest. 3d Agency § 3.12 cmt. d:

> Designating a proxy to vote creates a relationship of agency as defined in § 1.01 unless the proxy is irrevocable. Thus, the principal may revoke a proxy holder's actual authority. The principal lacks power to revoke the proxy holder's authority to vote when such authority is expressly made irrevocable . . . .

The Restatement does not say that irrevocable proxy cannot create any agency relationship; an irrevocable proxy simply does not create a *revocable* agency relationship. And, in any event, Plaintiff has not located any Texas or Virginia case that relied on or adopted that section of the Restatement. Thus, like *Bonfigli*, the Restatement is not controlling here.

2.    *The Scope of the Agency was not Limited to One Meeting.*

The Golias Defendants claim the irrevocable proxies only granted T. Golias authority for one particular November 12, 2012 meeting of shareholders. *See* Golias Opp. at 62. That argument is easily dismissed because the plain language of the irrevocable proxies -- which controls -- flatly contradicts Defendants' argument. *See United States v. Gissel*, 353 F. Supp. 768, 779 (S.D. Tex. 1973), *aff'd*, 493 F.2d 27 (5th Cir. 1974) ("The scope of an agency relationship is determined by the agreement between the parties and the particular circumstances

35

under consideration."); *Alamo Cmty. Coll. Dist. v. Browning Constr. Co.*, 131 S.W.3d 146, 156

(Tex. App. 2004) ("A court can determine, as a matter of law, the existence of an agency

relationship from an agreement between the parties.").

      While the Golias Defendants signed *some* irrevocable proxies stating they granted T.

Golias power of attorney for a November 12, 2012 meeting (*see e.g.*, Kanowitz Decl., Ex. 242 at

-6006, -6007), they also executed more than a dozen irrevocable proxies after that meeting,

wherein they granted T. Golias power of attorney       **Redacted**

      **Redacted**       *See id.*, Exs. 240-241 (emphasis added).  In no way

did these later irrevocable proxies limit T. Golias's authority to a November 12, 2012 meeting.

Indeed, in many cases these irrevocable proxies were signed months or years after *after* the

November 12 meeting.  *See id*.  As such, they could not possibly be limited to that meeting.

      3.     *Defendants Cite no Law that Prohibits Constructive Notice on a Principal.*

      The Golias Defendants cite no law to support their argument that a principal cannot have

constructive notice if its agent has constructive (rather than actual) notice.  Golias Opp. at 63.

That is because they are wrong.  *See, e.g.*, *Williams v. Jennings*, 755 S.W.2d 874, 882 (Tex. App.

1988) (holding principal had constructive notice even though agent only had constructive

notice); *Whitlock v. Johnson*, 87 Va. 323, 332 (1891) (same).  And, Defendants do not contest

that, to the extent T. Golias had *actual* notice, it was imputed to them.  Golias Opp. at 63.

      4.     *Defendants Cite no Specific Facts to Support a Claim Tipton or J. Golias*
               *Were not Acting on Behalf of the Company.*

      Defendants argue Tipton and Joseph Golias's knowledge is imputed to Helena only to the

extent they were "acting on the corporation's behalf."  Golias Opp. at 63.  Fatally, however, they

do not argue or present any facts to dispute that Tipton or Joseph Golias were acting on the

company's behalf.  *Id.*  Thus, the Court will not consider that argument on summary judgment.

*Hately v. Torrenzano*, 2017 WL 2274326, *3 (E.D. Va. 2017); *see infra*, Section V.D.

>    5.    *Defendants do not Dispute that the Knowledge of Galen, Bartlett, and Dent
>          is Imputed to Them.*

Defendants make no argument disputing that Galen and Bartlett's knowledge was

imputed to the Golias Defendants, or that Dent's and his agents' knowledge was imputed to the

BlueWave Defendants (*see* LT MSJ at 23-24), so the Court should treat that as established on

summary judgment.  *See infra*, Section V.D.

## V.    The Court Should Enter Summary Judgment on the Tortious Interference Claims.

With no substantive defense to the interference claims, Defendants try to stave off

summary judgment by arguing that Plaintiff (a) applied the wrong law, (b) submitted evidence

the Court cannot consider, and (c) failed to identify specific facts to support the claim.  As

detailed below, these arguments have no merit, so the Court should enter judgment in Plaintiff's

favor on these claims.

### A.    The Carnaggio Defendants Misapply the Conflict of law Rules.

The Court does not need to resolve a conflict of law issue.  A conflict of law analysis is

necessary "only if the relevant laws of the different states lead to different outcomes."

*Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013) (citation

omitted).  In other words, if "the laws do not so conflict, the choice is immaterial."  *Id.*

Applied here, Defendants do not identify the state law they claim applies or explain how

that law differs from Pennsylvania, Connecticut, or Minnesota law.  Rather, they concede "the

required elements for proof of the tort are substantially the same" in other jurisdictions.  Dkt. No.

1317 ("**Carnaggio Opp.**") at 15 n.9, 21-22 (conceding tortious interference in Connecticut,

Pennsylvania, and Minnesota has elements "common to all jurisdictions"). Because there is no conflict, the Court should apply the law of Connecticut, Pennsylvania, and Minnesota.

Even if there was a conflict, the law of Connecticut, Pennsylvania, and Minnesota applies. The parties agree that the state "where the wrong occurred" is the proper law to apply. *Id.* at 17-19. They also agree that the place of the wrong is "where the last event necessary to make an actor liable for an alleged tort takes place." *Id.*

The Carnaggio Defendants argue that the "last event necessary" to create liability was the breach of contract by the HCPs and patients "in the states where the HCPs practiced medicine." *Id.* at 18-19. They are wrong because, for "a claim of tortious interference, the last event necessary is a legal injury or damage to Plaintiff caused by the wrongful interference." *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 858 (E.D. Va. 2013).

The place where the "last event necessary" occurred varies depending on the circumstances of the case because "there are significant factual variations that can affect" the analysis. *Id.* at 857. The Court must consider the particular "nature of the injury induced by the interfering defendant." *Id.*; *see also In re Health Diagnostics Lab., Inc.*, 571 B.R. 182, 193 (Bankr. E.D. Va. 2017) (holding that the "last act necessary" to create liability for tortious interference was sending certain payments to Virginia, so Virginia law applies).

Applied here, the "last act necessary" was HDL sending claims for payment to the Insurers (which are located in Connecticut, Pennsylvania, and Minnesota). That must be the last act necessary to create liability because, if HDL had not sent claims to the Insurers, the Insurers would not have paid any insurance claims, would have suffered no harm, and thus, would have no tortious interference claims.

38

Defendants' reliance on the place where the HCPs and patients breached the contracts (*e.g.*, by failing to refer patients to in-network labs, violating the law, ordering unnecessary tests, and failing to make and collect copayments) is wrong because that conduct only caused harm to the Insurers once HDL later committed the separate act of submitting a claim to the Insurers.

Defendants' argument that Plaintiff argues the Court should apply the law of the place of the "financial impact" on the Insurers is wrong. *See* Carnaggio Opp. at 19. As explained *supra*, the Court applies the law of the last act necessary to create liability. It is not surprising that, here, the place of the last act is the same place where the Insurers suffered the financial impact because the place of the last event necessary to create liability and the place where the injury is felt are often the same. *E.g.*, *L-3 Commc'ns Corp. v. Serco, Inc.*, 2018 WL 1352093, *6 (E.D. Va. 2018) ("In most cases, the last event consummating the tort is the event causing injury, and so the place of the wrong is effectively the place of the injury."), *aff'd in part, vacated in part on other grounds*, 926 F.3d 85 (4th Cir. 2019); *Cole v. Daoud*, 2016 WL 11410410, *6 (E.D. Va. 2016) (applying Virginia law to tortious interference claim because "any injury or loss" plaintiff sustained "would have occurred in Virginia"); *Palaxar Grp., LLC v. Williams*, 2014 WL 2002214, *5 n.7 (E.D. Va. 2014) ("The last element of a tortious interference claim is damage to the plaintiff; without damages, a defendant may not be held liable.").

**B.    The Court Can Consider Plaintiff's Evidence at Summary Judgment.**

The Carnaggio Defendants argue that nearly all of the summary judgment exhibits are not admissible, and thus, may not be considered by the Court. *E.g.*, Carnaggio Opp. at 4. Defendants are wrong.

For starters, they apply the wrong legal standard by relying on cases that pre-date the

2010 amendments to Rule 56.[26] *E.g.*, Carnaggio Opp. at 4, 28, 31 (citing *Md. Highways*

*Contractors Ass'n v. Maryland*, 933 F.2d 1246 (4th Cir. 1991), 13-14 (citing *Evans v. Tech.*

*Applications & Serv. Co.*, 80 F.3d 954 (4th Cir. 1996)).   In 2010, Rule 56 was amended to permit

courts to consider any "materials that would themselves be admissible at trial, *and* the content or

substance of otherwise inadmissible materials" so long as "it will be possible to put the

information . . . into an admissible form."  *Humphreys & Partners Architects, L.P. v. Lessard*

*Design, Inc.*, 790 F.3d 532, 538-39 (4th Cir. 2015) (emphasis added) (citation omitted); *Hately*,

2017 WL 2274326 at *1 (documents were "properly part of the summary judgment record

because even if some materials would not be admissible at trial, Plaintiff can put the substance of

the materials into admissible form"); *see* Fed. R. Civ. P. 56(c)(2).   Thus, since the 2010

amendments, "the Court and the parties have great flexibility with regard to the evidence that

may be used on a summary judgment proceeding."  *Humphreys*, 790 F.3d at 538-39 (rejecting

argument that court should not consider "inadmissible hearsay" because party "does not claim" it

"would be inadmissible at trial"); *Sanders v. Callender*, 2019 WL 3717868, *2 (D. Md. 2019)

(rejecting objections to summary judgment exhibits because, among other reasons, party never

explained "why each individual item is ineligible for submission at trial").   Instead, Defendants

must show why the documents "cannot be presented in a form that would be admissible in

evidence" at trial.  Fed. R. Civ. P. 56(c)(2).  They have not even attempted this, so the Court

should reject their invalid objections outright.

---

[26] Fed. R. Civ. P. 56 is made applicable herein by Fed. R. Bankr. P. 7056.

**The interference.**  Defendants argue that a representative "sample" of the *millions* of contracts at issue violates the "best evidence rule."  Carnaggio Opp. at 28.  They are wrong.

The best evidence rule ("**Rule 1002**") states that an "original writing, recording, or photograph is required in order to provide its content unless these rules or a federal statute provides otherwise."  Here, the federal rules of evidence *do* "provide otherwise."

Specifically, Rule 1006 allows a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Courts and juries cannot and do not examine millions of individual contracts, and Plaintiff was entirely within its legal rights to identify one document that identifies the terms at issue.[27]  That it is a representative sample does not make it inadmissible.  *E.g.*, *United States v. Hofstetter*, 2019 WL 5057176, *4 (E.D. Tenn. 2019) (holding summary of underlying records was admissible under Rule 1006, and the fact that it was a sample "based on a subset of data does not make it inadmissible"); *DL v. District of Columbia*, 2015 WL 6446087, *5 (D.D.C. 2015) (admitting sample of 300 files); *cf. United States v. Hunter*, 2016 WL 3815175, *2 (D. Minn. 2016) (holding "subset" of company records was admissible under Rule 803(6) even if it was not admissible under Rule 1006); *In re Int'l Loan Network, Inc.*, 160 B.R. 1, 6 & 6n.5 (Bankr. D.D.C. 1993) (considering affidavit where materials upon which it relied were not in the record, but were a "sample" provided to the court).  And, in any event, Defendants concede Plaintiff attached to its summary judgment motion written contracts that

---

[27] Rule 1006 requires that "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."  As explained below, Defendants had the opportunity to examine the underlying contracts, but they did not want them and agreed the Insurers did not have to produce them. *See infra*, at 47-48.

41

contain the provisions that were breached.  Carnaggio Opp. at 5; *see e.g.*, Kanowitz Decl., Ex. 20

at 39: 22-40:7; Ex. 63, ¶ 42; *see generally id.*, Exs. 105-06, 197-99, 219-220.  Thus, the exhibits

comply with the best evidence rule because the Court has written evidence of the contracts'

terms.

    **The Insurers' testimony about their contracts.**  Defendants complain that Cigna's Rule

30(b)(6) witness had no foundation to testify that the Cigna contracts contained specific

provisions because he did not read *every* contract.  Carnaggio Opp. at 30-31.  This is incorrect.

    *First*, Defendants failed to object during the deposition that the questions lacked

foundation, so any such objection is waived.  *See* Fed. R. Civ. P. 32(d)(3).

    *Second*, a Cigna witness could appear at trial to lay a foundation.  *E.g.*, *Hately*, 2017 WL

2274326 at *5 (holding "the Court may consider third-party subpoena responses" and

"deposition testimony" at summary judgment because the third party could be called to testify at

trial, which would be admissible).

    *Third*, Defendants identify no testimony from other Insurers that their witnesses lacked

foundation to testify about their contracts.  *E.g.*, Kanowtiz Decl., Ex. 8 at 50:4-24 (Aetna

testifying as to "all" plans); Ex. 27 at 68:3-70:19 (UHC testifying as to the content of the

contracts).  Thus, at best, Defendants' objection only relates to the Cigna contracts, and not the

Aetna or UHC contracts.

    **The Kanowitz Declaration.**  Defendants argue that "many" exhibits to the Kanowitz

declaration are inadmissible because he lacks "personal knowledge" to state they are "true and

correct."  Carnaggio Opp. at 31-32.  Wrong again.

*First*, other Defendants filed a similar declaration from counsel stating numerous documents they filed with the Court are "true and correct" copies, including documents they filed with their summary judgment papers. *E.g.*, Griffin Decl. The Carnaggio Defendants adopted and incorporated that same declaration. Carnaggio Opp. at 13 n.8 (adopting and incorporating the Golias SDF "for all purposes"); *see generally* Golias SDF (citing throughout to the Griffin Decl.). Thus, the Carnaggio Defendants engaged in the very same method of presenting exhibits that they now argue is improper.

*Second*, Defendants never identify which exhibits lack authentication. Carnaggio Opp. at 31 ("many of the exhibits"). Accordingly, the objection should be rejected. *Sanders*, 2019 WL 3717868 at *2 (rejecting objections to summary judgment exhibits because, among other reasons, party never explained "why each individual item is ineligible for submission at trial").

*Third*, the Kanowitz declaration is supported by his personal knowledge. Plaintiffs give no explanation for why Mr. Kanowitz does not know what documents his law firm filed as part of summary judgment. And, he does have the requisite personal knowledge (*i.e.*, that he attached true and correct copies of reports provided to him by experts). Kanowitz Decl., ¶¶ 33-36. Mr. Kanowitz also has knowledge of documents filed on the court's docket (*id.*, ¶¶ 56-70), of which the Court may take judicial notice. *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("[T]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.") (citation omitted).

The exhibits that are Office of the Inspector General ("**OIG**") Advisory Opinions (Kanowitz Decl., ¶¶ 50-55) are self-authenticating. Fed. R. Civ. P. 902(5); *e.g.*, *Estate of Gonzales v. Hickman*, 2007 WL 3237727, *2 n.3 (C.D. Cal. 2007) (holding OIG publications are

self-authenticating under Rule 902(5)).  As for deposition transcripts (Kanowitz Decl., ¶¶ 5-32),

Mr. Kanowitz is competent to confirm he attached a true copy of the transcript provided by the

court reporter, where in each such transcript the court reporter confirmed the substance is a true

and accurate transcription of the words spoken by the witnesses (*see* Kanowitz Reply Decl., Ex.

356), and the Court can consider deposition transcripts as a matter of law.  *Hately*, 2017 WL

2274326 at *5 (court can consider deposition testimony at summary judgment because "it will be

possible for [the witnesses] to testify at trial about the substance of what [they] testified about

during [their] deposition").

   As for documents produced by the parties or third parties referenced in the declaration

(Kanowitz Decl., ¶¶ 71-260), for each such document, the declaration either refers to the

deposition wherein the witness authenticated the document, or the document could be

authenticated by the witness at trial -- the declaration simply confirms that the document attached

to Plaintiff's summary judgment papers is the same one that was already authenticated by the

witness at their deposition.  And, the "charts" attached to the declaration (*id.*, ¶¶ 37-49) merely

compile excerpts of deposition transcripts (which are properly considered at summary judgment,

as explained *supra*) and deposition exhibits (which were or will be authenticated by the

deponents).

   Lastly, Defendants argue Rule 3.7 of the Rules of Professional Conduct prohibits Mr.

Kanowitz from authenticating documents.  Carnaggio Opp. at 31-32.  Defendants fail to tell the

Court, however, that Rule 3.7 explicitly permits a lawyer to offer testimony on an "uncontested

issue."  *See* R. of Prof. Conduct 3.7(a)(1).  Defendants have not contested that any of the exhibits

are "true and correct" copies.

44

**Carnaggio Defendants' list of "inadmissible" exhibits.** The Carnaggio Defendants offer a 26-page list of exhibits they claim are inadmissible (Carnaggio Opp., Ex. 2), but assert only boilerplate objections and bare assertions of inadmissibility, with no argument or explanation as to why each document (a) is subject to the objection asserted, and (b) cannot be presented in a form that would be inadmissible at trial. Such conclusory objections -- devoid of any argument or detail -- are not sufficient to object to summary judgment materials. *Sanders*, 2019 WL 3717868 at *2 (rejecting objections to summary judgment exhibits because, among other reasons, plaintiff made "only bare assertions that the materials provided by Defendant are inadmissible without explanation as to why each individual item is ineligible for submission at trial"); *Prudential Ins. Co. of Am. v. Sagers*, 2019 WL 6879755, *1 (D. Utah 2019) (rejecting objection to summary judgment exhibits because defendant "makes conclusory objections on grounds of hearsay that fail entirely to allege how 'the material cited . . . cannot be presented in a form that would be admissible in evidence'") (ellipsis in original) (citation omitted); *Borja v. Shulkin*, 2018 WL 6725565, *1 n.3 (N.D. Ill. 2018) (rejecting plaintiff's "conclusory argument" that document should not be considered at summary judgment).

### C.     Plaintiff Identified the Specific Contracts, HCPs, and Patients at Issue.

The Carnaggio Defendants argue that Plaintiff failed to identify the contracts with which Defendants interfered, or the HCPs and patients who breached them. Carnaggio Opp. at 22-24. Their argument has no merit.

Defendants claim that Interrogatory Nos. 3-4 seek information about the tortious interference claims, but Plaintiff did not answer them. Carnaggio Opp. at 22-23. Defendants *left out*, however, that the first sentence of Plaintiff's response to each incorporated Plaintiff's nearly

45

30 page answer to Interrogatory No. 1, which identified 700+ documents. *See* Kanowitz Reply

Decl., Ex. 372 at 6-29, 32-33. That is why the Court held Plaintiff answered those

interrogatories and denied Defendants' motion to compel. *See* Dkt. No. 980; Carnaggio Opp.,

Ex. 1 at 27 (THE COURT:  "[Y]ou've got the answers now to their questions . . . .").

The Carnaggio Defendants' reliance on *Masco Contractor Servs. E., Inc. v. Beals*, 279 F.

Supp. 2d 699 (E.D. Va. 2003) and *Concordia Pharms., Inc. v. Method Pharms., LLC*, 2016 WL

1271082 (W.D. Va. 2016) is misplaced. Here, they argue that Plaintiff did not identify specific

contracts and relationships at issue. But, in *Masco* and *Concordia*, the tortious interference

claims were dismissed because plaintiffs did not identify *any* contracts with which defendant

interfered or *any* persons with whom plaintiff had a contractual relationship. *Masco*, 279 F.

Supp. 2d at 710 (party made "no mention of *any* particular contract") (emphasis added);

*Concordia*, 2016 WL 1271082 at *16 ("Concordia has not cited to *any* specific contractual

relationship . . . .") (emphasis added).

Here, contrary to Defendants' assertion, Plaintiff identified the contracts, HCPs and

patients at issue, and produced ample evidence of them.

Plaintiff identified the huge number of specific HCPs and patients with whom the

Insurers had a contractual relationship that was breached as a result of the interference. The

"Seacoast" database is HDL's claims and billing data, which was produced to Defendants. *See*

Kanowitz Decl., Ex. 30 ¶ 75 (describing Seacoast database). It lists every insurance claim that

46

was a result of defendants' interference and identifies each patient and HCP whose breaches caused the claim to be submitted.  *Id.*, ¶¶ 75-79.[28]

Plaintiff also identified and produced contracts and information the Defendants agreed would be sufficient.  In addition to the representative examples attached to Plaintiff's summary judgment papers (Kanowitz Decl., Exs. 105-06, 197-99, 291-20), Plaintiff or the Insurers produced numerous provider agreements, plan documents and claims databases that show the HCPs, patients and claims at issue and how the claims triggered applicable exclusions.

Further, Defendants are barred from objecting to the representative agreements under the doctrines of equitable estoppel and waiver.  Equitable estoppel applies "when there is voluntary conduct by the party to be estopped that induces detrimental reliance on the part of the party asserting the estoppel."  *United States v. Cox*, 964 F.2d 1431, 1434 (4th Cir. 1992).  Waiver is "the intentional relinquishment or abandonment of a known right."  *Craddock v. LeClairRyan*, 2019 WL 2437460, *10 (E.D. Va. 2019) (citations and quotations omitted).

Applied here, Defendants omit that they *agreed* that Plaintiff could use a "sample" contract as evidence of the terms of the other contracts.  Carnaggio Opp. at 25-27.  Specifically, the Insurers possessed the contracts at issue, which are extremely voluminous, so Defendants agreed that every contract did not need to be produced and Defendants did not want them.  On June 25, 2019, for example, counsel for Defendants was asked whether they wanted all of the summary plans produced, and they did not.  *See* Kanowitz Reply Decl., Ex. 357 at 261:22-262:3

---

[28] The Seacoast database consists of 496 million rows of data, which would be impossible to for Plaintiff to submit to the Court or for the Court to interpret.  Accordingly, Plaintiffs submitted the expert report of Ernest Dixon, who interpreted, summarized and opined on the data.  *See id.*

("MR. CRUMLISH:  Do you want 1 million plans?  MR. FUNK:  Absolutely not . . . .").

Defendants also specifically agreed the Insurers only needed to produce a sample of the

underlying contracts and related documents.

Defendants agreed, for example, that UHC only needed to produce contracts relating to a

sample of 25 insurance claims out of the millions that HCL filed.  *E.g.*, *id.*, Ex. 366 at 1-5

(showing Defendants selecting samples pursuant to agreement to sample claims); Exs. 367-368

(discussing which sample claims to use pursuant to agreement).

As to Aetna, Defendants agreed it only had to produce contracts if they were used in

drafting the Amended Complaint.  *E.g.*, *id.*, Ex. 369 at 3 ("Mr. Funk agreed that Aetna did not

need to create any information or gather any information that was not relied upon in preparing

the Amended Complaint.").  And, even then, "[d]ue to the broad temporal and geographic scope

of HDL's scheme and the fact that requested documents could be almost a decade old at this

point," the parties agreed Aetna would "try and pull a sample of some of the relevant contracts

and, if possible, related EOB's and plan documents."  *Id*. at 3-4.

Regarding Cigna, Defendants agreed it could produce "representative" contracts so the

parties could "rely on them as being representative" of the plans at issue.  *Id.*, Ex. 362 at 1 ("If

we cannot rely on them as being representative of the plans in place during the relevant time,

then we need whatever pans are necessary to meet that standard").  Cigna confirmed it produced

"exemplar" and "sample" contracts "consistent with the parties' agreement."  *Id.*, Ex. 363 at 2.

Cigna received no objections to its production.  *Id.*, Ex. 365 at 1.

In short, Defendants waived any objection to the sample agreements by intentionally

agreeing that the Insurers could produce samples, and not every agreement.  Moreover, Plaintiff

and the Insurers relied on Defendants representations, and did not produce additional contracts.

Now, Defendants argue a sample is insufficient and Plaintiff and Insurers had to produce the

millions of contracts.  Defendants cannot have both accepted and agreed that Plaintiff and the

Insurers do not need to produce every contract at issue, but then turn around and argue Plaintiff

and the Insurers must have done so in order to prevail on their claims.  That is textbook equitable

estoppel, and the Court will not permit Defendants to employ such gamesmanship.

     **D.**    **The Carnaggio Defendants Have not Established There are Material Facts in Dispute.**

Defendants devote virtually their entire argument on tortious interference arguing

(incorrectly) that the evidence is inadmissible.  Notably, however, Defendants fail to offer their

own specific facts to refute Plaintiff's evidence, but rely only on bare denials or procedural

evidentiary objections.  The Court should grant summary judgment for this reason alone.

It is black letter law that "[a] party opposing summary judgment 'may not rest upon the

mere allegation or denials of his pleading, but must set forth specific facts showing that there is a

genuine issue for trial.'"  *McMillan*, 734 F. App'x at 843 (quoting *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 256 (1986)); *Wilkins v. Montgomery*, 751 F.3d 214, 220 (4th Cir. 2014)

(party opposing summary judgment "must demonstrate that a triable issue of fact exists; he may

not rest upon mere allegations or denials") (citation omitted).  "If a party fails to properly address

another party's assertion of fact as required by Rule 56(c), the court may consider the fact

undisputed for purposes of the motion."  *Hately*, 2017 WL 2274326 at *3 (citation omitted).

Moreover, "the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original) (quoting *Anderson v.*
*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

Here, Defendants offer no evidence to dispute the material facts required for Plaintiff to
prevail on its tortious interference claim. They do not set forth specific facts showing they were
unaware of Plaintiff's contracts or expectancy. They do not set forth specific facts showing they
did not induce HCPs and patients to breach their insurance contracts. They do not set forth
specific facts showing the Insurers suffered no damages.

While Defendants argue the HCPs and patients did not breach the provisions of their
contracts, that is not sufficient to create a material issue of fact for two reasons.

*First*, Defendants are wrong. They dispute that under the contracts (1) HCPs were
prohibited from referring patients to out-of-network laboratories, and (2) patients required to pay,
and HCPs were required to collect, co-pays, coinsurance and deductibles. Carnaggio Opp. at 6,
8-9. As Plaintiff's opening papers detail, that is untrue, and is directly contradicted by the plain
terms of the agreements. LT MSJ at 44-46.

*Second*, Defendants do not argue (let alone establish by specific facts) that the HCPs and
patients breached the other contractual provisions, including the Legal Compliance Requirement,
Medically Unnecessary Services Exclusion, Billing Exclusion Provision and Medically
Necessary Exclusion. LT MSJ at 53.

## VI.    The Court Should Enter Summary Judgment on the Advice of Counsel Defense.

The Golias Defendants argue that Va. Code 13.1-690's safe harbor shields Bartlett and
Galen from liability. Golias Opp. at 64-66. They are mistaken.

50

The Golias Defendants' first affirmative defense asserts that "Plaintiff's claims against the Golias Defendants are barred, in whole or in part, because Bartlett and Galen's actions as directors were protected by Va. Code § 13.1-690(A)-(C)."  Dkt. No. 683 ("**Golias Ans.**") at 36. This argument, however, is irrelevant because Plaintiff did not move for summary judgment on this affirmative defense.

 The Golias Defendants' second affirmative defense of advice of counsel fails too.  To establish an advice of counsel defense, a party must establish that *they*: (1) fully disclosed all pertinent facts to a lawyer; and (2) relied, in good faith, on the lawyer's advice.  *See United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 381 (4th Cir. 2015) (quoting *United States v. Butler*, 211 F.3d 826, 833 (4th Cir. 2000)).  The Golias Defendants admittedly never sought advice from counsel about revocation of the S-election.  And, they concede they "are not asserting an 'advice of counsel' defense with respect to the revocation of HDL's S-election on their own behalf."  Golias Opp. at 66.  So, this advice of counsel defense fails.

Likewise, the Golias Defendants' admitted failure to produce privileged communications with their own attorneys regarding revocation of HDL's S-election also means their advice of counsel defense fails as a matter of law.  That is because, once an advice of counsel defense is asserted, a party may not then shield relevant communications under the guise of privilege.  *See Sedillos v. Bd. of Educ.*, 313 F. Supp. 2d 1091, 1093 (D. Colo. 2004) (defendant cannot claim reliance on advice of counsel while "prevent[ing] the plaintiffs from exploring fully the substance and circumstances of that advice").

Here, they admit that their "privilege log reflects that Bartlett was 'seeking legal advice'" regarding revocation of the S-election.  Golias Opp. at 66.  Their failure to produce this

communication precludes assertion of an advice of counsel defense.  Knowing they cannot assert

an advice of counsel defense for themselves, defendants instead argue that they may nonetheless

*benefit from* advice of counsel given to two former HDL directors who are no longer defendants

in this case.  In other words, they are attempting to assert for themselves an affirmative defense

available only to two former defendants.  But, they cite no authority to support their argument for

such a novel application of the advice of counsel defense.

In sum, Defendants' concessions that they did not receive advice of counsel from HDL's

attorneys, and did not produce privileged communications with their own attorneys, mandate

judgment in favor of Plaintiff on the second affirmative defense of advice of counsel.

**VII.    Plaintiff is Entitled to Summary Judgment on the BlueWave and Golias Defendants' Purported Voluntary Payment Affirmative Defense.**

**A.    Defendants Forfeited the Voluntary Payment Doctrine.**

A party must "affirmatively state any avoidance or affirmative defense" in its responsive

pleading.  Fed. R. Civ. P. 8(c)(1).  If a party amends its pleading, an amended pleading replaces

and supersedes all earlier pleadings unless it expressly incorporates the prior pleading.  *Brinkley*

*v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999) ("[I]t is indisputably the general

rule that a party's failure to raise an affirmative defense in the appropriate pleading results in

waiver. . . ."); *Marquez v. Wilshire Credit Corp.*, 2008 WL 11464717, *8 (S.D. Tex. 2008)

(rejecting affirmative defense pled in an original answer but omitted from subsequent answers).

Omitting a defense from the operative answer is properly considered a forfeiture.  *Wood v.*

*Milyard*, 566 U.S. 463, 470 n.4 (2012).  Because it is done knowingly, it is also a deemed a

waiver.  *Id.*

52

The voluntary payment doctrine ("**Doctrine**") is an affirmative defense.  *Bova v. Cox Commc'ns, Inc.*, 2002 WL 389264, *3 (W.D. Va. 2002).  The BlueWave Defendants voluntarily withdrew the answer that raised the Doctrine,[29] and now raise it for the first time since withdrawing it.  BW Opp. at 42-44, 60-61. Thus, they waived and forfeited it.  The Golias Defendants never raised it, and now raise it for the first time.  Golias Opp. at 38-40.  They too forfeited the Doctrine.

The BlueWave Defendants try to avoid this rule by citing Federal Rule of Civil Procedure 15(b)(1), which provides that "If, *at trial, a party objects that evidence* is not within the issues raised in the pleadings, the court may permit the pleadings to be amended."  BW Opp. at 60-61 (emphasis added).  However, here, Plaintiff is not objecting to evidence.  He is moving for summary judgment on the affirmative defense.  LT MSJ at 68-69.  *See Myers v. Moore*, 326 F.R.D. 50, 60 n.6 (S.D.N.Y. 2018) ("Even assuming that Rule 15(b)(1) applies at summary judgment, it has no application here, because Defendants object to litigating an insufficiently pled claim, not to the admission of evidence.").  Hence, Rule 15(b)(1) does not protect it.[30]

---

[29] The Bluewave Defendants asserted the Doctrine as an affirmative defense in their Second Amended Answer (Dkt. No. 640 at 32), but later withdrew that answer. Dkt. No. 648.  The operative Answer does not assert the Doctrine.  Dkt. No. 562; LT MSJ at 68-69.

[30] The Bluewave Defendants admit they are not asserting the Doctrine on their own behalf.  BW Opp. at 60.  They want to preserve their right to do so at trial, but cite no evidence to prove they could actually do that.  *Id.* at 61.

**B.      The Doctrine Does not Defeat the Fraudulent Conveyance Claims.**

The BlueWave and Golias Defendants argue that they can rely on HDL's voluntary

payment doctrine to defeat the fraudulent conveyance claims.  BW Opp. at 48-49; Golias Opp. at

38-39.  They are mistaken.

*First*, courts do not apply the Doctrine to defeat bankruptcy claims under 11 U.S.C.

§§ 544, 547, or 548.  *In re Racing Servs., Inc.,* 482 B.R. 276, 294-95 (Bankr. D.N.D. 2012),

*rev'd and remanded on other grounds*, 504 B.R. 549 (D.N.D. 2014), *aff'd*, 779 F.3d 498 (8th Cir.

2015) (Doctrine does not apply to bar recovery).

*Second*, the Doctrine does not apply if the payor lacked "full knowledge of the relevant

facts."  *E.g.*, *Jackson v. U.S. Bank, N.A.*, 44 F. Supp. 3d 1210, 1217 (S.D. Fla. 2014) ("For the

doctrine to apply, U.S. Bank would have to show that Plaintiffs had full knowledge of the

allegedly undisclosed kickbacks and other wrongful conduct alleged."); *Allstate Ins. Co. v. Utica*

*Physical Therapy, Inc.*, 2018 WL 3037885, *7 (E.D. Mich. 2018) ("Given the nature of the

allegedly fraudulent activity, and the extent to which plaintiffs did not, and could not, have had

'full knowledge of all of the circumstances' of the alleged fraudulent scheme at the time each

individual claim was paid, the voluntary payment doctrine is not applicable in this case.")

(citation omitted).

Applied here, it is undisputed that the Insurers did *not* have full knowledge of the Illicit

Scheme in this case.  *E.g.*, LT MSJ at 57 n.40 (citing deposition testimony where insurers testify

they did not know about significant components of the Illicit Scheme); LT SMF, ¶ 250;

Kanowitz Decl., Ex. 8 at 34:16-35:14, 28:11-18, 107:7-110:17, 126:1-127:10, 138:11-152:12,

386:2-6; Ex. 27 at 31:19-36:1, 94:7-101:17; Ex. 20 at 36:3-7, 58:5-25, 78:3-79:7, 89:6-90:2,

124:7-11.  Defendants cite no evidence that the insurers knew of all the wrongful conduct involved in the Illicit Scheme.  Therefore, the Court should grant summary judgment on the voluntary payment doctrine affirmative defense.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests the Court enter an order granting the relief requested in the LT MSJ and entering such other and further relief as may be just and proper.[31]

Dated: April 17, 2020

/s/ *Cullen D. Speckhart*
Cullen D. Speckhart (VSB No. 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; not admitted to practice in DC; supervised by members of DC bar*
Michael J. Klisch (VSB No. 32074)
**COOLEY LLP**
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 842-7800
Direct: (202) 776-2052
Email: cspeckhart@cooley.com
Email: mklisch@cooley.com

Richard S. Kanowitz (admitted pro hac vice)
**COOLEY LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: rkanowitz@cooley.com

*Counsel to Plaintiff Richard Arrowsmith, Liquidating Trustee of the HDL Liquidating Trust*

222739446

---

[31] The Carnaggio Defendants argue that this Court must issue proposed findings of fact and conclusions of law pursuant to the MWR Order.  *See* Carnaggio Opp. at 15-17.  However, because Plaintiff seeks only partial summary judgment, this Court need not decide what issues, if any are core/non-core or *Stern* claims.  *See* LT MSJ at 71 n.48.